### BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

|                                                              |     |                            |
| ------------------------------------------------------------ | --- | -------------------------- |
|                                                              | )   |                            |
| IN RE: INVOKANA (CANAGLIFLOZIN)                              | )   |                            |
| PRODUCTS LIABILITY LITIGATION                                | )   | **MDL Docket No.: 2750**   |
|                                                              | )   |                            |

### RESPONSE OF PLAINTIFFS MARIA PUENTE, CARLOS PUENTE, ELIZABETH SANDERS, ARSHAK SARKISYAN AND AMALYA BAGDASARYAN TO THE MOTION FOR TRANSFER AND COORDINATION OF ACTIONS TO A SINGLE DISTRICT FOR CONSOLIDATED AND COORDINATED PRE-TRIAL PROCEEDINGS PURSUANT TO 28 U.S.C. § 1407

## I.     PRELIMINARY STATEMENT

Plaintiffs Maria Puente, Carlos Puente, Elizabeth Sanders, Arshak Sarkisyan and Amalya Bagdasaryan ("collectively, Plaintiffs") submit this Response to the motion by Seeger Weiss LLP (hereinafter referred to as the "Seeger Weiss Motion") who has moved for consolidated and coordinated pre-trial procedure under 28 U.S.C. § 1407.

Your undersigned's law firm represents the afore-named five Plaintiffs who have cases pending in the United States District Court for the District of New Jersey, Trenton Division, who are seeking recovery against Defendants Janssen Pharmaceuticals, Inc. ("Janssen"), Johnson and Johnson Co. ("J&J"), and Mitsubishi Tanabe Pharma Corp. ("Mitsubishi")(collectively "Defendants") for personal injuries caused by their defective prescription drugs, Invokana and/or Invokamet, which they designed, manufactured, labeled, marketed, distributed, sold and introduced into the stream of commerce.  (Attached hereto as Exhibit A is the schedule of their actions).

For the reasons set forth herein, Plaintiffs support the Seeger Weiss Motion and agree that centralization of all Invokana and Invokamet actions pursuant to 28 U.S.C. § 1407 is warranted.   Indeed, an MDL would be the most efficient and most appropriate course of action for the Panel because it would: (1) promote the just and efficient conduct of these actions; (2)

prevent inconsistent pretrial rulings and duplicative discovery; and (3) conserve the resources of the judiciary, the parties and their counsel.

Additionally, Plaintiffs agree with the position set forth in the Seeger Weiss Motion that the most appropriate venue for this litigation is the United States District Court for the District of New Jersey, Trenton Division, before the Honorable Judge Brian R. Martinotti.   Specifically: (1) the District of New Jersey is a convenient and accessible venue; (2) two of the three Defendants maintain their principal places of business in New Jersey and, as such, key witnesses and documents will be found in New Jersey, (3) there are currently 46 Invokana actions pending in the District of New Jersey that have all been consolidated and assigned to Judge Martinotti; (4) the New Jersey Invokana consolidated litigation is further advanced than any other Invokana actions that have been filed in other venues; and (5) Judge Martinotti is an exceptional jurist with significant mass tort products liability experience, especially in the pharmaceutical drug context.

As an alternative, the United States District Court for the Southern District of Illinois, before the Honorable Judge Stacie M. Yandle, would be an appropriate venue given the volume of cases currently before her and the fact that she has entered some preliminary orders in the cases assigned to her.

## II.      FACTUAL CLAIMS ABOUT INVOKANA AND INVOKAMET

Invokana is a prescription diabetes drug developed by Defendant Mitsubishi and marketed and sold by Defendant J&J and its subsidiary Defendant Janssen.   In or about March 2013, the United States Food and Drug Administration ("FDA") approved Invokana for use in adults to treat type 2 diabetes mellitus.[1]

---

[1] The generic name of Invokana is canagliflozin, but currently the generic drug is not offered on the market.

Invokana belongs to a class of drugs known as sodium-glucose co-transporter 2 ("SGLT2") inhibitors.  SGLT2 inhibitors are designed to lower blood sugar by causing the body to discharge some glucose via the urinary tract that would otherwise be reabsorbed into the bloodstream.   Defendants' Invokana was the first of several SGLT2 inhibitors to be approved in the United States.

Following Invokana's approval by the FDA in March 2013, Defendants then sought approval from the FDA to market and sell a new, related pharmaceutical drug to treat diabetes. Particularly, this new drug, Invokamet, combines Invokana with another FDA approved diabetes drug, metformin.   In or about August 2014, the FDA granted its approval for Invokamet to be marketed and sold as a treatment for adults with type 2 diabetes mellitus.     Thereafter, Defendants sought approval for an extended release version of Invokamet – Invokamet XR – and said approval was granted by the FDA in or about September 2016.

Ever since Invokana's approval in 2013, serious and significant adverse events, such as kidney disease, ketoacidosis, bone injuries, stroke, thromboembolic events, cardiac events and bodily amputations, have been reported causing significant controversy over the safety of the drug.  Evidence against the medication's safety continues to mount today:

- <u>Ketoacidosis</u> – In May 2015, the FDA released a safety announcement stating that Invokana and Invokamet can cause ketoacidosis, a life-threatening condition in which the body overproduces blood acids called ketones.  Six months later, in December 2015, the FDA ordered Defendants to revise their labels to include warnings regarding ketoacidosis and severe urinary tract infections.

- <u>Bone fracture</u> – In September 2015, the FDA released a safety communication advising the public that it was strengthening the warning for Invokana and Invokamet because of the increased risk of bone fractures and adding new information about decreased bone mineral density.   The FDA took such action because results of several clinical trials has revealed that fractures occur more frequently with these drugs than they did with placebo, an inactive treatment.

- <u>Acute kidney injury</u> – In October 2015, Health Canada – Canada's drug regulatory authority – announced that a safety review it had performed of Invokana and another SGLT2 inhibitor had revealed that the evidence supported the existence of a causal link between the drugs and the risk of acute kidney injury.   Less than a year later, in June 2016, the FDA issued a safety announcement advising the public that they had ordered the Defendants to strengthen the existing warning about the risk of acute kidney injury with Invokana and Invokamet.   In its safety alert, the FDA announced that from March 2013, when Invokana was first approved in the United States, to October 2015, the FDA had "received reports of 101 confirmable cases of acute kidney injury, some requiring hospitalization and dialysis," with the use of Invokana, Invokamet and another SGLT2 inhibitor.   The FDA acknowledged that this number only represented numbers reported to the FDA and that there were likely additional cases about which it was unaware.

- <u>Leg and foot amputations</u> – In May 2016, the FDA issued another safety alert notifying the public that interim safety results relating to an ongoing clinical trial relating to Invokana and Invokamet had revealed an increase in leg and foot amputations, mostly affecting the toes.    The amputations had occurred about twice as often in patients treated with these drugs as opposed to those receiving placebo, an inactive treatment.

- <u>Stroke, thromboembolic events and cardiac events</u> – As of February 2016, the FDA is evaluating the need for regulatory action regarding stroke and thromboembolic events relating to Invokana use. Postmarketing studies regarding stroke, thromboembolic events and cardiac events relating to Invokana use are ongoing.

It is increasingly clear that Defendants have neglected to provide sufficient warning of the adverse events associated with Invokana and Invokamet. Furthermore, Defendants' marketing of these drugs as a safe and effective medication to treat and/or manage diabetes is highly irresponsible and misrepresentative given the vast number of other, less dangerous diabetes medications on the market.

Defendants' failure to adequately warn of the potential dangers associated with Invokana and Invokamet has prevented the medical community and the general public from making informed decisions about prescribing and using these medications. Millions of individuals have risked and continue to risk adverse events due to their use of Invokana and Invokamet.   Upon information and belief, hundreds, if not thousands, of these individuals have experienced serious

injuries, including but not limited to ketoacidosis, kidney injury, heart attack, stroke, bone fractures and amputations, as a direct and proximate result of ingesting Defendants' Invokana and Invokamet. Many of these injured individuals have filed or will be filing claims against Defendants.

Currently, approximately 70 personal injuries actions have been filed against the Defendants related to Invokana and Invokamet (the "Invokana actions") in at least 19 other United States District Courts throughout the country. It is anticipated that this number will likely increase to the thousands. Given the volume of actions filed and the overlapping nature of the facts and issues involved, consolidation and coordination of all of these actions into one MDL is undoubtedly warranted.

To this end, the District of New Jersey is the most appropriate venue for this MDL, particularly because: (1) the District of New Jersey is a convenient and accessible venue for this litigation; (2) two of the three Defendants have their principal place of business in New Jersey; (3) there are 46 actions pending in the District of New Jersey that have all been consolidated before and assigned to Judge Brian R. Martinotti; (4) these actions in the District of New Jersey have advanced further than any other actions pending in other venues; and (5) Judge Martinotti appears to be an interested jurist with exceptional experience to preside over this MDL. Alternatively, the Southern District of Illinois is a viable alternative venue option.

### III.    ARGUMENT

**A.    MULTIDISTRICT CONSOLIDATION IS APPROPRIATE FOR THESE CASES**

Under 28 U.S.C. § 1407, the multidistrict litigation Panel *may* consolidate numerous cases if the moving party sufficiently demonstrates that (1) the lawsuits contain common questions of fact, (2) consolidation would best serve the convenience of the parties and witnesses, and (3) consolidation promotes just and efficient conduct of such actions. *See* 28 U.S.C. § 1407.

Plaintiffs herein submit that these factors have been demonstrated, and, thus, centralization and coordination of pretrial proceedings against the Defendants is warranted.

First, each of the related Invokana actions against the Defendants allege highly similar, if not virtually identical, causes of action and contain allegations about Invokana and/or Invokamet and the propensity of these drugs to cause serious adverse events, including but not limited to ketoacidosis, kidney injury, heart attack, stroke, bone fractures and amputations.  These actions are based upon the same or substantially similar underlying facts: (1) Invokana and/or Invokamet can cause ketoacidosis, kidney injury, heart attack, stroke, bone fractures and amputations; (2) the Defendants unlawfully designed, researched, manufactured, tested, marketed, advertised, promoted and/or sold Invokana and/or Invokamet that caused the alleged injuries; and (3) all plaintiffs suffered grave injuries as a result of the Defendants' Invokana and/or Invokamet.

In response to these common allegations, Defendants commonly deny that their Invokana and/or Invokamet can cause the alleged injuries and vehemently disagree with the FDA's safety communications and alerts regarding these injuries.  Thus, these actions involve common questions of facts and law that overlap and are common to all plaintiffs and Defendants.

To illustrate, Plaintiffs submit that these related actions will collectively involve common questions against the Defendants, inter alia, in the following topic areas:

- whether Invokana and/or Invokamet poses an increased risk of causing the alleged adverse events over other diabetic medications;

- whether Defendants knew of these increased risks and/or side effects;

- whether Defendants suppressed, concealed, misrepresented, and/or mischaracterized the known health risks relating to Invokana and/or Invokamet;

- whether Defendants failed to timely and fully disclose the results of the tests and studies on the adverse effects and risks of Invokana and/or Invokamet;

- whether Defendants failed to adequately and appropriately test the safety and efficacy of Invokana and/or Invokamet prior to marketing and making representations about Invokana and/or Invokamet;

- whether Defendants failed to disseminate adequate warnings which would have disclosed the nature and extent of the side effects of Invokana and/or Invokamet;

- whether Defendants failed to provide adequate instructions regarding safety precautions to be observed by users and/or handlers of Invokana and/or Invokamet;

- whether Defendants failed to disclose that adequate and/or standard and/or generally accepted standards for post-marketing testing of Invokana and/or Invokamet had not been done;

- whether Defendants negligently advertised and/or recommended the use of Invokana and/or Invokamet without sufficient knowledge of its dangerous side effects;

- whether Defendants negligently represented that Invokana and/or Invokamet were as safe as other oral diabetic mediations;

- whether Defendants concealed information from the FDA regarding the safety profile of Invokana and/or Invokamet;

- whether there is available scientific data to support a causal link between Invokana and/or Invokamet and the alleged adverse events; and

- what warnings should the Defendants have included on their labels to advise plaintiffs and/or their treating healthcare physicians of the safety risks associated with their Invokana and/or Invokamet.

Second, consolidation before one MDL court would prevent inconsistent judicial rulings, would eliminate duplicative discovery, would be more convenient to the parties, witnesses and their counsel, and would conserve the resources of the judiciary, the parties and their counsel. Indeed, because the actions alleging injuries as a result of Invokana and/or Invokamet are based upon substantially similar allegations, the parties will likely address similar issues in discovery, and in some cases identical issues, especially those involving the FDA's Safety Communications and the available scientific data upon which they relied. *See In re Actos Prods. Liab. Litig.*, 840 F. Supp. 2d 1356 (J.P.M.L. 2011)(granting consolidation of claims involving a pharmaceutical drug promoted to treat type 2 diabetes where: (1) the actions involved common questions of fact regarding whether the drug could cause cancer and whether defendants concealed their knowledge of the risk and failed to provide adequate warnings; and (2) centralization would eliminate duplicative discovery, prevent inconsistent pretrial rulings na dconserve the rouces of the parties, their counsel and the judiciary); *see also In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, 65 F/Supp.3d 1402 (J.P.M.L. 2014)(granting consolidation where issues concerning the development, manufacture, regulatory approval, labeling and marketing of the pharmaceutical drug were common to all actions and centralization would eliminate duplicative discovery, prevent inconsistent pretrial ruling and conserve the resources of the parties, their counsel and the judiciary.)

Lastly, the need for centralization is evidenced by the fact that there are already approximately 70 related Invokana actions on file in at least 19 district courts around the country that will ultimately result in separate scheduling orders should a MDL not be created.   It would be inefficient and uneconomical to have any sort of informal coordination of these separate proceedings that are pending in different district courts, before different judges, and/or on

different scheduling tracks, in large part because of the sheer number of cases at issue.  *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.*, 997 F. Supp. 2d 1354, 1356 (J.P.M.L. 2014)(granting centralization after previously denying centralization noting that the number of involved actions, districts and judges had grown considerably to over 226 actions, 40 districts and 100 judges such that it would be highly difficult, if not impossible, to coordinate effectively on an informal basis); *see also In re Xarelto*, 65 F. Supp. 3d at 1404 (rejecting informal coordination argument finding that "the considerable growth in the litigation over the past few months" which included 51 actions pending in 22 districts demonstrated that informal coordination would not be practicable or effective); *In re Fluoroquinolone Prods. Liab. Litig.*, 122 F. Supp. 3d 1378, 1379-1380 (J.P.M.L. 2015)(rejecting a defendants argument that informal coordination was superior to consolidation pursuant to 28 U.S.C. § 1407 noting that there were already 78 actions pending in 38 districts and, even if additional actions were not filed, the number of actions pending, involved districts and involved counsel warranted centralization).

Here, it is estimated that there will likely be hundreds, if not thousands, of Invokana actions filed throughout the country.   MDL centralization of such related actions was instituted precisely for the purpose of avoiding such issues, and in order to promote efficiency and significant financial savings, all of which would surely result if these actions are not consolidated.   Thus, for the sake of economy and efficiency, coordination of all actions is clearly warranted.

**B.**     **THE MOST APPROPRIATE VENUE FOR THIS LITIGATION IS THE DISTRICT OF NEW JERSEY OR, ALTERNATIVELY, THE SOUTHERN DISTRICT OF ILLINOIS**

Assuming centralization is appropriate – which we submit that it is – the question presented then becomes one of determining the proper venue for transfer of these cases.   To this end, Plaintiffs submit that the most appropriate venue for this litigation is the District of New Jersey over any other forum.  Alternatively, the United States District Court for the Southern District of Illinois will serve as an appropriate forum.

**1.**     **The United States District Court for the District of New Jersey is a Proper Transferee Court and Venue**

Plaintiffs herein support the Seeger Weiss motion and respectfully submit that the District of New Jersey, Trenton Division, before the Honorable Brian R. Martinotti, the judge already assigned to the 46 Invokana actions pending there, is the most appropriate forum for this MDL.

**i)**     **Defendants Have Already Agreed to Transfer at Least One Out-of-State Invokana Action to the District of New Jersey on the Basis that Said Transfer Would Serve the Convenience of the Parties and Witnesses**

Defendants' actions to date support that they do not oppose the District of New Jersey, Trenton Division, before the Honorable Brian R. Martinotti.  Specifically, Plaintiff Elizabeth Sanders' case was originally filed in the United States District Court for the Eastern District of New York.   However, after discussions among counsel, the parties jointly moved to transfer the action pursuant to 28 U.S.C. § 1406(a) to the District of New Jersey because such a transfer would serve the convenience of the parties and witnesses, especially the Defendants, because many of their key witnesses and documents are located in New Jersey, and plaintiff had no objection.   (Attached hereto as Exhibit B is a copy of said consent motion and the Court's Order.) The Court ordered the transfer and Plaintiff Sander's case is now before Judge Martinotti in

Trenton.   Accordingly, this factor favors the District of New Jersey as a convenient forum for this MDL.

### ii)      Defendants Have a Long Standing History of Supporting the District of New Jersey

Defendants, in particular J&J, have repeatedly taken the position that the District of New Jersey is an easily accessible and convenient location for MDLs, especially for them since their principal places of business are located in New Jersey.   To illustrate, in *In Re Xarelto Products Marketing and Sales Practice Litigation* (MDL-2592)*,* Defendants J&J and Jansen advocated for centralization in the District of New Jersey and argued that:

(1)      the District of New Jersey was better suited to meet the goals of ***any*** MDL proceeding, over the venues advocated by the plaintiffs;

(2)      the District of New Jersey was a convenient location that had sufficient available resources to handle an MDL proceeding;

(3)      the District of New Jersey should be considered a strong candidate for transfer since Defendants had their principal places of business located there and, thus, the District of New Jersey offered a distinct advantage of proximity to many witnesses and documents;

(4)      the District of New Jersey is located in a major metropolitan area that can accommodate counsel and courthouses; and

(5)      the relative congestion of the District of New Jersey's docket weighed in favor of transfer to the District of New Jersey.

(Attached hereto as Exhibit C is a copy of said Response Memorandum.)   Likewise, Defendant J&J has consistently advocated for the District of New Jersey in prior mass tort MDLs.  *See e.g. In Re DePuy Orthopaedics, Inc. ASR Hip Implant Products Liability Litigation*, MDL No. 2197 [Doc 8]; *In Re Ethicon, Inc. Women's Pelvic Repair Products Liability Litigation*, MDL No. 2327 [Doc. 42-1]; *In Re Johnson & Johnson "Baby Powder" and "Shower to Shower" Marketing, Sales Practices and Products Liability Litigation*, MDL No. 2738 [Doc. 38]; *In Re*

*Levaquin Products Liability Litigation*, MDL No. 1943 [Doc. 4]; ]; *In Re Propulsid Products Liability Litigation*, MDL No. 1355 [Doc. 4]; and *In re Panacryl Sutures Products Liability Litigation*, MDL No. 1959 [Doc. 5].

While we recognize that positions change and neither the Defendants nor their counsel are bound to the position they advocated in the aforementioned MDL's (clearly the litigations are different, although many of them involve pharmaceuticals and/or medical devices regulated by the FDA), centralization of this MDL to the District of New Jersey is as appropriate now as it was then – perhaps more so given the unique experience of Judge Brian Martinotti, the advanced posture of the cases before him, and the volume of cases already filed in the District of New Jersey (discussed *infra*).

### iii)     The District of New Jersey Currently has 46 Actions Pending

Currently, 46 actions have been filed in the District of New Jersey, and they all have been assigned to one judge, Judge Martinotti.  This factor lends support to the District of New Jersey as an appropriate venue for this MDL. *See In re Fosamax (Alendronate Sodium) Prods. Liab. Litig. (No. II)*, 787 F. Supp. 2d 1355 (J.P.M.L. 2011) (transferring to the District of New Jersey noting that nearly 2/3 of the pending actions were already there before a single judge); *see also In Re DePuy Orthopaedics, Inc.*, 753 F.Supp.2d 1378, 1380 (J.P.M.L. 2010)(transferring to the Northern District of Ohio because, among other things, several potential tag-along actions were already pending there).

### iv)     Judge Martinotti has the Expertise to Oversee this MDL and Appears Interested in So Doing

Upon information and belief, the Panel looks to interested, experienced jurists to ensure that any given MDL will be managed in an efficient manner that is beneficial to all parties and witnesses involved.  To this end, Judge Martinotti is an experienced mass tort jurist who appears

interested in "steering this MDL on a prudent course," – a proposition expressed by the Panel in prior Orders.  *See In re DePuy Orthopaedics, Inc.*, 753 F.Supp. 2d 1378 (J.P.M.L. 2010); *In re Mirena IUD Prods. Liab. Litig.*, 938 F.Supp.2d 1355 (J.P.M.L. 2013); *In re Vigara (Sildenafil Citrate) Prods. Liab. Litig.*, 2016 LEXIS 47256 (J.P.M.L. 2016).

As this Panel may be aware, prior to being appointed to the federal bench in 2016, Judge Martinotti served as a judge of the Superior Court of New Jersey, and in August 2009 he was appointed one of only three judges in New Jersey to oversee mass tort cases.   In holding this position for almost six years, Judge Martinotti managed numerous mass tort litigations, many of which involved pharmaceutical drugs and medical devices regulated by the FDA.  *In Re Zelnorm Litigation* (Case No. 280)*; In Re Stryker Trident Hip Implant Litigation* (Case No. 285)*; In Re Yaz, Yasmin, Ocella Litigation* (Case No. 287)*; In Re Pelvic Mesh/Gynecare Litigation* (Case No. 291)*; In Re DePuy ASR Hip Implant Litigation* (Case No. 293)*; In Re Stryker Rejuvenate and ABG II Hip Modular Stem Litigation* (Case No. 296)*; and In Re Mirena Litigation* (Case No. 297).

It also appears that Judge Martinotti is interested in managing and overseeing this litigation.  This interest is evidenced by the fact that, regarding his 46 assigned Invokana actions:

> (1) he has held two in-person status conferences, one on August 29, 2016 and one on October 5, 2016 and has scheduled a third for November 15, 2016;
>
> (2) he has already issued two Case Management Orders, one on August 30, 2016 and the other on October 5, 2016, that direct counsel for the parties to meet regarding preliminary procedural orders, such as short-form complaints, short-form answers, plaintiff fact sheets and defendant fact sheets;
>
> (3) he has appointed interim liaison counsel;
>
> (4) he has successfully had the parties agree that all motions to dismiss would be administratively terminated without prejudice; and

> (5) it is likely that he will be entering other foundational Case Management Orders in the very near future, including a uniform Confidentiality Order to govern the production of confidential information that is being produced.

The work in this case, which neither Defendants nor Plaintiffs have sought to stay, evinces an able, competent, and interested jurist, who we respectfully submit, should be permitted to continue to oversee this litigation as a MDL.

In sum, Judge Martinotti clearly has exceptional experience overseeing mass tort litigations, and given his judicial leadership in the Invokana actions pending before him, it strongly appears that he is an interested jurist.

**v)**     **The District of New Jersey is a Convenient and Easily Accessibly <u>Venue</u>**

In the past, this Panel has shown preference for consolidation in the district which is most convenient for the parties and witnesses.  Given that two of the three Defendants maintain their principal places of business in New Jersey, and, therefore, a majority of documents and witnesses that will be produced in this litigation will be found in New Jersey, centralization in the District of New Jersey, Trenton Division, is clearly not unduly burdensome.  *In re Plavix Mktg., Sales Practice & Prods. Liability Litig.*, 923 F. Supp. 2d 1376 (J.P.M.L. 2013)(transferring MDL to District of New Jersey, Trenton Division where certain defendants had headquarters in New Jersey and Defendants had represented that a majority of the conduct complained of occurred in New Jersey); *In re* Fosamax, 787 F. Supp. 2d 1355 (transferring MDL to District of New Jersey, Trenton Division where the headquarters, witnesses and documents of the common defendant were located in New Jersey and nearly 2/3 of the pending actions were already there before a single judge); *In re Lipitor Antitrust Litig.*, 856 F. Supp. 2d 1355 (J.P.M.L. 2012)(transferring MDL to District of New Jersey, Trenton Division where one defendant

14

maintained corporate headquarters in New Jersey and another defendant's principal place of business in New York was convenient to Trenton).    Indeed, this is the primary reason why Defendants J&J and Janssen in past MDLs have advocated for the District of New Jersey over any other forum.

Additionally, the District of New Jersey is extremely convenient for the parties, witnesses and their counsel as it is easily accessible from anywhere in the United States. Trenton is located just 36 miles from Philadelphia, Pennsylvania and is easily accessible by train or car.   In this regard, Philadelphia International Airport offers multiple non-stop and one-stop flights.    Further, Trenton is within a reasonable traveling distance from one of the country's largest airports, Newark Liberty International Airport, which also offers multiple non-stop and one-stop flights.  Similarly, Trenton is within a reasonable traveling and/or commuting distance from other regional and international airports, including the airports in Atlantic City and New York.

Accordingly, travel to the District of New Jersey will conserve the resources of the parties and witnesses, particularly those of the Defendants, when compared with other venues that have been proposed.

### vi)    The Respective Caseload and History of Speedy and Effective Resolution Favors the District of New Jersey

The District of New Jersey would also be an efficient location for these cases.  The District of New Jersey currently has eighteen MDLs before it; however, none of these MDLs are assigned to Judge Martinotti.   As such, Judge Martinotti has the time to devote to an MDL and, as discussed in detail above, the experience to do so.   Thus, he would undoubtedly be a strong candidate to oversee this litigation.

According to judicial statistics, each District of New Jersey judge had approximately 522 civil filings for the 12 month period ending on June 30, 2016.   Nonetheless, the average length of time from filing to disposition was an extremely efficient 8.0 months, and 47.8 months to see a case through trial.  Given the efficiency of the District of New Jersey, it would serve as a very appropriate transferee forum.

**2.      The United States District Court for the Southern District of Illinois is also an Appropriate Venue for These Cases**

Should the Panel be inclined to send this litigation to a District other than the District of New Jersey, Plaintiffs herein support the Southern District of Illinois before the Honorable Stacie M. Yandle, as an appropriate venue and jurist.      While it appears that only four actions have thus far been filed there, these four actions involve the claims of over 110 plaintiffs.   As such, the volume of individual claims filed there alone supports that it is a viable venue for centralization.

**i)      The Southern District of Illinois is Also Convenient for All Parties and Witnesses**

The Southern District of Illinois is a readily accessible and geographically central locale for this MDL and will provide convenient travel for attorneys and parties from across the country.  The courthouse itself is in close proximity to Lambert–St. Louis International Airport (which is only 15.4 miles away and, per Google maps, approximately 23 minutes from the courthouse) and is, thus, a very convenient location for witnesses and parties to convene. Furthermore, there are a multitude of local hotels ranging from a Four Seasons, Westin, Hyatt, Sheraton, two Hiltons, multiple Drury Inns, and many more available options, all centrally located in downtown St. Louis, which is just over the river and only minutes from the District Courthouse for the Southern District of Illinois. Therefore, in the interest of time, convenience,

and economy, Plaintiffs submit that the Southern District of Illinois is undeniably one of the most appropriate forums in which these actions should be coordinated and centralized.

<strong>ii)       The Southern District of Illinois Has MDL Experience</strong>

The Southern District of Illinois appears to be currently assigned only two MDL's, namely the *Yasmin/Yaz* litigation (MDL-2100) and the *Pradaxa* litigation (MDL-2385), and your undersign can attest, as the court-appointed co-lead counsel in both of those MDLs, that they have are both over 99% concluded.   Thus, the docket of the Southern District of Illinois should not be overburdened by MDLs and is ready to take another.

Further, neither of the aforementioned MDL's are assigned to Judge Yandle.   Thus, it would appear she has the time to devote to an MDL.   While admittedly Judge Yandle has never before overseen an MDL, she is a more than capable jurist who, if needed, can seek the advice of her colleague – Judge David R. Herndon –  who was the judge assigned to both the *Yasmin/Yaz* and the *Pradaxa* litigations and who was instrumental in guiding these litigations to their ultimate resolution.

<strong>iii)      The Respective Caseload and History of Speedy and Effective<br>Resolution Favors The Southern District of Illinois</strong>

According to judicial statists, each Southern District of Illinois judge had approximately 366 civil filings for the 12 month period ending on June 30, 2016.   Nonetheless, the average length of time from filing to seeing a case through trial was an efficient 29.0 months.

Additionally, the aforementioned MDLs were resolved in a speedy and effective manner due in large part due to the ability of the Southern District of Illinois to efficiently manage large complex litigations, such as this one.

To be specific, MDL-2100 – the *Yasmin/Yaz* litigation was one of the largest mass tort MDLs in history, proven simply by the voluminous discovery statistics.   The extremely brief

17

time-frame for accomplishing the progress is by far one of the most astounding aspects of that fast-paced litigation:  virtually the entire discovery process was accomplished in just under 27 months from the Panel's Transfer Order dated October 1, 2009, to the announcement of the resolution process with the issuance of CMO 53, dated December 31, 2011.  Further, just over two years passed from the Court's first *Yasmin/Yaz* status conference on November 19, 2009 to CMO 53.

Regarding the *Pradaxa* litigation, in addition to the production of over 70 million pages of documents, 48 defense corporate witness depositions took place both in the U.S. and abroad, all within less than two years. In addition to, and simultaneously with, general liability discovery, case-specific plaintiff discovery also took place, which included 84 depositions of plaintiffs and their spouses, their treating/prescribing doctors, and sales representatives.   Like with the *Yasmin/Yaz* litigation, this entire discovery process ran on an expedited schedule:  not even two years passed between the Panel's Transfer Order on August 8, 2012 creating the *Pradaxa* MDL and the announcement of the parties agreeing to the *Pradaxa* global settlement on May 28, 2014.

Accordingly, judicial statistics as well as the speedy yet efficient resolution of the two prior MDLs assigned to the Southern District of Illinois support that the Southern District of Illinois is a suitable alternative venue.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs herein respectfully request that the Panel grant the Seeger Weiss Motion for consolidation and centralization via a multidistrict litigation to the United States District Court for the District of New Jersey, Trenton Division, or in the alternative, the United States District Court for the Southern District of Illinois; and grant such other and further relief as it may deem just and appropriate under the circumstances.

Dated: New York, New York
      October 12, 2016

By: /s/ Michael A. London<br>
Michael A. London, Esq. (ML-7510)<br>
DOUGLAS & LONDON, P.C.<br>
59 Maiden Lane, 6th Floor<br>
New York, New York 10038<br>
Ph: (212) 566-7500<br>
Fax: (212) 566-7501<br>
<em>Attorneys for Plaintiffs</em>

19