# EXHIBIT 3

Case ALS/1:16-cv-00471   Document 2-3   Filed 10/24/16   Page 2 of 63

**SUMMONS** ON FOURTH AMENDED
*(CITACION JUDICIAL)* COMPLAINT

FOR COURT USE ONLY
*(SOLO PARA USO DE LA COR...)*

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

JAN 0 8 2015

Sherri R. Carter, Executive Officer/Clerk
By: Kandece Bennett, Deputy

56595383
Jan 13 2015
09:45AM
E-SERVICE
File & ServeXpress

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

AMYLIN PHARMACEUTICALS, LLC f/k/a AMYLIN
PHARMACEUTICALS, INC. (see Additional Parties Attachment)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

CARLA MALLORY, INDIVIDUALLY, AND AS
SUCCESSOR-IN-INTEREST (see Additional Parties Attachment)

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

CASE NUMBER: *(Número del Caso:)* **JCCP 4574**
(SDSC 37-2014-00024380-CU-PO-CTL)

The name and address of the court is:
*(El nombre y dirección de la corte es:)*

SUPERIOR COURT OF LOS ANGELES - CENTRAL CIVIL WEST
600 S. Commonwealth Avenue, Los Angeles, CA 90005

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
ENGSTROM, LIPSCOMB & LACK 10100 Santa Monica Blvd., 12th Flr., Los Angeles, CA 90067-4113

DATE: JAN 0 8 2015   SHERRI R. CARTER   Clerk, by ____K. Bennett____, Deputy
*(Fecha)* *(Secretario)* *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS** ON FOURTH AMENDED COMPLAINT

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

SUM-200(A)

| SHORT TITLE: Mallory et al. v. Amylin Pharmaceuticals et al. | CASE NUMBER: JCCP 4574 |
|---|---|

### INSTRUCTIONS FOR USE

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

[✓] Plaintiff   [ ] Defendant   [ ] Cross-Complainant   [ ] Cross-Defendant

OF THE ESTATE OF STEPHEN MALLORY, DECEASED; SCOTT INGRAHAM, INDIVIDUALLY, AND AS A CHILD OF STEPHEN MALLORY, DECEASED; ROSARIO SALDANA, INDIVIDUALLY; SANDRA VARSI, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST OF THE ESTATE OF IVANA VARSI, DECEASED; MORDECHIA ZARGER, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST OF THE ESTATE OF REBECCA ZARGER, DECEASED; ILAN A. ZARGER, JOSEPH ZARGER, AND WILLIAM ZARGER, INDIVIDUALLY, AND AS CHILDREN OF REBECCA ZARGER, DECEASED; KAY BRUGGEMAN, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST OF THE ESTATE OF HENRY BRUGGEMAN, DECEASED; GEORGE VOLLMER, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST OF THE ESTATE OF AUDREY VOLLMER, DECEASED; PAUL VOLLMER AND GEORGE A. VOLLMER, INDIVIDUALLY AND AS CHILDREN OF AUDREY VOLLMER, DECEASED; MARY B. CLARK, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST OF THE ESTATE OF EDWARD CLARK, SR., DECEASED; MARY F. WILLIS, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST OF THE ESTATE OF CLAUDE H. WILLIS, III, DECEASED; CLAUDE HAMPTON WILLIS AND DANIEL BENJAMIN WILLIS, INDIVIDUALLYAND AS CHILDREN OF CLAUDE H. WILLIS, III, DECEASED; MATTIE S. ALLEN, INDIVIDUALLY; TERRY BYRD AND RICKY BYRD, INDIVIDUALLY; VIVIAN MARIE SHAMBURGER MITCHELL, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST AND EXECUTRIX OF THE ESTATE OF DOROTHY SHAMBURGER, DECEASED; CAROL SHIMER, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST OF THE ESTATE OF THOMAS SHIMER, III, DECEASED; JOHN J. SHIMER AND THOMAS E. SHIMER, IV, INDIVIDUALLY, AND AS CHILDREN OF THOMAS SHIMER, III, DECEASED; SHELLEY BRIDGES, INDIVIDUALLY AND AS SUCCESSOR-IN-INTERST TO THE ESTATE OF VIOLA CARSON, DECEASED; JEREMY JOHNSON, INDIVIDUALLY, AND AS A CHILD OF VIOLA CARSON, DECEASED; CAROLYN J. KENNEDY, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST OF THE ESTATE OF BOBBY W. KENNEDY, DECEASED; TAMMY CARR, GARY KENNEDY, AND JIMMY PAUL KENNEDY, INDIVIDUALLY, AND AS CHILDREN OF BOBBY W. KENNEDY, DECEASED; RUSSELL PICKERING AND CAROL PICKERING, INDIVIDUALLY; GONZALO RAMOS, JR., INDIVIDUALLY AND AS THE SUCCESSOR-IN-INTEREST OF THE ESTATE OF MARIA E. RAMOS, DECEASED; IRENE CARSON AND LC. CARSON, INDIVIDUALLY; FRANCIS FRAILEY AND DORIS FRAILEY, INDIVIDUALLY; GILBERT E. JONES, JR., INDIVIDUALLY; AND AS THE SUCCESSOR-IN-INTEREST OF THE ESTATE OF PATRICIA L. JONES, DECEASED; TAMI BEERT ARNELL, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST OF THE ESTATE OF CHRISTOPHER ARNELL, DECEASED; NAGHMANA JANJUA, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST OF THE ESTATE OF MOHAMMAD JANJUA, DECEASED; ELLIOTT WAITES, JR., INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST AND AS EXECUTOR OF THE ESTATE OF JOSEPHINE ROBINSON,

Page 1 of 3

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

SUM-200(A)

| SHORT TITLE:<br>Mallory et al v. Amylin Pharmaceuticals et al. | CASE NUMBER:<br>37-2014-00024380-CU-PO-CTL |
|---|---|

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.):*

[✓] Plaintiff   [ ] Defendant   [ ] Cross-Complainant   [ ] Cross-Defendant

(page 2 of 2 of Plaintiffs' Additional Parties attachment)

DECEASED; LYNN MCCREA, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST OF THE ESTATE OF DAVID MCCREA, SR., DECEASED; DAVID EDWARD MCCREA, JR. AND TRAVIS JAMES MCCREA, INDIVIDUALLY, AND AS CHILDREN OF DAVID MCCREA, SR., DECEASED; FLORA LLESHANAKU, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST OF THE ESTATE OF ALPIN LLESHANAKU, DECEASED; ALMA COHEN, INDIVIDUALLY, AND AS CHILD OF ALPIN LLESHANAKU, DECEASED; WILLIAM BENTLEY, SR., INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST OF THE ESTATE OF ELMYRA BENTLEY, DECEASED; WILLIAM BENTLEY JR., INDIVIDUALLY, AND AS A CHILD OF ELMYRA BENTLEY, DECEASED; GERALDINE M. ROMANO, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST OF THE ESTATE OF JOHN A. ROMANO, DECEASED; MELODY RYPSTRA, INDIVIDUALLY, AND AS A CHILD OF JOHN A. ROMANO, DECEASED; PATRICIA A. SHACKELFORD, INDIVIDUALLY, AS SUCCESSOR-IN-INTEREST AND ADMINISTRATOR OF THE ESTATE OF MELVIN L. SHACKELFORD, DECEASED; LAUREEN QUIRK AND TIMOTHY QUIRK, INDIVIDUALLY; JOANNE RIPA, INDIVIDUALLY AND AS SUCCESSOR-IN-INTEREST OF THE ESTATE OF LOUIS N. RIPA, DECEASED; TIMOTHY PRATT AND JACKIE PRATT, INDIVIDUALLY; DANIEL HAMMOND AND SUSAN HAMMOND, INDIVIDUALLY;

Plaintiffs,

Page 2 of 3

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

SUM-200(A)

| SHORT TITLE: Mallory et al v. Amylin Pharmaceuticals et al. | CASE NUMBER: JCCP 4574 |
|---|---|

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.
→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

List additional parties *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff  ☑ Defendant  ☐ Cross-Complainant  ☐ Cross-Defendant

(Page 1 of Defendants' Additional Parties Attachment)

AMYLIN PHARMACEUTICALS, LLC f/k/a AMYLIN PHARMACEUTICALS, INC.; ELI LILLY AND COMPANY; McKESSON CORPORATION; MERCK & CO., INC.; MERCK SHARP & DOHME CORP; MERCK SHARP & DOHME LTD.; MERCK SHARP & DOHME (ITALIA) S.P.A; NOVO NORDISK, INC.; NOVO NORDISK A/S; JAMES FRANCES BRUGGEMAN; AARON MICHAEL BRUGGEMAN; CHRISTOPHER LEE BRUGGEMAN; VICKIE ROSHELLE BYRD; EDWARD CLARK, JR., ASTRIT LLESHANAKU, JOHN RAMONO JR., ANTHONY ROMANO, MATTHEW MALLORY, SHEHARYAR JANJUA, ASFANDYAR JANJUA, CASSANDRA ENLES, AMANDA ARNELL, EUGENE JONES, ANNALISE STINES, KELLY JONES, KIMBERLY JONES, LUANN GRASSO, NICHOLAS RIPA AND DOES 1 THROUGH 200, INCLUSIVE,

Defendants.

Page 3 of 3

Page 1 of 1

**ADDITIONAL PARTIES ATTACHMENT**
Attachment to Summons

1 | WALTER J. LACK, ESQ., SBN 57550
2 | BRIAN D. DEPEW, ESQ., SBN 89339
   | ELIZABETH L. CROOKE, ESQ., SBN 90305
3 | TIMOTHY M. CLARK, ESQ., SBN 284447
   | **ENGSTROM, LIPSCOMB & LACK**
4 | 10100 Santa Monica Blvd., 12th Floor
   | Los Angeles, CA  90067-4113
5 | Tel: (310) 552-3800; Fax: (310) 552-9434
6 | bdepew@elllaw.com
   | bcrooke@elllaw.com
7 | tclark@elllaw.com

8 | MICHAEL K. JOHNSON, MN BAR No. 258696
9 | TIMOTHY J. BECKER, MN BAR No. 256663
   | KENNETH W. PEARSON, MN BAR No. 016088X
10 | PETER C. SNOWDON, MN BAR No. 389642
11 | **JOHNSON BECKER, PLLC**
   | 33 South 6th Street, Suite 4530
12 | Minneapolis, MN 55402
   | Tel:  (612) 436-1800
13 | mjohnson@johnsonbecker.com
14 | tbecker@johnsonbecker.com
   | kpearson@johnsonbecker.com
15 | psnowdon@johnsonbecker.com

16 | *Attorneys for Plaintiffs*

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

JAN 08 2015

Sherri R. Carter, Executive Officer/Clerk
By: Kandece Bennett, Deputy

17 |
18 | ### SUPERIOR COURT OF STATE OF CALIFORNIA
19 | ### COUNTY OF LOS ANGELES, CENTRAL CIVIL WEST

| | |
|---|---|
| 20 COORDINATION PROCEEDING SPECIAL TITLE (rule 3.550) | Case No. JCCP 4574 |
| 21 | The Hon. William F. Highberger |
| 22 BYETTA CASES | Dept. 322 |
| 23 This Document Relates To: | [SDSC Case No. 37-2014-00024380-CU-PO-CTL] |
| 24 CARLA MALLORY, INDIVIDUALLY AND AS | |
| 25 SUCCESSOR-IN-INTEREST OF THE ESTATE OF STEPHEN MALLORY, DECEASED; | **FOURTH AMENDED COMPLAINT FOR DAMAGES FOR PERSONAL INJURIES AND WRONGFUL DEATH** |
| 26 SCOTT INGRAHAM, INDIVIDUALLY, AND AS A CHILD OF STEPHEN MALLORY, | |
| 27 DECEASED; ROSARIO SALDANA, INDIVIDUALLY;SANDRA VARSI, | 1)   Strict Liability – Failure to Warn; |
| 28 | 2)   Strict Liability – Design Defect; |

397001

1

INDIVIDUALLY AND AS SUCCESSOR-IN-
INTEREST OF THE ESTATE OF IVANA
VARSI, DECEASED; MORDECHIA ZARGER,
INDIVIDUALLY AND AS SUCCESSOR-IN-
INTEREST OF THE ESTATE OF REBECCA
ZARGER, DECEASED; ILAN A. ZARGER,
JOSEPH ZARGER, AND WILLIAM ZARGER,
INDIVIDUALLY, AND AS CHILDREN OF
REBECCA ZARGER, DECEASED; KAY
BRUGGEMAN, INDIVIDUALLY AND AS
SUCCESSOR-IN-INTEREST OF THE ESTATE
OF HENRY BRUGGEMAN, DECEASED;
GEORGE VOLLMER, INDIVIDUALLY AND
AS SUCCESSOR-IN-INTEREST OF THE
ESTATE OF AUDREY VOLLMER,
DECEASED; PAUL VOLLMER AND GEORGE
A. VOLLMER, INDIVIDUALLY AND AS
CHILDREN OF AUDREY VOLLMER,
DECEASED; MARY B. CLARK,
INDIVIDUALLY AND AS SUCCESSOR-IN-
INTEREST OF THE ESTATE OF EDWARD
CLARK, SR., DECEASED; MARY F. WILLIS,
INDIVIDUALLY AND AS SUCCESSOR-IN-
INTEREST OF THE ESTATE OF CLAUDE H.
WILLIS, III, DECEASED; CLAUDE
HAMPTON WILLIS AND DANIEL BENJAMIN
WILLIS, INDIVIDUALLYAND AS CHILDREN
OF CLAUDE H. WILLIS, III, DECEASED;
MATTIE S. ALLEN, INDIVIDUALLY; TERRY
BYRD AND RICKY BYRD, INDIVIDUALLY;
VIVIAN MARIE SHAMBURGER MITCHELL,
INDIVIDUALLY AND AS SUCCESSOR-IN-
INTEREST AND EXECUTRIX OF THE
ESTATE OF DOROTHY SHAMBURGER,
DECEASED; CAROL SHIMER,
INDIVIDUALLY AND AS SUCCESSOR-IN-
INTEREST OF THE ESTATE OF THOMAS
SHIMER, III, DECEASED; JOHN J. SHIMER
AND THOMAS E. SHIMER, IV,
INDIVIDUALLY, AND AS CHILDREN OF
THOMAS SHIMER, III, DECEASED;
SHELLEY BRIDGES, INDIVIDUALLY AND
AS SUCCESSOR-IN-INTEREST TO THE
ESTATE OF VIOLA CARSON, DECEASED;
JEREMY JOHNSON, INDIVIDUALLY, AND

3)  Negligence;
4)  Negligence *Per Se*;
5)  Breach of Implied Warranty;
6)  Breach of Express Warranty;
7)  Negligent Misrepresentation;
8)  Fraud by Concealment;
9)  Wrongful Death;
10) Loss of Consortium; and
11) Survival Action.

**DEMAND FOR JURY TRIAL**

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

AS A CHILD OF VIOLA CARSON, )
DECEASED; CAROLYN J. KENNEDY, )
INDIVIDUALLY AND AS SUCCESSOR-IN- )
INTEREST OF THE ESTATE OF BOBBY W. )
KENNEDY, DECEASED; TAMMY CARR, )
GARY KENNEDY, AND JIMMY PAUL )
KENNEDY, INDIVIDUALLY, AND AS )
CHILDREN OF BOBBY W. KENNEDY, )
DECEASED; RUSSELL PICKERING AND )
CAROL PICKERING, INDIVIDUALLY; )
GONZALO RAMOS, JR., INDIVIDUALLY )
AND AS THE SUCCESSOR-IN-INTEREST )
  OF THE ESTATE OF MARIA E. RAMOS, )
  DECEASED; IRENE CARSON AND LC. )
  CARSON, INDIVIDUALLY; FRANCIS )
  FRAILEY AND DORIS FRAILEY, )
  INDIVIDUALLY; GILBERT E. JONES, JR., )
  INDIVIDUALLY; AND AS THE )
  SUCCESSOR-IN-INTEREST OF THE ESTATE )
  OF PATRICIA L. JONES, DECEASED; TAMI )
  BEERT ARNELL, INDIVIDUALLY AND AS )
  SUCCESSOR-IN-INTEREST OF THE ESTATE )
  OF CHRISTOPHER ARNELL, DECEASED; )
  NAGHMANA JANJUA, INDIVIDUALLY )
  AND AS SUCCESSOR-IN-INTEREST OF THE )
  ESTATE OF MOHAMMAD JANJUA, )
  DECEASED; ELLIOTT WAITES, JR., )
  INDIVIDUALLY AND AS SUCCESSOR-IN- )
  INTEREST AND AS EXECUTOR OF THE )
  ESTATE OF JOSEPHINE ROBINSON, )
  DECEASED; LYNN MCCREA, )
INDIVIDUALLY AND AS SUCCESSOR-IN- )
INTEREST OF THE ESTATE OF DAVID )
MCCREA, SR., DECEASED; DAVID EDWARD )
MCCREA, JR. AND TRAVIS JAMES )
MCCREA, INDIVIDUALLY, AND AS )
CHILDREN OF DAVID MCCREA, SR., )
DECEASED; FLORA LLESHANAKU, )
INDIVIDUALLY AND AS SUCCESSOR-IN- )
INTEREST OF THE ESTATE OF ALPIN )
LLESHANAKU, DECEASED; ALMA COHEN, )
INDIVIDUALLY, AND AS CHILD OF ALPIN )
LLESHANAKU, DECEASED; WILLIAM )
BENTLEY, SR., INDIVIDUALLY AND AS )
SUCCESSOR-IN-INTEREST OF THE ESTATE )

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

OF ELMYRA BENTLEY, DECEASED;
WILLIAM BENTLEY JR., INDIVIDUALLY,
AND AS A CHILD OF ELMYRA BENTLEY,
DECEASED; GERALDINE M. ROMANO,
INDIVIDUALLY AND AS SUCCESSOR-IN-
INTEREST OF THE ESTATE OF JOHN A.
ROMANO, DECEASED; MELODY RYPSTRA,
INDIVIDUALLY, AND AS A CHILD OF JOHN
A. ROMANO, DECEASED; PATRICIA A.
SHACKELFORD, INDIVIDUALLY, AS
SUCCESSOR-IN-INTEREST AND
ADMINISTRATOR OF THE ESTATE OF
MELVIN L. SHACKELFORD, DECEASED;
LAUREEN QUIRK AND TIMOTHY QUIRK,
INDIVIDUALLY; JOANNE RIPA,
INDIVIDUALLY AND AS SUCCESSOR-IN-
INTEREST OF THE ESTATE OF LOUIS  N.
RIPA, DECEASED; TIMOTHY PRATT AND
JACKIE PRATT, INDIVIDUALLY; DANIEL
HAMMOND AND SUSAN HAMMOND,
INDIVIDUALLY;

     Plaintiffs,

   vs.

AMYLIN PHARMACEUTICALS, LLC f/k/a
AMYLIN PHARMACEUTICALS, INC.; ELI
LILLY AND COMPANY; McKESSON
CORPORATION; MERCK & CO., INC.;
MERCK SHARP & DOHME CORP; MERCK
SHARP & DOHME LTD.; MERCK SHARP &
DOHME (ITALIA) S.P.A; NOVO NORDISK,
INC.; NOVO NORDISK A/S; JAMES
FRANCES BRUGGEMAN; AARON
MICHAEL BRUGGEMAN; CHRISTOPHER
LEE BRUGGEMAN; VICKIE ROSHELLE
BYRD; EDWARD CLARK, JR., ASTRIT
LLESHANAKU, JOHN RAMONO JR.,
ANTHONY ROMANO, MATTHEW
MALLORY, SHEHARYAR JANJUA,
ASFANDYAR JANJUA, CASSANDRA
ENLES, AMANDA ARNELL, EUGENE
JONES, ANNALISE STINES, KELLY JONES,

397001

4

1 | KIMBERLY JONES, LUANN GRASSO, )
2 | NICHOLAS RIPA AND DOES 1 THROUGH )
   | 200, INCLUSIVE, )
3 |                    Defendants. )
   |                                )
4 | _____

5   COMES NOW, Plaintiffs, CARLA MALLORY, individually, and as heir and successor in

6 interest to STEPHEN MALLORY, Decedent; SCOTT INGRAHAM, individually, and as a child of

7 STEPHEN MALLORY, Decedent; ROSARIO SALDANA, individually; SANDRA VARSI,

8 individually, and as heir and successor in interest to INVANA VARSI, Decedent; MORDECHIA

9 ZARGER, individually, and as heir and successor in interest to REBECCA ZARGER, Decedent,

10 ILAN A. ZARGER, JOSEPH ZARGER, and WILLIAM ZARGER, individually, and as children of

11 REBECCA ZARGER, Decedent; KAY BRUGGEMAN, individually, and as heir and successor in

12 interest to HENRY BRUGGEMAN, Decedent; GEORGE VOLLMER, individually, and as heir and

13 successor in interest to AUDREY VOLLMER, Decedent, PAUL VOLLMER AND GEORGE A.

14 VOLLMER, individually, and as children of AUDREY VOLLMER; MARY B. CLARK,

15 individually, and as heir and successor in interest to EDWARD CLARK, SR., Decedent; MARY F.

16 WILLIS, individually, and as heir and successor in interest to CLAUDE H. WILLIS, III, Decedent,

17 CLAUDE HAMPTON WILLIS AND DANIEL BENJAMIN WILLIS, individually, and as children

18 of CLAUDE H. WILLIS, III; MATTIE S. ALLEN, individually; TERRY BYRD AND RICKY

19 BYRD, individually and jointly; VIVIAN MARIE SHAMBURGER MITCHELL, individually, and

20 as heir and successor in interest to DOROTHY SHAMBURGER, Decedent; CAROL SHIMER,

21 individually, and as heir and successor in interest to THOMAS SHIMER, III, Decedent, JOHN J.

22 SHIMER and THOMAS E. SHIMER, IV, individually, and as children of THOMAS SHIMER, III,

23 Decedent; SHELLEY BRIDGES, individually, and as heir and successor in interest to VIOLA

24 CARSON, Decedent, JEREMY JOHNSON, individually, and as a child of VIOLA CARSON,

25 Decedent; CAROLYN J. KENNEDY, individually, and as heir and successor in interest to BOBBY

26 W. KENNEDY, Decedent, TAMMY CARR, GARY KENNEDY, and JIMMY PAUL KENNEDY,

27 individually, and as children of BOBBY W. KENNEDY, Decedent; RUSSELL PICKERING AND

28 CAROL PICKERING, individually and jointly; GONZALO RAMOS, JR., individually, and as heir

397001                            5

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

and successor in interest to MARIA E. RAMOS, Decedent; IRENE CARSON AND LC. CARSON, individually and jointly; FRANCIS FRAILEY AND DORIS FRAILEY, individually and jointly; GILBERT E. JONES, JR., individually, and as heir and successor in interest to PATRICIA L. JONES, Decedent; TAMI BEERT ARNELL, individually, and as heir and successor in interest to

CHRISTOPHER ARNELL, Decedent; NAGHMANA JANJUA, individually, and as heir and successor in interest to MOHAMMAD JANJUA, Decedent; ELLIOTT WAITES, JR., individually, and as heir and successor in interest to JOSEPHINE ROBINSON, Decedent; LYNN MCCREA, individually, and as heir and successor in interest to DAVID MCCREA, SR., Decedent; DAVID EDWARD MCCREA, JR. and TRAVIS JAMES MCCREA, individually, and as children of DAVID MCCREA, SR., Decedent; FLORA LLESHANAKU, individually, and as heir and successor in interest to ALPIN LLESHANAKU, Decedent; ALMA COHEN, individually, and as child of ALPIN LLESHANAKU, Decedent; WILLIAM BENTLEY, SR., individually, and as heir and successor in interest to ELMYRA BENTLEY, Decedent; WILLIAM BENTLEY JR., individually, and as a child of ELMYRA BENTLEY, Decedent; GERALDINE M. ROMANO, individually, and as heir and successor in interest to JOHN A. ROMANO, Decedent; MELODY RYPSTRA, individually, and as a child of JOHN A. ROMANO, Decedent; PATRICIA A. SHACKELFORD, individually, and as heir and successor in interest and administrator of the estate of MELVIN L. SHACKELFORD, Decedent; LAUREEN QUIRK AND TIMOTHY QUIRK, individually and jointly; JOANNE RIPA, individually, and as heir and successor in interest to LOUIS N. RIPA, Decedent; TIMOTHY PRATT AND JACKIE PRATT, individually and jointly; DANIEL HAMMOND AND SUSAN HAMMOND, individually and jointly; (collectively hereafter "PLAINTIFFS"), complain and allege against AMYLIN PHARMACEUTICALS, LLC f/k/a AMYLIN PHARMACEUTICALS, INC.; AMERISOURCEBERGEN CORPORATION; CARDINAL HEALTH, INC.; ELI LILLY AND COMPANY; McKESSON CORPORATION; MERCK & CO., INC.; MERCK SHARP & DOHME CORP; MERCK SHARP & DOHME LTD.; MERCK SHARP & DOHME (ITALIA) S.P.A.; NOVO NORDISK, INC.; NOVO NORDISK A/S; JAMES FRANCES BRUGGEMAN; AARON MICHAEL BRUGGEMAN; CHRISTOPHER LEE BRUGGEMAN; VICKIE ROSHELLE BYRD; EDWARD CLARK, JR., ASTRIT LLESHANAKU, JOHN RAMONO JR., ANTHONY ROMANO,

MATTHEW MALLORY, SHEHARYAR JANJUA, ASFANDYAR JANJUA, CASSANDRA ENLES, AMANDA ARNELL, EUGENE JONES, ANNALISE STINES, KELLY JONES, KIMBERLY JONES, LUANN GRASSO, NICHOLAS RIPA and DOES I through 200, and each of them as follows:

## GENERAL ALLEGATIONS

1.      Plaintiffs herein, by and through Plaintiffs' attorneys, bring this action for personal injuries and/or wrongful death suffered by the injured party (the "Injured Party," and collectively, the Injured Party and/or Plaintiffs are the "Plaintiffs"), as detailed more fully herein, suffered as a proximate result of the Injured Party's being prescribed and ingesting the defective and unreasonably dangerous prescription drug(s) Januvia, Janumet, Byetta, and/or Victoza (the "Drugs"), prescription medication(s) used to help lower blood sugar levels in adults with diabetes mellitus type 2, which at all times relevant hereto, the Drugs were manufactured, designed, tested, packaged, labeled, marketed, advertised, distributed, and sold by Defendants Amylin Pharmaceuticals, LLC f/k/a Amylin Pharmaceuticals, Inc. and Eli Lilly and Company (collectively, the "Amylin Lilly Defendants" for Byetta); Defendants Novo Nordisk Inc., and Novo Nordisk A/S (collectively, the "Novo Defendants" for Victoza); Defendants Merck & Co., Inc., Merck Sharp & Dohme Corp., Merck Sharp & Dohme Ltd., and Merck Sharp & Dohme (Italia) S.p.A., Inc., (collectively, the "Merck Defendants" for Januvia and Janumet); and McKesson Corporation (the "Distribution Defendant" for Byetta) and Does 1 through 200 (collectively, the "Doe Defendants" for either of Byetta, Januvia, Janumet and/or Victoza) (the Merck Defendants, Amylin Lilly Defendants, Novo Defendants, Distribution Defendant and the Doe Defendants collectively are the "Defendants").

2.      James Frances Bruggeman, Aaron Michael Bruggeman, Christopher Lee Bruggeman, Vickie Roshelle Byrd, Edward Clark, Jr., Astrit Lleshanaku, John Ramono Jr., Anthony Romano, Matthew Mallory, Sheharyar Janjua, Asfandyar Janjua, Cassandra Enles, Amanda Arnell, Eugene Jones, Annalise Stines, Kelly Jones, Kimberly Jones, LuAnn Grasso, and Nicholas Ripa are joined as nominal defendants in this action pursuant to Code of Civil Procedure section 382 for the reason that their consent to be joined as plaintiffs could not be obtained.

397001

7

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

3.     The true names or capacities whether individual, corporate or otherwise, of the Doe Defendants 1 through 200, inclusive, are unknown to Plaintiffs who therefore, pursuant to Code of Civil Procedure section 474, sue said Defendants by such fictitious names. Plaintiffs believe and allege that each of the Defendants designated herein by fictitious names is in some manner legally responsible for the events and happenings herein referred to and caused damages proximately and foreseeably to Plaintiffs as alleged herein.

4.     At all times herein mentioned, each of the Defendants was the agent, servant, partner, aider and abettor, co-conspirator, and joint venturer of each of the remaining Defendants herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their conduct constituted a breach of duty.

5.     At all times herein mentioned, each of the Doe Defendants was the agent, servant, partner, aider and abettor, co-conspirator, and joint venturer of each of the remaining Doe Defendants, Amylin Lilly Defendants, Merck Defendants, Novo Defendants and/or Distribution Defendant herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy and joint venture and rendered substantial assistance and encouragement to the other Doe Defendants, Amylin Lilly Defendants, Merck Defendants, Novo Defendants and/or Distribution Defendant, knowing that their conduct constituted a breach of duty.

6.     There exists, and at all times herein mentioned, there existed, a unity of interest in ownership between certain Defendants and other certain Defendants such that any individuality and separateness between the certain Defendants has ceased and these Defendants are the alter ego of the other certain Defendants, and exerted control over those Defendants. Adherence to the fiction of the separate existence of these certain Defendants as any entity distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction fraud and would promote injustice.

7.     The injuries and damages to the Injured Parties were caused by the wrongful acts, omissions, and fraudulent representations of Defendants, many of which occurred within the State of California.

397001

8

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

8.    At all times herein mentioned, Defendants were each engaged in the business of, or were successors in interest to, entities engaged in the business of research, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging and/or advertising for sale or selling the Drugs.

9.    At all times herein mentioned Defendants were each authorized to do or otherwise engaged in business within the State of California and did in fact supply the aforementioned products within the State of California and elsewhere, including the Injured Parties' states of residence.

10.    At all times herein mentioned, the officers and directors of Defendants authorized and directed the production and promotion of the Drugs when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of the Drugs, and thereby actively participated in the tortious conduct which resulted in the physical injuries described herein.

## PLAINTIFFS

11.    Plaintiff Carla Mallory ("Plaintiff Mallory") is a natural person currently residing in Cypress, California.  She is the surviving spouse and successor-in-interest of the estate of Stephen Mallory ("Decedent Mallory"), who was a natural person residing in Cypress, California at the time he ingested the defective and unreasonably dangerous prescription drug, Januvia, was diagnosed with pancreatic cancer, and ultimately died of said cancer on January 8, 2013.  Plaintiff Mallory is bringing her individual claims, including her claim for the wrongful death of the Decedent Mallory, and the claims of the estate.  Plaintiff Scott Ingraham is a natural person currently residing in Meridian, Idaho and is the son of Decedent Mallory.  Plaintiff Scott Ingraham is bringing his individual claims, including his claims for the wrongful death of Decedent Mallory.

12.    Decedent Mallory was prescribed and used Januvia beginning on or about September 10, 2008 and continued said use through at least December 12, 2012. On or about November 7, 2012, Decedent Mallory suffered severe physical, economic and emotional injuries as a result of Januvia usage, including but not limited to Decedent Mallory being diagnosed with pancreatic cancer. Plaintiff Mallory, Decedent Mallory, and his physician were unaware that Decedent Mallory's injuries were caused by Januvia until shortly before the filing of this complaint.

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

13.     Plaintiff Rosario Saldana ("Plaintiff Saldana") is a natural person currently residing in Chicago, Illinois, was residing there at the time she ingested the defective and unreasonably dangerous prescription drug, Januvia, and was diagnosed with pancreatic cancer.

14.     Plaintiff Saldana was prescribed and used Januvia beginning on or about October 15, 2011 and continued said use through at least November 12, 2012.  On or about September 12, 2012, Plaintiff Saldana suffered severe physical, economic and emotional injuries as a result of Januvia usage, including but not limited to Decedent Saldana being diagnosed with pancreatic cancer. Plaintiff Saldana and her physicians were unaware that Plaintiff Saldana's injuries were caused by Januvia until shortly before the filing of this complaint.

15.     Plaintiff Sandra Varsi ("Plaintiff Varsi") is a natural person residing in Whitestone, New York.  She is the surviving daughter and successor-in-interest of the estate of Ivana Varsi ("Decedent Varsi"), who was a natural person residing in New Hempstead, New York at the time she ingested the defective and unreasonably dangerous prescription drug, Janumet, was diagnosed with pancreatic cancer, and ultimately died of said cancer on September 3, 2012.  Plaintiff Varsi is bringing her individual claims, including her claim for the wrongful death of the Decedent Varsi, and the claims of the estate.

16.     Decedent Varsi was prescribed and used Janumet beginning on or about January 23, 2008 and continued said use through at least April 13, 2012.  On or about July 9, 2012, Decedent Varsi suffered severe physical, economic and emotional injuries as a result of Janumet usage, including but not limited to being diagnosed with pancreatic cancer.  Plaintiff Varsi, Decedent Varsi and her physicians were unaware that Decedent Varsi's injuries were caused by Byetta until shortly before the filing of this complaint.

17.     Plaintiff Mordechia Zarger ("Plaintiff Zarger") is a natural person currently residing in Brooklyn, New York.  He is the surviving spouse and successor-in-interest of the estate of Rebecca Zarger ("Decedent Zarger"), who was a natural person residing in Brooklyn, New York at the time she ingested the defective and unreasonably dangerous prescription drug, Januvia, was diagnosed with pancreatic cancer, and ultimately died of said cancer on September 5, 2013.  Plaintiff Zarger is bringing his individual claims, including his claim for the wrongful death of the Decedent Zarger, and

397001

10

the claims of the estate.  Plaintiff Ilan A. Zarger is a natural person currently residing in New York City, New York and is the son of Rebecca Zarger.  Plaintiff Joseph Zarger, is a natural person currently residing in Brooklyn, New York and is the son of Rebecca Zarger.  Plaintiff William Zarger, is a natural person currently residing in Brooklyn, New York and is the son of Rebecca Zarger.  Plaintiffs Ilan A. Zarger, Joseph Zarger, and William Zarger are bringing their individual claims, including their claims for the wrongful death of Decedent Zarger.

18.   Decedent Zarger was prescribed and used Januvia beginning on or about June 5, 2009 and continued said use through at least August 2, 2011.  On or about August 4, 2011, Decedent Zarger suffered severe physical, economic and emotional injuries as a result of Januvia usage, including but not limited to being diagnosed with pancreatic cancer.  Plaintiff Zarger, Decedent Zarger, and her physicians were unaware that Decedent Zarger's injuries were caused by Januvia until shortly before the filing of this complaint.

19.   Plaintiff Kay Bruggeman ("Plaintiff Bruggeman") is a natural person currently residing in Waddell, Arizona.  She is the surviving spouse and successor-in-interest of Henry Bruggeman ("Decedent Bruggeman"), who was a natural person residing in Waddell, Arizona at the time he ingested the defective and unreasonably dangerous prescription drugs, Byetta and Januvia, was diagnosed with pancreatic cancer, and ultimately died of said cancer on February 23, 2013. Plaintiff Bruggeman is bringing her individual claims, including her claim for the wrongful death of Decedent Bruggeman, and the claims of the estate.

20.   Decedent Bruggeman was prescribed and used Byetta beginning on or about June 14, 2010 and continued said use through at least November 29, 2012.  Decedent Bruggeman also used Byetta beginning on September 15, 2011 and continued said use through as least June 30, 2012.  On or about July 27, 2012, Decedent Bruggeman suffered severe physical, economic and emotional injuries as a result of Byetta usage, including but not limited to Decedent Bruggeman being diagnosed with pancreatic cancer.  Plaintiff Bruggeman, Decedent Bruggeman, and his physicians were unaware that Decedent Bruggeman's injuries were caused by Byetta until shortly before the filing of this complaint.

21.   Plaintiff George Vollmer ("Plaintiff Vollmer") is a natural person currently residing in

11

Deptford, New Jersey.  He is the surviving spouse and successor-in-interest of Audrey Vollmer ("Decedent Vollmer"), who was a natural person residing in Deptford, New Jersey at the time she ingested the defective and unreasonably dangerous prescription drug, Januvia, was diagnosed with pancreatic cancer, and ultimately died of said cancer on November 21, 2012.  Plaintiff Vollmer is bringing his individual claims, including his claim for the wrongful death of Decedent Vollmer, and the claims of the estate.  Plaintiff Paul Vollmer is a natural person currently residing in Bridgeport, New Jersey and is the son of Audrey Vollmer.  Plaintiff George A. Vollmer is a natural person currently residing in Deptford, New Jersey and is the son of Audrey Vollmer.  Plaintiffs Paul Vollmer and George A. Vollmer are bringing their individual claims, including their claims for the wrongful death of Decedent Vollmer.

22.    Decedent Vollmer was prescribed and used Januvia beginning on or about December 23, 2009 and continued said use through at least August 25, 2012.  On or about July 26, 2012, Decedent Vollmer suffered severe physical, economic and emotional injuries as a result of Januvia usage, including but not limited to Decedent Vollmer being diagnosed with pancreatic cancer. Plaintiffs Vollmer, Plaintiffs Paul Vollmer and George A. Vollmer, Decedent Vollmer, and her physicians were unaware that Decedent Vollmer's injuries were caused by Januvia until shortly before the filing of this complaint.

23.    Plaintiff Mary B. Clark ("Plaintiff Clark") is a natural person currently residing in Chicago, Illinois.  She is the surviving spouse and successor-in-interest of the estate of Edward Clark, Sr. ("Decedent Clark"), who was a natural person residing in Chicago, Illinois at the time he ingested the defective and unreasonably dangerous prescription drug, Januvia, was diagnosed with pancreatic cancer, and ultimately died of said cancer on December 2, 2012.  Plaintiff Clark is bringing her individual claims, including her claim for the wrongful death of the Decedent Clark, and the claims of the estate.

24.    Decedent Clark was prescribed and used Januvia beginning on or about March 28, 2011 and continued said use through at least August 15, 2012.  On or about August 1, 2012, Decedent Clark suffered severe physical, economic and emotional injuries as a result of Januvia usage, including but not limited to Decedent Clark being diagnosed with pancreatic cancer.  Plaintiff Clark,

Decedent Clark, and his physicians were unaware that Decedent Clark's injuries were caused by Januvia until shortly before the filing of this complaint.

25.     Plaintiff Mary F. Willis ("Plaintiff Willis") is a natural person currently residing in Mobile, Alabama. She is the surviving spouse and successor-in-interest of the estate of Claude H. Willis, III ("Decedent Willis"), who was a natural person residing in Mobile, Alabama at the time he ingested the defective and unreasonably dangerous prescription drugs, Byetta and Januvia, was diagnosed with pancreatic cancer, and ultimately died of said cancer on November 8, 2012. Plaintiff Willis is bringing her individual claims, including her claim for the wrongful death of the Decedent Willis, and the claims of the estate. Plaintiff Claude Hampton Willis is a natural person currently residing in Alabama and is the son of Claude H. Willis, III. Plaintiff Daniel Benjamin Willis is a natural person currently residing in Mobile, Alabama and is the son of Claude H. Willis, III. Plaintiffs Claude Hampton Willis and Daniel Benjamin Willis are bringing their individual claims, including their claims for the wrongful death of Decedent Willis.

26.     Decedent Willis was prescribed and used Byetta beginning on or about April 24, 2006 and continued said use through at least April 5, 2007. In addition, Decedent Willis was prescribed and used Januvia beginning on or about July 12, 2008 and continued said use through at least September 16, 2010. On or about August 24, 2012, Decedent Willis suffered severe physical, economic and emotional injuries as a result of Byetta and Januvia usage, including but not limited to being diagnosed with pancreatic cancer. Plaintiff Willis, Plaintiffs Claude Hampton Willis and Daniel Benjamin Willis, Decedent Willis, and his physicians were unaware that Decedent Willis's injuries were caused by Byetta and Januvia until shortly before the filing of this complaint.

27.     Plaintiff Mattie S. Allen ("Plaintiff Allen") is a natural person residing in Corpus Christi, Texas, was residing there at the time she ingested defective and unreasonably dangerous prescription drugs, Byetta and Victoza, and was diagnosed with pancreatic cancer.

28.     Plaintiff Allen was prescribed and used Byetta beginning on or about August 27, 2009 and continued said use through at least April 7, 2010. In addition, Plaintiff Allen was prescribed and used Victoza beginning on or about April 7, 2010 and continued said use through at least September 21, 2010. As a result of her use of Byetta and Victoza, Plaintiff Allen suffered severe physical,

397001

13

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

1  economic and emotional injuries, including but not limited to being diagnosed with pancreatic cancer.

2  Plaintiff Allen and her physician were unaware that Plaintiff Allen's injuries were caused by Byetta

3  and Victoza until shortly before the filing of this complaint.

4      29.    Plaintiff Terry Byrd ("Plaintiff Terry Byrd") is a natural person residing in Carlton,

5  Georgia, was residing there at the time she ingested defective and unreasonably dangerous

6  prescription drugs, Byetta and Januvia, and was diagnosed with pancreatic cancer.  Plaintiff Ricky

7  Byrd ("Plaintiff Ricky Byrd") is a natural person residing in Carlton, Georgia and is the spouse of

8  Plaintiff Terry Byrd.

9      30.    Plaintiff Terry Byrd was prescribed and used Byetta beginning on or about June 27,

10  2006 and continued said use through at least December 5, 2007.  In addition, Plaintiff Terry Byrd was

11  prescribed and used Januvia beginning on or about March 23, 2009 and continued said use through at

12  least August 24, 2009.  As a result of her use of Byetta and Januvia, Plaintiff Terry Byrd suffered

13  severe physical, economic and emotional injuries, including but not limited to being diagnosed with

14  pancreatic cancer.  Plaintiff Terry Byrd, Plaintiff Ricky Byrd and Plaintiff Terry Byrd's physicians

15  were unaware that Plaintiff Terry Byrd's injuries were caused by Byetta and Januvia until shortly

16  before the filing of this complaint.

17      31.    Plaintiff Vivian Marie Shamburger Mitchell ("Plaintiff Mitchell") is a natural person

18  currently residing in Anderson, South Carolina.  She is the surviving daughter, successor-in-interest,

19  and executrix of the estate of Dorothy Shamburger ("Decedent Shamburger"), who was a natural

20  person residing in Vicksburg, Mississippi at the time she ingested the defective and unreasonably

21  dangerous prescription drug, Januvia, was diagnosed with pancreatic cancer, and ultimately died of

22  said cancer on May 15, 2012.  Plaintiff Mitchell is bringing her individual claims, including her claim

23  for the wrongful death of the Decedent Shamburger, and the claims of the estate.

24      32.    Decedent Shamburger was prescribed and used Januvia beginning on or about July 30,

25  2007 and continued said use through at least February 22, 2012.  On or about December 8, 2011,

26  Decedent Shamburger suffered severe physical, economic and emotional injuries as a result of

27  Januvia usage, including but not limited to Decedent Shamburger being diagnosed with pancreatic

28  cancer.  Plaintiff Mitchell, Decedent Shamburger, and her physicians were unaware that Decedent

Shamburger's injuries were caused by Januvia until shortly before the filing of this complaint.

33.     Plaintiff Carol Shimer ("Plaintiff Shimer") is a natural person currently residing in Henderson, Nevada.  She is the surviving spouse and successor-in-interest of the estate of Thomas Shimer, III ("Decedent Shimer"), who was a natural person residing in Henderson, Nevada at the time he ingested the defective and unreasonably dangerous prescription drug, Byetta, was diagnosed with pancreatic cancer, and ultimately died of said cancer on February 2, 2013.  Plaintiff Shimer is bringing her individual claims, including her claim for the wrongful death of the Decedent Shimer, and the claims of the estate.  Plaintiff John J. Shimer is a natural person currently residing in Henderson, Nevada and is the son of Thomas Shimer, III.  Plaintiff Thomas E. Shimer, IV, is a natural person currently residing in Houston, Texas and is the son of Thomas Shimer, III.  Plaintiffs John J. Shimer and Thomas E. Shimer, IV are bringing their individual claims, including their claims for the wrongful death of Decedent Shimer.

34.     Decedent Shimer was prescribed and used Byetta beginning on or about February 12, 2009 and continued said use through at least September 13, 2012.  On or about November 20, 2012, Decedent Shimer suffered severe physical, economic and emotional injuries as a result of Byetta usage, including but not limited to being diagnosed with pancreatic cancer.  Plaintiff Shimer, Decedent Shimer, and his physicians were unaware that Decedent Shimer's injuries were caused by Byetta until shortly before the filing of this complaint.

35.     Plaintiff Shelley Bridges ("Plaintiff Bridges") is a natural person currently residing in Morganton, North Carolina.  She is the surviving daughter and successor-in-interest of the estate of Viola Carson ("Decedent Carson"), who was a natural person residing in Morganton, North Carolina at the time she ingested the defective and unreasonably dangerous prescription drug, Janumet, was diagnosed with pancreatic cancer, and ultimately died of said cancer on January 24, 2013.  Plaintiff Bridges is bringing her individual claims, including her claim for the wrongful death of the Decedent Carson, and the claims of the estate.  Plaintiff Jeremy Johnson is a natural person currently residing in Morganton, North Carolina and is the son of Viola Carson.  Plaintiff Jeremy Johnson is bringing his individual claims, including his claims for the wrongful death of Decedent Carson.

36.     Decedent Carson was prescribed and used Janumet beginning on or about August 10,

2007 and continued said use through at least October 25, 2012. On or about December 14, 2012, Decedent Carson suffered severe physical, economic and emotional injuries as a result of Janumet usage, including but not limited to Decedent Carson being diagnosed with pancreatic cancer. Plaintiff Bridges, Decedent Carson, and her physicians were unaware that Decedent Carson's injuries were caused by Janumet until shortly before the filing of this complaint.

37.     Plaintiff Carolyn J. Kennedy ("Plaintiff Kennedy") is a natural person currently residing in Arab, Alabama. She is the surviving spouse and successor-in-interest of the estate of Bobby W. Kennedy ("Decedent Kennedy"), who was a natural person residing in Arab, Alabama at the time he ingested the defective and unreasonably dangerous prescription drugs, Byetta and Januvia, was diagnosed with pancreatic cancer, and ultimately died of said cancer on December 20, 2012. Plaintiff Kennedy is bringing her individual claims, including her claim for the wrongful death of the Decedent Kennedy, and the claims of the estate. Plaintiff Tammy Carr is a natural person currently residing in Somerville, Alabama and is the daughter of Bobby W. Kennedy. Plaintiff Gary Kennedy, is a natural person currently residing in Arab, Alabama and is the son of Bobby W. Kennedy. Plaintiff Jimmy Paul Kennedy, is a natural person currently residing in Arab, Alabama and is the son of Bobby W. Kennedy. Plaintiffs Tammy Carr, Gary Kennedy, and Jimmy Paul Kennedy are bringing their individual claims, including their claims for the wrongful death of Decedent Kennedy.

38.     Decedent Kennedy was prescribed and used Byetta beginning on or about January 11, 2007 and continued said use through at least August 22, 2008. In addition, Decedent Kennedy was also prescribed Januvia beginning on or about August 22, 2008 and continued said use through at least November 7, 2011. On or about December 11, 2012, Decedent Kennedy suffered severe physical, economic and emotional injuries as a result of Byetta and Januvia usage, including but not limited to Decedent Kennedy being diagnosed with pancreatic cancer. Plaintiff Kennedy, Decedent Kennedy, and his physicians were unaware that Decedent Kennedy's injuries were caused by Byetta and Januvia until shortly before the filing of this complaint.

39.     Plaintiff Russell Pickering ("Plaintiff Russell Pickering") is a natural person currently residing in Fredericktown, Ohio, was residing there at the time he ingested the defective and

unreasonably dangerous prescription drug, Byetta, and was diagnosed with pancreatic cancer. Plaintiff Carol Pickering ("Plaintiff Carol Pickering") is a natural person currently residing in Fredericktown, Ohio, and is the spouse of Russell Pickering.

40.    Plaintiff Russell Pickering was prescribed and used Byetta beginning on or about March 2, 2007 and continued said use through at least September 4, 2010.  On or about September 25, 2012, Plaintiff Russell Pickering suffered severe physical, economic and emotional injuries as a result of Byetta usage, including but not limited to being diagnosed with pancreatic cancer.  Plaintiff Russell Pickering, Plaintiff Carol Pickering, and his physicians were unaware that Plaintiff Russell Pickering's injuries were caused by Byetta until shortly before the filing of this complaint.

41.    Plaintiff Gonzalo Ramos, Jr. ("Plaintiff Ramos") is a natural person currently residing in El Paso, Texas.  He is the surviving son and successor-in-interest of the estate of Maria E. Ramos ("Decedent Ramos"), who was a natural person residing in El Paso, Texas at the time she ingested the defective and unreasonably dangerous prescription drugs, Januvia and Janumet, and was diagnosed with pancreatic cancer, and ultimately died of said cancer on September 15, 2013.  Plaintiff Ramos is bringing his individual claims, including his claim for the wrongful death of the Decedent Ramos, and the claims of the estate.

42.    Decedent Ramos was prescribed and used Januvia beginning on or about April 24, 2007, and continued said use through at least July 14, 2011. In addition, Decedent Ramos was prescribed and used Janumet in February 2010.  On or about August 22, 2012, Decedent Ramos suffered severe physical, economic and emotional injuries as a result of Januvia and Janumet usage, including but not limited to Decedent Ramos being diagnosed with pancreatic cancer. Plaintiff Ramos, Decedent Ramos, and her physicians were unaware that Decedent Ramos's injuries were caused by Januvia and Janumet until shortly before the filing of this complaint.

43.    Plaintiff Irene Carson ("Plaintiff Carson") is a natural person currently residing in Oklahoma City, Oklahoma, was residing there at the time she ingested the defective and unreasonably dangerous prescription drug, Januvia, and was diagnosed with pancreatic cancer. Plaintiff LC. Carson ("Plaintiff LC. Carson") is a natural person currently residing in Oklahoma City, Oklahoma and is the spouse of Plaintiff Irene Carson.

44.     Plaintiff Irene Carson was prescribed and used Januvia beginning on or about December 16, 2009 and continued said use through at least July 16, 2012.  On or about August 17, 2012, Plaintiff Irene Carson suffered severe physical, economic and emotional injuries as a result of Januvia usage, including but not limited to Plaintiff Irene Carson being diagnosed with pancreatic cancer.  Plaintiff Irene Carson, Plaintiff LC. Carson, and her physician were unaware that Plaintiff Irene Carson's injuries were caused by Januvia until shortly before the filing of this complaint.

45.     Plaintiff Francis Frailey ("Plaintiff Francis Frailey") is a natural person currently residing in Swiftwater, Pennsylvania, was residing there at the time he ingested the defective and unreasonably dangerous prescription drug, Januvia, and was diagnosed with pancreatic cancer.  Plaintiff Doris Frailey ("Plaintiff Doris Frailey") is a natural person currently residing in Swiftwater, Pennsylvania and is the spouse of Plaintiff Francis Frailey.

46.     Plaintiff Francis Frailey was prescribed and used Januvia beginning on or about January 6, 2012 and continued said use through at least May 6, 2013.  On or about September 1, 2012, Plaintiff Francis Frailey suffered severe physical, economic and emotional injuries as a result of Januvia usage, including but not limited to Plaintiff Francis Frailey being diagnosed with pancreatic cancer.  Plaintiff Francis Frailey, Plaintiff Doris Frailey, and his physicians were unaware that Plaintiff Francis Frailey's injuries were caused by Januvia until shortly before the filing of this complaint.

47.     Plaintiff Gilbert E. Jones, Jr. ("Plaintiff Jones") is a natural person currently residing in West Salem, Oregon.  He is the surviving spouse and the successor-in-interest of the estate of Patricia L. Jones ("Decedent Jones"), who was a natural person residing in West Salem, Oregon at the time she ingested the defective and unreasonably dangerous prescription drug, Januvia, was diagnosed with pancreatic cancer, and ultimately died of said cancer on February 4, 2013.  Plaintiff Jones is bringing his individual claims, including his claim for the wrongful death of the Decedent Jones, and the claims of the estate.

48.     Decedent Jones was prescribed and used Januvia beginning on or about July 10, 2007 and continued said use through at least December 10, 2012.  On or about September 10, 2012, Decedent Jones suffered severe physical, economic and emotional injuries as a result of Januvia

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

1  usage, including but not limited to being diagnosed with pancreatic cancer. Plaintiff Jones, Decedent

2  Jones, and her physicians were unaware that Decedent Jones's injuries were caused by Januvia until

3  shortly before the filing of this complaint.

4      49.    Plaintiff Tami Beert Arnell ("Plaintiff Beert Arnell") is a natural person currently

5  residing in Laveen, Arizona. She is the surviving spouse and successor-in-interest of the estate of

6  Christopher Arnell ("Decedent Arnell"), who was a natural person residing in Laveen, Arizona at the

7  time he ingested the defective and unreasonably dangerous prescription drug, Victoza, was diagnosed

8  with pancreatic cancer, and ultimately died of said cancer on January 31, 2014. Plaintiff Beert Arnell

9  is bringing her individual claims, including her claim for the wrongful death of the Decedent Arnell,

10  and the claims of the estate.

11      50.    Decedent Arnell was prescribed and used Victoza beginning on or about February 15,

12  2011 and continued said use through at least January 6, 2013. On or about January 5, 2013, Decedent

13  Arnell suffered severe physical, economic and emotional injuries as a result of Victoza usage,

14  including but not limited to Decedent Arnell being diagnosed with pancreatic cancer. Plaintiff Beert

15  Arnell, Decedent Arnell, and his physicians were unaware that Decedent Arnell's injuries were

16  caused by Victoza until shortly before the filing of this complaint.

17      51.    Plaintiff Naghmana Janjua ("Plaintiff Janjua") is a natural person currently residing in

18  Cerritos, California. She is the surviving spouse and successor-in-interest of the estate of Mohammad

19  Janjua ("Decedent Janjua"), who was a natural person residing in Cerritos, California at the time he

20  ingested the defective and unreasonably dangerous prescription drug, Januvia, was diagnosed with

21  pancreatic cancer, and ultimately died of said cancer on January 20, 2013. Plaintiff Janjua is bringing

22  her individual claims, including her claim for the wrongful death of the Decedent Janjua, and the

23  claims of the estate.

24      52.    Decedent Janjua was prescribed and used Januvia beginning on or about February 1,

25  2009 and continued said use through at least November 28, 2011. On or about January 10, 2013,

26  Decedent Janjua suffered severe physical, economic and emotional injuries as a result of Januvia

27  usage, including but not limited to Decedent Janjua being diagnosed with pancreatic cancer. Plaintiff

28  Janjua, Decedent Janjua, and his physicians were unaware that Decedent Janjua's injuries were

1 | caused by Januvia until shortly before the filing of this complaint.

2 |      53.    Plaintiff Elliott Waites, Jr. ("Plaintiff Waites") is a natural person currently residing in
3 | Jamestown, North Carolina.  He is the surviving son, successor-in-interest, and executor of the estate
4 | of Josephine Robinson ("Decedent Robinson"), who was a natural person residing in Willow Grove,
5 | Pennsylvania at the time she ingested the defective and unreasonably dangerous prescription drug,
6 | Januvia, was diagnosed with pancreatic cancer, and ultimately died of said cancer on June 10, 2010.
7 | Plaintiff Waites is bringing his individual claims, including his claim for the wrongful death of the
8 | Decedent Robinson, and the claims of the estate.

9 |      54.    Decedent Robinson was prescribed and used Januvia beginning on or about August 8,
10 | 2008 and continued said use through at least May 2, 2010.  In or about April 2010, Decedent
11 | Robinson suffered severe physical, economic and emotional injuries as a result of Januvia usage,
12 | including but not limited to Decedent Robinson being diagnosed with pancreatic cancer.  Plaintiff
13 | Waites, Decedent Robinson, and her physicians were unaware that Decedent Robinson's injuries
14 | were caused by Januvia until shortly before the filing of this complaint.

15 |      55.    Plaintiff Lynn McCrea ("Plaintiff McCrea") is a natural person currently residing in
16 | Cottonwood, California.  She is the surviving spouse and successor-in-interest of the estate of David
17 | McCrea, Sr. ("Decedent McCrea"), who was a natural person residing in Cottonwood, California at
18 | the time he ingested the defective and unreasonably dangerous prescription drug, Januvia, was
19 | diagnosed with pancreatic cancer, and ultimately died of said cancer on August 23, 2013.  Plaintiff
20 | McCrea is bringing her individual claims, including her claim for the wrongful death of the Decedent
21 | McCrea, and the claims of the estate.  Plaintiff David Edward McCrea, Jr., is a natural person
22 | currently residing in Novato, California and is the son of Decedent McCrea.  Plaintiff Travis James
23 | McCrea, is a natural person currently residing in Benicia, California and is the son of Decedent
24 | McCrea.  Plaintiffs David Edward McCrea, Jr. and Travis James McCrea are bringing their individual
25 | claims, including their claims for the wrongful death of Decedent McCrea.

26 |      56.    Decedent McCrea was prescribed and used Januvia beginning on or about October 24,
27 | 2011 and continued said use through at least July 11, 2013.  On or about January 30, 2013, Decedent
28 | McCrea suffered severe physical, economic and emotional injuries as a result of Januvia usage,

397001
20
**FOURTH AMENDED COMPLAINT FOR DAMAGES**

1   including but not limited to Decedent McCrea being diagnosed with pancreatic cancer. Plaintiff

2   McCrea, Decedent McCrea, and his physicians were unaware that Decedent McCrea's injuries were

3   caused by Januvia until shortly before the filing of this complaint.

4          57.    Plaintiff Flora Lleshanaku ("Plaintiff Lleshanaku") is a natural person currently

5   residing in Elm Grove, Illinois. She is the surviving spouse and successor-in-interest of the estate of

6   Alpin Lleshanaku ("Decedent Lleshanaku"), who was a natural person residing in Worth, Illinois at

7   the time he ingested the defective and unreasonably dangerous prescription drug, Januvia, was

8   diagnosed with pancreatic cancer, and ultimately died of said cancer on September 13, 2012. Plaintiff

9   Lleshanaku is bringing her individual claims, including her claim for the wrongful death of the

10  Decedent Lleshanaku, and the claims of the estate. Plaintiff Alma Cohen, is a natural person

11  currently residing in Buffalo Grove, Illinois and is the daughter of Alpin Lleshanaku. Plaintiff Alma

12  Cohen is bringing her individual claims, including her claims for the wrongful death of Decedent

13  Lleshanaku.

14         58.    Decedent Lleshanaku was prescribed and used Januvia beginning on or about April 24,

15  2011 and continued said use through at least September 5, 2012. On or about September 7, 2012,

16  Decedent Lleshanaku suffered severe physical, economic and emotional injuries as a result of Januvia

17  usage, including but not limited to Decedent Lleshanaku being diagnosed with pancreatic cancer.

18  Plaintiff Lleshanaku, Decedent Lleshanaku, and his physicians were unaware that Decedent

19  Lleshanaku's injuries were caused by Januvia until shortly before the filing of this complaint.

20         59.    Plaintiff William Bentley, Sr. ("Plaintiff Bentley") is a natural person currently

21  residing in Blue Ridge, Virginia. He is the surviving spouse and successor-in-interest of the estate of

22  Elmyra Bentley ("Decedent Bentley"), who was a natural person residing in Blue Ridge, Virginia at

23  the time she ingested the defective and unreasonably dangerous prescription drug, Januvia, was

24  diagnosed with pancreatic cancer, and ultimately died of said cancer on February 12, 2013. Plaintiff

25  Bentley is bringing his individual claims, including his claim for the wrongful death of the Decedent

26  Bentley, and the claims of the estate. Plaintiff William Bentley, Jr. is a natural person currently

27  residing in Troutville, VA and is the son of Decedent Bentley. Plaintiff William Bentley, Jr. is

28  bringing his individual claims, including his claims for the wrongful death of Decedent Bentley.

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

60.     Decedent Bentley was prescribed and used Januvia beginning on or about March 23, 2009 and continued said use through at least October 8, 2012.  On or about September 18, 2012, Decedent Bentley suffered severe physical, economic and emotional injuries as a result of Januvia usage, including but not limited to Decedent Bentley being diagnosed with pancreatic cancer. Plaintiff Bentley, Decedent Bentley, and her physicians were unaware that Decedent Bentley's injuries were caused by Januvia until shortly before the filing of this complaint.

61.     Plaintiff Geraldine M. Romano ("Plaintiff Romano") is a natural person currently residing in Steger, Illinois.  She is the surviving spouse and successor-in-interest of the estate of John A. Romano ("Decedent Romano"), who was a natural person residing in Steger, Illinois at the time he ingested the defective and unreasonably dangerous prescription drug, Byetta, was diagnosed with pancreatic cancer, and ultimately died of said cancer on September 15, 2012.  Plaintiff Romano is bringing her individual claims, including her claim for the wrongful death of the Decedent Romano, and the claims of the estate.  Plaintiff Melody Rypstra is a natural person currently residing in Steger, Illinois and is the daughter of Decedent Romano.  Plaintiff Melody Rypstra is bringing her individual claims, including her claims for the wrongful death of Decedent Romano.

62.     Decedent Romano was prescribed and used Byetta beginning on or about March 19, 2007 and continued said use through at least January 28, 2008.  As a result of his use of Byetta, Decedent Romano suffered severe physical, economic and emotional injuries, including but not limited to Decedent Romano being diagnosed with pancreatic cancer.  Plaintiff Romano, Decedent Romano, and his physicians were unaware that Decedent Romano's injuries were caused by Byetta until shortly before the filing of this complaint.

63.     Plaintiff Patricia A. Shackelford ("Plaintiff Shackelford") is a natural person currently residing in Oklahoma City, Oklahoma.   She is the surviving spouse, successor-in-interest and administrator of the estate of Melvin A. Shackelford ("Decedent Shackelford"), who was a natural person residing in Oklahoma City, Oklahoma at the time he ingested the defective and unreasonably dangerous prescription drug, Januvia, was diagnosed with pancreatic cancer, and ultimately died of said cancer on November 13, 2012.  Plaintiff Shackelford is bringing her individual claims, including her claim for the wrongful death of the Decedent Shackelford, and the claims of the estate.

64.    Decedent Shackelford was prescribed and used Januvia beginning on or about October 17, 2010 and continued said use through at least October 2, 2012.  On or about October 26, 2012, Decedent Bentley suffered severe physical, economic and emotional injuries as a result of Januvia usage, including but not limited to Decedent Shackelford being diagnosed with pancreatic cancer. Plaintiff Shackelford, Decedent Shackelford, and his physicians were unaware that Decedent Shackelford's injuries were caused by Januvia until shortly before the filing of this complaint.

65.    Plaintiff Laureen Quirk ("Plaintiff Laureen Quirk") is a natural person currently residing in Scotts Valley, California, was residing there at the time she ingested the defective and unreasonably dangerous prescription drug, Byetta, and was diagnosed with pancreatic cancer. Plaintiff Timothy Quirk ("Plaintiff Timothy Quirk") is a natural person currently residing in Scotts Valley, California and is the spouse of Plaintiff Laureen Quirk.

66.    Plaintiff Laureen Quirk was prescribed and used Byetta beginning on or about October 7, 2008 and continued said use through at least June 4, 2011.  As a result of her use of Byetta, Plaintiff Laureen Quirk suffered severe physical, economic and emotional injuries including, but not limited to, Plaintiff Laureen Quirk being diagnosed with pancreatic cancer.  Plaintiff Laureen Quirk, Plaintiff Timothy Quirk, and her physicians were unaware that Plaintiff Laureen Quirk's injuries were caused by Januvia until shortly before the filing of this complaint.

67.    Plaintiff Joanne Ripa ("Plaintiff Ripa") is a natural person currently residing in Toms River, New Jersey.  She is the surviving spouse and successor-in-interest of the estate of Louis N. Ripa ("Decedent Ripa"), who was a natural person residing in Toms River, New Jersey at the time he ingested the defective and unreasonably dangerous prescription drugs, Byetta, Januvia and Victoza, was diagnosed with pancreatic cancer, and ultimately died of said cancer on March 29, 2013. Plaintiff Ripa is bringing her individual claims, including her claim for the wrongful death of the Decedent Ripa, and the claims of the estate.

68.    Decedent Ripa was prescribed and used Byetta beginning on or about June 27, 2005 and continued said use through at least January 9, 2006.  In addition, Decedent Ripa was prescribed and used Januvia beginning on or about November 9, 2006 and continued said use through July 19, 2009.  In addition, Decedent Ripa was prescribed and used Victoza beginning on or about October

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

28, 2010 and continued said use through at least February 28, 2013. On or about March 10, 2013, Decedent Ripa suffered severe physical, economic and emotional injuries as a result of his Byetta, Januvia and Victoza usage, including but not limited to, Decedent Ripa being diagnosed with pancreatic cancer. Plaintiff Ripa, Decedent Ripa, and his physicians were unaware that Decedent Ripa's injuries were caused by Byetta, Januvia and Victoza until shortly before the filing of this complaint.

69. Plaintiff Timothy Pratt ("Plaintiff Timothy Pratt") is a natural person currently residing in Freehold, New Jersey, was residing there at the time he ingested the defective and unreasonably dangerous prescription drugs, Januvia and Victoza, and was diagnosed with pancreatic cancer. Plaintiff Jackie Pratt ("Plaintiff Jackie Pratt") is a natural person currently residing in Freehold, New Jersey and is the spouse of Plaintiff Timothy Pratt.

70. Plaintiff Timothy Pratt was prescribed and used Januvia beginning on or about April 8, 2011 and continued said use through at least August 25, 2011. In addition, Plaintiff Timothy Pratt was prescribed and used Victoza beginning on or about August 25, 2011 and continued said use through at least August 29, 2013. As a result of his use of Januvia and Victoza, Plaintiff Timothy Pratt suffered severe physical, economic and emotional injuries including, but not limited to being diagnosed with pancreatic cancer. Plaintiff Timothy Pratt, Plaintiff Jackie Pratt, and his physicians were unaware that Plaintiff Timothy Pratt's injuries were caused by Januvia and Victoza until shortly before the filing of this complaint.

71. Plaintiff Daniel Hammond ("Plaintiff Daniel Hammond") is a natural person currently residing in Rensselaer, Indiana, was residing there at the time he ingested the defective and unreasonably dangerous prescription drugs, Byetta, Januvia and Victoza, and was diagnosed with pancreatic cancer. Plaintiff Susan Hammond ("Plaintiff Susan Hammond") is a natural person currently residing in Rensselaer, Indiana and is the spouse of Plaintiff Daniel Hammond.

72. Plaintiff Daniel Hammond was prescribed and used Byetta beginning on or about November 8, 2007 and continued said use through at least June 13, 2010. In addition, Plaintiff Daniel Hammond was prescribed and used Januvia beginning on or about March 17, 2011 and continued said use through at least June 25, 2012. In addition, Plaintiff Daniel Hammond was prescribed and

24
**FOURTH AMENDED COMPLAINT FOR DAMAGES**

1  used Victoza beginning on or about July 7, 2012 and continued said use through at least March 30,

2  2013.  On or about February 8, 2013, Plaintiff Daniel Hammond suffered severe physical, economic

3  and emotional injuries as a result of his use of Byetta, Januvia, and Victoza including, but not limited

4  to being diagnosed with pancreatic cancer.  Plaintiff Daniel Hammond, Plaintiff Susan Hammond,

5  and his physicians were unaware that Plaintiff Daniel Hammond's injuries were caused by Byetta,

6  Januvia and Victoza until shortly before the filing of this complaint.

7                                                     **DEFENDANTS**

8          73.     Amylin Pharmaceuticals, Inc. f/k/a Amylin Pharmaceuticals, Inc. ("Amylin") is a

9  Delaware Corporation, which has its principal place of business is at 9360 Towne Centre Drive, Suite

10  100, San Diego, CA 92121-3030.  Amylin may be served by and through its registered agent:  CT

11  Corporation System, 818 W. Seventh St., Los Angeles, CA 90017.

12          74.     Eli Lilly and Company ("Eli Lilly") is an Indiana corporation with its principal place

13  of business located at Lilly Corporate Center, Indianapolis, Indiana 46285.  Eli Lilly may be served

14  by and through its registered agent: National Registered Agents, Inc., 2875 Michelle Dr., Ste. 100,

15  Irvine, CA 92606.

16          75.     Merck Sharp & Dohme (Italia) S.p.A., Inc. ("MSDI") is a foreign corporation with its

17  principal place of business located at Via Emilia, 21 27100 – Pavia, Italy.  MSDI has transacted and

18  conducted business within the State of California.  MSDI has derived substantial revenue from goods

19  and products disseminated and used in the State of California, and MSDI expected or should have

20  expected its acts to have consequences within the State of California, and derived substantial revenue

21  from commerce within the State of California.

22          76.     Merck Sharp & Dohme Corp. ("MSDC") is a California corporation, which has its

23  principal place of business at 2000 Galloping Hill Rd., Kenilworth, NJ 07033.  MSDC may be served

24  at CT Corporation System, 818 W. Seventh St., Los Angeles, CA 90017.  MSDC has conducted

25  business and derived substantial revenue from within the State of California.

26          77.     Merck Sharp & Dohme Ltd. ("MSDL") is a foreign corporation with its principal

27  place of business located at Cramlington, Northumberland, UK NE23 3JU.  MSDL has transacted and

28  conducted business within the State of California.  MSDL has derived substantial revenue from goods

397001                                                        25

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

and products disseminated and used in the State of California, and MSDL expected or should have expected its acts to have consequences within the State of California, and derived substantial revenue from commerce within the State of California.

78.     Merck & Co., Inc ("Merck") is a California corporation, which has its principal place of business at One Merck Drive, P.O. Box 100, Whitehouse Station, NJ 08889-0100 USA.  Merck may be served at Merck & Co., Inc., One Merck Drive, P.O. Box 100, Whitehouse Station, NJ 08889-0100.  Merck has conducted business and derived substantial revenue from within the State of California.

79.     Novo Nordisk, Inc. ("Novo Nordisk") is a Delaware corporation, which has its principal place of business at 800 Scudders Mill Road Plainsboro, NJ 08536.  Novo Nordisk may be served by and through its registered agent: CT Corporation System, 818 W. Seventh St., Los Angeles, CA 90017.  Novo Nordisk has conducted business and derived substantial revenue from within the State of California.

80.     Novo Nordisk A/S ("Nordisk A/S") is a foreign corporation with its business headquarters located at Novo Allé, DK-2880 Bagsvaerd, Denmark.  Nordisk A/S has transacted and conducted business within the State of California.  Nordisk A/S has derived substantial revenue from goods and products disseminated and used in the State of California, and Nordisk A/S has expected or should have expected its acts to have consequences within the State of California, and derived substantial revenue from commerce within the State of California.

81.     McKesson Corporation ("McKesson") is a Delaware corporation with its principal place of business located at One Post Street, San Francisco, California 94104.  McKesson has conducted business and derived substantial revenue from within the State of California.

### JURISDICTION AND VENUE

82.     Plaintiffs are informed and believe, and thereon allege that at all times herein mentioned each of the Defendants hereto are individuals, corporations, partnerships and/or unincorporated associations organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that said Defendants, and each of them, were and are authorized to do and are doing business in the State of California, including

26

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

1   Defendant McKesson Corporation, which has elected to maintain its corporate headquarters in

2   California, and that said Defendants have and do regularly conduct business in the County of San

3   Diego, State of California.   Moreover, Defendant Amylin has elected to maintain its corporate

4   headquarters in California, and that Defendant has and does regularly conduct business in San Diego

5   County, California.

6        83.   Venue is proper in this county because at least one Defendant, Amylin, has its

7   principal place of business in this county.

8        84.   Plaintiffs herein expressly disavow any claims are being made pursuant to federal law,

9   treaties, or constitution.  Although the amount in controversy greatly exceeds $75,000.00, there is a

10  lack of complete diversity because at least one plaintiff and one defendant are citizens of California.

11  Additionally, at least one plaintiff and one defendant are citizens of Indiana and New Jersey. Any

12  removal, or consent to removal, of this case to federal court would be wholly improper and would

13  subject the removing party to costs and expenses associated with any wrongful removal of this

14  matter, which costs and expenses Plaintiffs will seek if removed.

15                          **FACTUAL ALLEGATIONS**

16       85.   This is an action for injuries and damages suffered by Plaintiffs and the Injured Parties

17  as a direct and proximate result of the Defendants' negligent and wrongful conduct in connection

18  with the design, development, manufacture, testing, packaging, promoting, marketing, distribution,

19  labeling, and/or sale of the Drugs.

20       86.   Defendants, directly or through their agents, apparent agents, servants or employees

21  designed, manufactured, marketed, advertised, distributed, promoted, labeled, tested and sold the

22  Drugs as prescriptions that, along with diet and exercise, are designed to help lower blood sugar

23  levels in adults with type 2 diabetes.

24       87.   According to the American Diabetes Association, "Type 2 diabetes is the most

25  common form of diabetes.  Millions of Americans have been diagnosed with type 2 diabetes. […]  In

26  type 2 diabetes, either the body does not produce enough insulin or the cells ignore the insulin.

27  Insulin is necessary for the body to be able to use glucose for energy.  When you eat food, the body

28  breaks down all of the sugars and starches into glucose, which is the basic fuel for the cells in the

397001

27

body.  Insulin takes the sugar from the blood into the cells.  When glucose builds up in the blood instead of going into cells, it can lead to diabetes complications."[1]

88.    Type 2 diabetes mellitus is a chronic disease, characterized by insulin resistance and deficient insulin secretion leading to high blood sugar levels or 'hyperglycemia', which is the hallmark of the condition.

89.    Diabetes remains the most frequent cause of blindness, amputations and dialysis worldwide.[2]  With the current estimate of more than 350 million patients worldwide[3] it is considered to be one of the major health challenges of the 21st century.

90.    Janumet, Januvia, Victoza, and Byetta are supposed to help prevent these diabetic complications.

91.    The two most recently approved classes of therapeutic agents for the treatment of type 2 diabetes, glucagon-like peptide-1 (GLP-1) receptor (GLP-1R) agonists (such as Byetta and Victoza) and dipeptidyl peptidase-4 (DPP-4) inhibitors (such as Janumet and Januvia), exert their actions through potentiation of incretin receptor signaling. Incretins are gut-derived hormones, principally GLP-1 and glucose-dependent insulinotropic peptide (GIP), that are secreted at low basal levels in the fasting state.

92.    Januvia was approved by the Food and Drug Administration ("FDA") on or about October 16, 2006 "as an adjunct to diet and exercise to improve glycemic control in patients with type 2 diabetes mellitus as monotherapy and in combination with metformin or a PPAR$\gamma$ agonist (e.g., thiazolidinediones) when diet and exercise plus the single agent do not provide adequate glycemic control."[4]

93.    Following FDA approval, Januvia was launched by Defendants in North America in 2006.

94.    Janumet was approved by the Food and Drug Administration ("FDA") on or about March 30, 2007 "as an adjunct to diet and exercise to improve glycemic control in adult patients with

---

[1]  http://www.diabetes.org/diabetes-basics/type-2/?loc=DropDownDB-type2
[2]  *Id.*
[3]  IDF Diabetes atlas, http://www.idf.org/diabetesatlas/5e/diabetes.
[4]  http://www.accessdata.fda.gov/Drugatfda_docs/appletter/2006/021995s000ltr.pdf

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

1  type 2 diabetes mellitus who are not adequately controlled on metformin or sitagliptin alone or in

2  patients already being treated with the combination of sitagliptin and metformin..["5]

3      95.    Following FDA approval, Janumet was launched by Defendants in North America in

4  2007. Janumet is a successor of Januvia which was the first in a new class of drugs that inhibit the

5  proteolytic activity of DPP-4, thereby potentiating the action of endogenous glucoregulatory peptides,

6  known as incretins.[6]

7      96.    Byetta was approved by the FDA in April of 2005 and was marketed to the medical

8  community and general public shortly thereafter.

9      97.    Victoza was approved by the FDA in January of 2010 and was marketed to the

10  medical community and general public shortly thereafter.

11      98.    Byetta and Victoza are members of the new class of Drugs known as glucagon-like

12  peptide-1 (GLP-1) receptor agonists.

13      99.    In February 2010, concerns were published regarding the GLP-1 drugs, including,

14  Byetta and Victoza, and the DPP-4 inhibitors, including Janumet and Januvia, and their potential

15  linkage with pancreatic cancer.

16      100.    Writing in DIABETES CARE, Butler *et al*. published *GLP-1–Based Therapy for*

17  *Diabetes: What You Do Not Know Can Hurt You*'[7] wherein they wrote, "History has taught us that

18  enthusiasm for new classes of drugs, heavily promoted by the pharmaceutical companies that market

19  them, can obscure the caution that should be exercised when the long-term consequences are

20  unknown.   Of perhaps greatest concern in the case of the GLP-1–based drugs, including GLP-1

21  agonists and dipeptidyl peptidase-4 (DPP-4) inhibitors, is preliminary evidence to suggest the

22  potential risks of asymptomatic chronic pancreatitis and, with time, pancreatic cancer."

23      101.    In addition, these researchers wrote, "However, in the context of a new class of

24  medical therapy, the proverb 'What you do not know cannot hurt you' clearly does not apply.  We

25  feel that enough preliminary evidence has accumulated to suggest that there is a plausible risk that

26
27
28

---

[5]  http://www.accessdata.fda.gov/drugsatfda_docs/appletter/2007/022044s000ltr
[6]  Drucker D, Easley Continuing, Kirkpatrick P. Sitagliptin. Nature Reviews Drug Discovery. Feb. 2007. 6:109-10.
[7]  Butler PC, Dry D, Elashoff D. GLP-1–Based Therapy for Diabetes: What You Do Not Know Can Hurt You Diabetes Care February 2010 33:453-455.

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

long-term recipients of GLP-1–based therapy may develop asymptomatic chronic pancreatitis…., and worse, subsequently a minority of individuals treated by this class of drugs may develop pancreatic cancer."

102.    In February 2011, the journal Gastroenterology published on-line the work of Elashoff *et al.*[8] titled, *Pancreatitis, pancreatic, and thyroid cancer with glucagon-like peptide-1-based therapies*.

103.    These researchers used the FDA Adverse Event Reporting System (AERS) to assess the association between treatment with Victoza and Januvia and an adverse event report of pancreatitis, where the drugs were listed as the primary suspect associated with a pancreatitis report in the database.  A secondary goal was to examine the FDA AERS database for reported pancreatic or thyroid cancer associated with use of Victoza and Januvia, with various other anti-diabetic drugs used as controls.  Metformin was not used as a control drug because it has been reported to decrease the risk of pancreatic cancer.

104.    These researchers reported that pancreatitis, inflammation of the pancreas, was >10-fold more frequently reported as an adverse event for patients administered GLP-1 class of drugs (including Victoza and Byetta) and >6-fold more frequently reported in patients prescribed Januvia (and other DPP-4 inhibitors, which includes Janumet).  Both these associations were statistically significant.

105.    Because pancreatitis is a known risk factor for pancreatic cancer,[9] Elashoff *et al.* evaluated the reported rates of pancreatic cancer with Januvia (and similar drugs) compared to control events relative to Avandia (rosiglitazone).

106.    The reported event rate for pancreatic cancer was 2.9-fold greater in patients treated with Byetta (and similar drugs in the GLP-1 class, like Victoza) compared to other therapies.  The reported event rate for pancreatic cancer was 2.7-fold greater with Januvia (and similar DPP-4 drugs, like Janumet) than other therapies.

---

[8]   Elashoff M, Matveyenko AV, Gier B, Elashoff R & Butler PC Pancreatitis, pancreatic, and thyroid cancer with glucagon-like peptide-1-based therapies. Gastroenterology (2011) 141:150-156.

[9]   Rebours V, Boutron-Ruault MC, Schnee M, et al.  The natural history of hereditary pancreatitis: a national series. Gut 2009; 58:97–103.

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

107.   Because pancreatitis acts as a risk factor for subsequent pancreatic cancer through the mechanisms of chronic inflammation and increased cell turnover,[10] it is foreseeable that there is a progressive increased risk of pancreatic cancer with prolonged exposure to the Drugs.

108.   These researchers noted that the potential to increase the risk of cancer might be expected to occur by "permitting declaration of tumors previously held in check by an intact immune system" as has been published by others within the world's medical literature.

109.   On May 13, 2011, the Arzneimittelkommission der deutschen Ärzteschaft (Drug Commission of the German Medical Association - AkdÄ) published *Pancreatic cancers associated with exenatide (Byetta ®)* on its website.[11]

110.   In the German adverse event database, reporting of pancreatic cancer was also unusually high in association with Byetta (11 cases in 4 years, with yearly 15,000-25,000 treated patients).[12]

111.   The period between the start of treatment with Byetta and a diagnosis of pancreatic cancer was on average 12.2 months (within a range of 2-33 months).

112.   Some of the manufacturers of the Drugs have suggested that the most likely reason for the apparent association between the use of these Drugs and acute pancreatitis is the increased risk of pancreatitis in patients with type 2 diabetes.[13]

113.   However, recent animal studies showing pancreatitis as a consequence of GLP-1 mimetic therapy (and other incretin-based therapies) challenge that assumption and lead to the conclusion that asymptomatic chronic pancreatitis is an adverse effect of GLP-1-based treatment, which is further confirmed by specific studies as applied to sitagliptin (active ingredient in Januvia and Janumet)[14] and exenatide (Byetta).[15]

---

[10]   Bhanot UK, Moller P. Mechanisms of parenchymal injury and signaling pathways in ectatic ducts of chronic pancreatitis: implications for pancreatic carcinogenesis. Lab Invest 2009; 89:489– 497.
[11]   http://www.akdae.de/Arzneimittelsicherheit/Bekanntgaben/Archiv/2011/20110513.html
[12]   Arzneimittelkommission der deutschen Ärzteschaft. Aus der UAW-Datenbank": Pankreaskarzinome im Zusammenhang mit Exenatid (Byetta®). Dtsch Arztebl, (2011) 108: A-1080; (as cited by Vangoitsenhoven R, Mathieu C, Van Der Schueren B. GLP1 and cancer: friend or foe? Endocrine Related Cancer. 2012 Jun 12. [Epub ahead of print])
[13]   Monami M, Lamanna C, Marchionni N, Mannucci E. Rosiglitazone and risk of cancer: a meta-analysis of randomized clinical trials. Diabetes Care 2008; 31:1455–1460.
[14]   Matveyenko AV, Dry S, Cox HI, et al. Beneficial endocrine but adverse exocrine effects of sitagliptin in the HIP rat

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

114.    GLP-1 receptors are abundantly expressed in the pancreas, and sitagliptin therapy has been shown to lead to increased pancreatic ductal replication, acinar to ductal metaplasia or cellular change, and also, acute pancreatitis in a rat model of type 2 diabetes.[16]

115.    Increased ductal turnover and acinar to ductal metaplasia are both well-established characteristics of chronic pancreatitis in humans.[17]

116.    It has also been suggested that immunomodulatory effects of DPP-4 inhibition might increase risk for all cancers.[18,19]

117.    Butler et al.[20] also reported that human and rodent pancreases contain numerous GLP-1 receptors in areas in which cancer is thought to originate, and mice that are genetically predisposed to pancreatic cancer develop the disease more quickly than usual in response to Byetta.

118.    In April 2012, Public Citizen, a non-profit consumer-advocacy organization based in Washington DC, sent a petition to the FDA to withdraw Victoza (liraglutide), a drug in the GLP-1 class, from the market.

119.    Dr. Sidney Wolfe, director of the health and research group at Public Citizen, said at that time, "We don't just go after drugs casually...(W)e only go after drugs when there is clear evidence of unique dangers or risks, and when there is no evidence of a unique clinical advantage."

120.    Dr. Wolfe said at the time that his concern extends to other diabetes drugs that alter the GLP-1 pathway, which would include Januvia, Janumet and Victoza.  The petition to withdraw Victoza was based on information pulled from the FDA's AERS database.  Public Citizen counted 28 cases of pancreatic cancer reported between February 2010 and September 2011 among patients on

model of type 2 diabetes, interactions with metformin. Diabetes 2009; 58:1604–1615.

[15] Nachnani JS, Bulchandani DG, Nookala A, et al. Biochemical and histological effects of exendin-4 (exenatide) on the rat pancreas. Diabetologia 2009; 58:1604–1615.

[16] Matveyenko AV, Dry S, Cox HI, et al. Beneficial endocrine but adverse exocrine effects of sitagliptin in the HIP rat model of type 2 diabetes, interactions with metformin. Diabetes 2009; 58:1604–1615.

[17] Bhanot UK, Moller P. Mechanisms of parenchymal injury and signaling pathways in ectatic ducts of chronic pancreatitis: implications for pancreatic carcinogenesis.  Lab Invest 2009; 89:489–497.

[18] Havre PA, Abe M, Urasaki Y, et al.  The role of CD26/dipeptidyl peptidase IV in cancer.  Front Biosci 2008; 13:1634–1645.

[19] Matteucci E, Giampietro O. Dipeptidyl peptidase-4 (CD26): knowing the function before inhibiting the enzyme.  Curr Med Chem 2009; 16:2943–2951.

[20] Gier B, Matveyenko AV, Kirakossian D, et al. Chronic GLP-1 Receptor Activation by Exendin-4 Induces Expansion of Pancreatic Duct Glands in Rats and Accelerates Formation of Dysplastic Lesions and Chronic Pancreatitis in the KrasG12D Mouse Model.  Diabetes May 2012 vol. 61 no. 5 1250-1262

1  Victoza, compared with just one case in a patient taking a diabetes drug that does not manipulate the

2  GLP-1 pathway.

3     121.    In February 2013, the results of the first case-controlled epidemiological study looking

4  at the Drugs and their effects upon the pancreas were published by Singh et al. out of the Johns

5  Hopkins School of Medicine and School of Public Health.[21]

6     122.    Singh et al used administrative claims data from the Blue Cross Blue Shield

7  Association plans of Tennessee, Hawaii, Michigan, and North Carolina; Highmark, Inc. and

8  Independence Blue Cross of Pennsylvania; and Wellmark, Inc. of Iowa and South Dakota.  They

9  evaluated 1,269 hospitalized cases with acute pancreatitis using a validated algorithm and 1,269

10  control subjects matched for age category, sex, enrollment pattern, and diabetes complications.  The

11  strengths of this study include the large size of the sample, the ability to adjust for confounders, and

12  the independence of the authors from the companies marketing the Drugs.

13     123.    After adjusting for available confounders and metformin hydrochloride use, current

14  use of GLP-1–based therapies within 30 days demonstrated the existence of a statistically significant

15  adjusted Odds Ratio (OR) of 2.24 in relation to the development of acute pancreatitis.  For those

16  patients with recent use of GLP-1-based therapies past 30 days and less than 2 years, the statistically

17  significant OR was 2.01 for the development of acute pancreatitis as compared to the odds of

18  'nonusers' of these drugs. 'Any use' was also associated with statistically significantly higher odds of

19  acute pancreatitis with a statistically significant adjusted OR of 2.07.  Significantly, the Confidence

20  Intervals for each of these findings were "tight" attesting to the robust nature of their findings.

21     124.    The results from the case-controlled epidemiological study "...support findings from

22  the previously mechanistic studies and spontaneous reports submitted to the US Food and Drug

23  Association that such an association may be causal."[22]  The import of this language – "...*such an*

24  *association may be causal*" – by these epidemiologists and physicians as peer-reviewed and

25  published in the *Journal of the American Medical Association - Internal Medicine*, one of the finest

---

27  [21] Singh S et al. Glucagonlike Peptide 1–Based Therapies and Risk of Hospitalization for Acute Pancreatitis in Type 2
    Diabetes Mellitus.  JAMA Intern Med. 2013 Feb 25:1-6. [Epub ahead of print].

28  [22] Id.

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

medical journals in the world, cannot be understated.

125.   It is easy to appreciate that the increased risk of pancreatitis associated with the Drugs is of critical importance.   Antecedent pancreatitis is the most common risk factor for subsequent pancreatic cancer.   Analysis of the FDA AERS database, discussed *supra,* already showed a signal for pancreatic cancer with exenatide and sitagliptin by 2009, and likely much earlier.

126.   Pancreatic cancer develops after progressive accumulation of somatic mutations leads to the formation of pancreatic intraepithelial neoplasia (PanIN) of increasing grade that, in a subset of individuals, transforms to malignant neoplasms.[23]

127.   The PanIN lesions are relatively common in middle-aged adults and express the GLP-1 receptor.   Glucagon-like peptide 1 induces growth of lesions similar to intraductal papillary mucinous neoplasia in rats and accelerates dysplasia of PanIN lesions and pancreatitis in mice prone to pancreatic cancer.[24]

128.   Therefore, in those individuals with preexisting PanIN lesions or intraductal papillary mucinous neoplasia, GLP-1–based therapy promotes growth of these lesions, causing partial ductal obstruction and pancreatitis in some individuals.   Of even greater concern, GLP-1–based therapy can accelerate the progression and transformation of premalignant PanIN lesions, much like the effect of estrogen therapy in women with estrogen receptor–expressing breast neoplasia.   In other words, the incretin-based therapies are to pancreatic premalignant cells as wheat is to the prairie fire.

129.   On March 22, 2013, in an on-line publication within the journal *Diabetes,* Butler et al published the results of their examinations of the pancreata obtained from age-matched brain dead organ donors with and without diabetes treated by incretin-based therapies (> 1 yr) or other therapy and non diabetic controls.[25]

---

[23] Gier B, Butler PC. Glucagonlike Peptide 1-Based Drugs and Pancreatitis: Clarity at Last, but What About Pancreatic Cancer?: Comment on "Glucagonlike Peptide 1-Based Therapies and Risk of Hospitalization for Acute Pancreatitis in Type 2 Diabetes Mellitus". JAMA Intern Med. 2013 Mar 5:1-3. doi: 10.1001/jamainternmed.2013.3374. [Epub ahead of print]

[24] Gier B, Matveyenko AV, Kirakossian D, Dawson D, Dry SM, Butler PC. Chronic GLP-1 receptor activation by exendin-4 induces expansion of pancreatic duct glands in rats and accelerates formation of dysplastic lesions and chronic pancreatitis in the KrasG12D mouse model. Diabetes. 2012;61(5): 1250-1262.

[25] Butler AE, Campbell-Thompson M, Gurlo T, Dawson DW, Atkinson M, Butler PC. Marked Expansion of Exocrine and Endocrine Pancreas with Incretin Therapy in Humans with increased Exocrine Pancreas Dysplasia and the potential for Glucagon-producing Neuroendocrine Tumors. Diabetes. 2013 Mar 22. [Epub ahead of print]

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

130.   These researchers observed that pancreatic mass was increased approximately 40 percent in diabetes patients treated with incretin-based therapies compared to that in individuals with diabetes not treated with such agents, and that the increase was statistically significant.   They also observed that the pancreatic fractional insulin area, that area occupied by each cell type, was approximately 60 percent reduced in diabetic patients not treated with incretin-based therapies compared to non-diabetic controls, again, a statistically significant result.   In contrast, they observed that the pancreatic fractional insulin area was approximately 5-fold increased in diabetic patients treated with incretin-based therapies when compared to individuals not treated with incretin-based therapies, also statistically significant.

131.   Furthermore, actual beta (ß) cell mass was increased 6-fold in incretin-based therapies treated diabetics and the ß cell mass was 3-fold greater in individuals with diabetes treated with incretin-based therapies in comparison to non diabetic controls, both observations also being statistically significant.   These researchers noted that the increased pancreatic mass in diabetics induced by incretin-based therapies was accompanied by increased whole pancreas cell proliferation and an increase in the presence of pancreatic intraepithelial neoplasia (PanINs), both observations being statistically significant.

132.   The observation by Butler et al that the pancreatic mass of the individuals with diabetes treated with incretin-based therapies was increased by 40 percent in comparison to diabetics not treated with incretin-based therapies is consistent with the prior rodent studies that revealed proliferative actions of GLP-1 on the exocrine pancreas – extending the animal studies to human studies.[26, 27]

133.   Of further concern is the marked alpha (α) cell hyperplasia, glucagon expressing microadenomas and glucagon expressing neuroendocrine tumors noted by Butler et al in individuals with diabetes treated with incretin-based therapies. These findings reproduce the α cell hyperplasia,

---

[26] Matveyenko AV, Dry S, Cox HI, Moshtaghian A, Gurlo T, Galasso R, Butler AE, Butler PC: Beneficial endocrine but adverse exocrine effects of sitagliptin in the human islet amyloid polypeptide transgenic rat model of type 2 diabetes: interactions with metformin. Diabetes 2009;58:1604-1615

[27] Gier B, Matveyenko AV, Kirakossian D, Dawson D, Dry SM, Butler PC: Chronic GLP-1 receptor activation by exendin-4 induces expansion of pancreatic duct glands in rats and accelerates formation of dysplastic lesions and chronic pancreatitis in the Kras(G12D) mouse model.  Diabetes 2012;61:1250-1262

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

abnormal α cell distribution, and predisposition to glucagon expressing neuroendocrine tumors previously reported in the literature.[28, 29, 30]

134.   As a result of the defective nature of the Drugs, persons who were prescribed and ingested the Drugs, for even a brief period of time, including the Injured Parties, were at increased risk for developing life-threatening pancreatic cancer. Once that cancer spreads, a patient stands just a 1.8% chance of surviving for longer than five years.

135.   "At present, the GLP-1 class of drugs is heavily promoted (and prescribed) as having purported advantages that outweigh its risks."[31] Singh et al, *supra,* show that, "...despite large numbers of underpowered studies claiming the contrary from marketing companies, little is yet known about long-term adverse effects of the GLP-1 class of drugs on the exocrine pancreas."[32] A striking finding in the studies by Butler et al[33] is the marked expansion of the exocrine and endocrine compartments of the pancreas with incretin-based therapies. The findings of an increased pancreatic mass, increased PanIN lesions, and endocrine proliferations by Butler et al in response to GLP-1 mimetic therapy adds significantly to concerns already shown regarding the adverse actions of GLP-1 mimetic therapy to induce pancreatitis and accelerate pancreatic dysplasia.[34] Prior reports concerning pancreas changes with incretin-based therapy were generally confined to studies of rodent pancreas, but have since been unquestionably extended by Butler et al to humans with the added concern of developing neuroendocrine tumors.   These findings demonstrate the effects of long term GLP-1 related therapy with respect to both unintended proliferative actions on the exocrine pancreas and an

---

[28] Gelling RW, Du XQ, Dichmann DS, Romer J, Huang H, Cui L, Obici S, Tang B, Holst JJ, Fledelius C, Johansen PB, Rossetti L, Jelicks LA, Serup P, Nishimura E, Charron MJ: Lower blood glucose, hyperglucagonemia, and pancreatic alpha cell hyperplasia in glucagon receptor knockout mice. Proc Natl Acad Sci U S A 2003;100:1438-1443

[29] Yu R, Dhall D, Nissen NN, Zhou C, Ren SG: Pancreatic neuroendocrine tumors in glucagon receptor-deficient mice. PLoS One 2011;6:e23397

[30] Zhou C, Dhall D, Nissen NN, Chen CR, Yu R: Homozygous P86S mutation of the human glucagon receptor is associated with hyperglucagonemia, alpha cell hyperplasia, and islet cell tumor. Pancreas 2009;38:941-946

[31] Gier B, Matveyenko AV, Kirakossian D, Dawson D, Dry SM, Butler PC. Chronic GLP-1 receptor activation by exendin-4 induces expansion of pancreatic duct glands in rats and accelerates formation of dysplastic lesions and chronic pancreatitis in the KrasG12D mouse model. Diabetes. 2012;61(5): 1250-1262.

[32] ID

[33] Butler AE, Campbell-Thompson M, Gurlo T, Dawson DW, Atkinson M, Butler PC. Marked Expansion of Exocrine and Endocrine Pancreas with Incretin Therapy in Humans with increased Exocrine Pancreas Dysplasia and the potential for Glucagon-producing Neuroendocrine Tumors. Diabetes. 2013 Mar 22. [Epub ahead of print]

[34] Elashoff M, Matveyenko AV, Gier B, Elashoff R, Butler PC: Pancreatitis, pancreatic, and thyroid cancer with glucagon-like peptide-1-based therapies.  Gastroenterology 2011;141:150-156

---

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

increased risk of neuroendocrine tumors.

136.    Due to the flawed formulation of the Drugs, the Drugs increase the risk of pancreatic cancer in those diabetic patients to whom it is prescribed.

137.    Defendants concealed their knowledge that the Drugs can cause, promote, or otherwise accelerate life threatening pancreatic cancer from the Injured Parties, other consumers, the general public, and the medical community.  Indeed, the manufacturers of the Drugs do not even mention 'pancreatic cancer' in their drugs' respective product inserts.

138.    Specifically, the Defendants did not adequately inform consumers and the prescribing medical community about the risks of pancreatic cancer associated with the Drugs' usage, nor did Defendants warn or otherwise advise physicians to institute monitoring procedures looking for the first signs of changes within the pancreas.

139.    The current warnings for the Drugs are simply inadequate.  The Defendants have failed and continue to fail in their duties to warn and protect the consuming public, including the Injured Parties herein.

140.    Even if the warnings were sufficient, which Plaintiffs strongly deny, the Drugs still lack any benefit sufficient to tolerate the extreme risk posed by the ingestion of these drugs.  Other drugs to treat diabetes are available.  The Drugs are quite simply too dangerous and defective as formulated.  The Defendants should withdraw the Drugs from the market.

141.    Defendants willfully, wantonly, and with malice withheld the knowledge of increased risk of pancreatic cancer in users of the Drugs to prevent any chance of their product's registration being delayed or rejected by FDA.

142.    As the manufacturers and distributors of the Drugs, Defendants knew or should have known that the Drugs' usage was associated with pancreatic cancer.

143.    With the knowledge of the true relationship between use of the Drugs and pancreatic cancer, rather than taking steps to pull the Drugs off the market or provide strong warnings, Defendants promoted and continue to promote the Drugs as a safe and effective treatment for adults with type 2 diabetes.

144.    Victoza's global sales reached $1.044 billion during 2011 and the first two sales

1 quarters of 2012 have already reached $748 million.[35]

2     145.    Januvia is also one of the top selling drugs in the country, and further, Januvia is one

3 of the Merck Defendants' best sellers with $1.977 billion in sales the first two quarters of 2012

4 alone.[36]

5     146.    Janumet and Byetta have likewise been highly successful drugs, making hundreds of

6 millions, if not billions, of dollars for the Defendants.

7     147.    While Defendants have enjoyed great financial success from their blockbuster drugs,

8 they continue to place American citizens at risk of developing deadly pancreatic cancer.

9     148.    Consumers, including the Injured Parties, who have used the Drugs for treatment of

10 their type 2 diabetes, had several alternative safer products available to treat their condition and have

11 not been adequately warned about the significant risks and lack of benefits associated with the Drugs'

12 therapy.

13     149.    Defendants, through their affirmative misrepresentations and omissions, actively

14 concealed from the Injured Parties and the Injured Parties' physicians the true and significant risks

15 associated with the Drugs' use.

16     150.    As a result of Defendants' actions, the Injured Parties and the Injured Parties'

17 physicians were unaware, and could not reasonably have known or have learned through reasonable

18 diligence that the Injured Parties would be exposed to the risks identified in this Complaint.   The

19 increased risks and subsequent medical damages associated with the Injured Parties' use of the Drugs

20 were the direct and proximate result of Defendants' conduct.

21     151.    At all times relevant hereto, the Defendants have directly marketed and distributed the

22 Drugs to the medical community.

23     152.    At all times relevant hereto, the Defendants have directly marketed the Drugs to the

24 consuming public throughout the United States, including the Injured Parties herein.

25     153.    Defendants departed from and failed to meet requirements of laws, regulations and

26

27 [35]http://webmedia.novonordisk.com/nncom/images/investors/investor_presentations/2012/Interim_report/PR120809_H1_ UK.pdf (Victoza 2011 sales amount converted from 804 million Euros to 1,044 million US dollars and 2012 quarters converted 576 Euros to 748 US dollars using Google Currency Converter accessed October 25, 2012)

28 [36] http://www.merck.com/investors/financials/sec-filings/home.html (Merck & Co., Inc. Form10Q filed 08/07/2012).

class and product specific requirements, including failing to undertake adequate post approval marketing studies on safety of the Drugs as dictated by good pharmaceutical science standards.

154.   Defendants both over-promoted the Drugs and under-warned about their risks, including:

  a.   in print advertising;

  b.   on their websites and blogs;

  c.   advertised to users that use of the Drugs was "safe" whereas it was not and Defendants knew or should have known it was not; and

  d.   promoted the Drugs to doctors, clinics and users as safer than (or as safe as) other diabetes drugs.

155.   Defendants did not perform adequate safety testing on the Drugs as required by good pharmaceutical science practice.

156.   Defendants failed to provide proper and full information as to the safety of the Drugs.

157.   Defendants failed to ensure that full and correct safety labeling and warnings were used in pharmacy sheets that accompanied the Drugs to the purchaser.

158.   Defendants have never sought to enlarge their warnings to include a warning about pancreatic cancer risks associated with the use of the Drugs.

159.   Instead, Defendants marketed (and continue to market) the Drugs as having a low risk of side effects and continue to minimize the Drugs' deadly side effects.

160.   Manufacturers, such as the Defendants herein, are required to have systems in place to collect and analyze any complaints they receive from doctors and hospitals about their products.

161.   Defendants did not timely apprise the FDA, the public, nor treating physicians of the defect(s) in Defendants' Drugs, despite Defendants' knowledge that injuries had occurred and had been reported to Defendants due to the above-described defects.

162.   At all times mentioned herein, Defendants knew, or in the exercise of reasonable care should have known, that the Drugs were of such a nature that they were not properly designed, manufactured, tested, inspected, packaged, labeled, distributed, marketed, examined, sold, supplied, prepared, and/or provided with proper warnings, were not suitable for the purpose they were intended

1    and were unreasonably likely to injure the products' users.

2        163.    The Injured Parties and their prescribing health care providers were unaware of the

3    true degree and incidence of pancreatic cancer associated with the use of the Drugs and would have

4    used and prescribed other methods for diabetes control if they had been so informed.

5        164.    The Injured Parties suffered from severe and personal injuries, which were permanent

6    and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as

7    well as the need for medical treatment, monitoring and/or medications.

8        165.    As a direct and proximate result of the aforesaid conduct of Defendants and each of

9    them as set forth hereinafter, the Injured Parties suffered injuries, including but not limited to

10   pancreatic cancer, which resulted in the damages to the Injured Parties in a sum in excess of the

11   jurisdictional limits of the Court.

12       166.    As a direct and proximate result of the aforesaid conduct of the Defendants, and each

13   of them, the Injured Parties were compelled to incur obligations for physicians, surgeons, nurses,

14   hospital care, medicine, hospices, x-rays, medical supplies, and other medical treatment, the true and

15   exact amount thereof being unknown at this time, and Plaintiffs pray leave to amend this complaint

16   accordingly when the true and exact cost thereof is ascertained.

17       167.    As a further direct and proximate result of the said conduct of the Defendants, and

18   each of them, the Injured Parties suffered a loss of income, wages, profits and commissions, a

19   diminishment of earning potential, and other pecuniary losses, the full nature and extent of which are

20   not yet known; and leave is requested to amend this complaint to conform to proof at the time of trial.

21       168.    By using the Drugs, Plaintiffs and the Injured Parties have been caused great pain and

22   suffering.

23                             **FIRST CAUSE OF ACTION**

24                       **STRICT LIABILITY - FAILURE TO WARN**

25                             **(As to All Defendants)**

26       169.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth

27   herein.

28       170.    Defendants are liable under the theory of strict products liability.  Defendants were at

all times relevant to this suit, and are now, engaged in the business of designing, manufacturing, testing, marketing, and placing into the stream of commerce pharmaceuticals, including the Drugs at issue in this lawsuit, for sale to and use by members of the public. The Drugs manufactured by Defendants reached the Injured Parties without substantial changes and were ingested as directed. The Drugs were defective and unreasonably dangerous when they entered into the stream of commerce and when used by the Injured Parties.

171. The Injured Parties were administered the Drugs for their intended purposes.

172. The Injured Parties could not have discovered any defect in the Drugs through the exercise of reasonable care.

173. Defendants, as manufacturers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field, and further, Defendants knew or should have known that warnings and other clinically relevant information and data which they distributed regarding the risks of injuries and death associated with the use of the Drugs were incomplete and inadequate.

174. The Injured Parties did not have the same knowledge as Defendants and no adequate warning or other clinically relevant information and data was communicated to the Injured Parties or their treating physicians. The warnings that were given by the Defendants were not accurate, clear, and/or were ambiguous or incomplete.

175. Defendants had a continuing duty to provide consumers, including the Injured Parties and their physicians, with warnings and other clinically relevant information and data regarding the risks and dangers associated with the Drugs, as it became or could have become available to Defendants.

176. Defendants marketed, promoted, distributed and sold unreasonably dangerous and defective prescription drugs, Janumet, Januvia, Victoza, and Byetta, to health care providers empowered to prescribe and dispense the Drugs to consumers, including the Injured Parties, without adequate warnings and other clinically relevant information and data. Through both omission and affirmative misstatements, Defendants misled the medical community about the risk and benefit balance of the Drugs, which resulted in injury to the Injured Parties and the untimely deaths of the Injured Parties.

177.    Despite the fact that Defendants knew or should have known that the Drugs caused unreasonable and dangerous side effects, they continued to promote and market the Drugs without stating that there existed safer and more or equally effective alternative drug products and/or providing adequate clinically relevant information and data.

178.    Defendants knew or should have known that consumers, including the Injured Parties, would foreseeably and needlessly suffer injury or death as a result of Defendants' failures.

179.    Defendants failed to provide timely and adequate warnings to physicians, pharmacies, and consumers, including the Injured Parties and their intermediary physicians, in at least the following ways:

   a.    Defendants failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert the Injured Parties and the Injured Parties' physicians to the dangerous risks of the Drugs including, among other things, their tendency to increase the risk of, and/or cause, the development of pancreatic cancer;

   b.    Defendants failed to provide adequate post-marketing warnings and instructions after the Defendants knew or should have known of the significant risks of, among other things, pancreatic cancer; and

   c.    Defendants continued to aggressively promote and sell the Drugs even after they knew or should have known of the unreasonable risks of developing pancreatic cancer from ingestion of the Drugs.

180.    Defendants had an obligation to provide the Injured Parties and the Injured Parties' physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to the Drugs, and/or to inform them that there existed safer and more or equally effective alternative drug products.

181.    By failing to provide the Injured Parties and the Injured Parties' physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to the Drugs, and/or to inform them that there existed safer and more or equally effective alternative drug products, Defendants breached their duty of reasonable care and safety.

182.    Defendants' actions described above were performed willfully, intentionally, and with reckless disregard of the life and safety of the Injured Parties and the public so as to warrant the imposition of punitive damages.

183.    Defendants' actions described above violated the federal and state Food, Drug and Cosmetic Acts and rendered the Drugs misbranded.

184.    As a direct and proximate result of the actions and inactions of the Defendants as set forth above, the Injured Parties were exposed to the Drugs and suffered the injuries and damages set forth hereinabove.

## SECOND CAUSE OF ACTION

## STRICT LIABILITY – DESIGN DEFECT

### (As to All Defendants)

185.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

186.    Defendants are the manufacturers, designers, distributers, sellers and suppliers of the Drugs, and sold the Drugs in the course of business.

187.    The Drugs manufactured, designed, sold, marketed, distributed, supplied and/or placed in the stream of commerce by Defendants were expected to and did reach the consumer without any alterations or changes.

188.    The Drugs administered to the Injured Parties were defective in design or formulation in the following respects:

a.    When they left the hands of the Defendants, the Drugs were unreasonably dangerous to an extent beyond that which could reasonably be contemplated by the Injured Parties or the Injured Parties' physicians;

b.    Any benefits of these Drugs were outweighed by the serious and undisclosed risks of their use when prescribed and used as the Defendants intended;

c.    The dosages and/or formulations of the Drugs sold by the Defendants were unreasonably dangerous;

d.    There are no patients for whom the benefits of the Drugs outweighed the risks;

43

e.     The subject product was not made in accordance with the Defendants' specifications or performance standards;

f.     There are no patients for whom the Drugs were a safer and more efficacious drug than other drug products in its class; and/or

g.     There were safer alternatives that did not carry the same risks and dangers that Defendants' Drugs had.

189.   The Drugs administered to the Injured Parties were defective at the time they were distributed by the Defendants or left their control.

190.   The foreseeable risks associated with the Drugs include, but are not limited to, the fact that the design or formulation of the Drugs is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner, and/or does not have the claimed benefits.

191.   The defective and unreasonably dangerous design and marketing of the Drugs was a direct, proximate and producing cause of the Injured Parties' injuries and damages.  Under strict products liability theories set forth in Restatement (Second) of Torts, Defendants are liable to Plaintiffs for all damages claimed in this case.

192.   As a direct, legal, proximate, and producing result of the defective and unreasonably dangerous condition of the Drugs, Plaintiffs and the Injured Parties suffered personal injuries and economic and non-economic damages, including pain and suffering.

193.   Defendants' actions and omissions as identified in this Complaint show that Defendants acted maliciously and/or intentionally disregarded the Injured Parties' rights so as to warrant the imposition of punitive damages.

### THIRD CAUSE OF ACTION

### NEGLIGENCE

### (As to All Defendants)

194.   Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

195.    Defendants had a duty to use reasonable care in the design, manufacture, testing, marketing and sale of the Drugs, and to use reasonable care in providing adequate warnings of the risks and dangers of the Drugs.

196.    Defendants negligently and carelessly designed, manufactured, tested, marketed and sold the Drugs, and negligently failed warn of the risks and dangers of the Drugs.  In particular, Defendants knew or should have known, in the exercise of reasonable care as experts in the field of drug design, manufacture, testing, marketing and sale, that the Drugs could cause or contribute to the development of pancreatic cancer and complications associated with pancreatic cancer in individuals who used the Drugs in an intended or reasonably foreseeable manner.

197.    Despite the fact that Defendants knew or should have known that the Drugs caused unreasonable and dangerous side effects, Defendants negligently failed to adequately warn prescribing physicians, including the Injured Parties' prescribing physicians, of the risks of developing pancreatic cancer as a result of ingesting the Drugs.  In addition, Defendants were negligent in marketing and promoting the Drugs to prescribing physicians and consumers because they overstated the Drugs' benefits while downplaying the nature and extent of their risks, with the result that any warnings relating to the risk of pancreatic cancer were overshadowed and rendered ineffective.

198.    Defendants knew or should have known that consumers such as the Injured Parties would reasonably suffer injuries and damages as a result of Defendants' failure to exercise ordinary care as described above.  Defendants' negligence was a direct, legal, proximate, and producing cause of Plaintiffs' and the Injured Parties' personal injuries and economic and non-economic damages, including pain and suffering.

199.    Defendants' negligent actions and omissions as identified herein show that Defendants acted maliciously and/or intentionally disregarded the Injured Parties' rights so as to warrant the imposition of punitive damages.

/ /

397001

45

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

**FOURTH CAUSE OF ACTION**

**NEGLIGENCE *PER SE***

**(As to All Defendants)**

200.     Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

201.     Defendants had an obligation to not violate the law in the design, manufacture, testing, marketing and sale of the Drugs, and in providing adequate warnings of the risks and dangers of the Drugs.

202.     Defendants violated the Health & Safety Code, sections 110290, 110390, 110395, 110398, 110400, and 111330, and Civil Code Sections 1750, 1790, *et. seq.,* and regulations promulgated thereunder, and Code of Regulations 1707.2, and other applicable laws, statutes and regulations.

203.     The Injured Parties, as consumers of the Drugs, are within the class of persons the statutes and regulations described above are designed to protect, and the Injured Parties' injuries are the type of harm these types of statutes are designed to prevent.

204.     Defendants failed to meet the standard of care set by the applicable statutes and regulations, which were intended for the benefit of individuals such as the Injured Parties, making Defendants' failures negligence *per se*.

205.     The labeling lacked adequate information on the use of the Drugs, even though Defendants were aware of the widespread use of the Drugs.

206.     The labeling failed to include warnings for serious side effects, including pancreatic cancer, when there was reasonable evidence of its association with the Drugs.

207.     The labeling was misleading and in violation of Health & Safety Code Sections 11130 and 110290.

208.     Defendants' advertising and representations regarding the Drugs were false and misleading in violation of Health & Safety Code Sections 110390 and 110290, and Civil Code Section 1770(a)(5).

209.     Defendants failed to warn and/or consult as required by Code of Regulations Section

1707.2.

210.    As a direct and proximate result of Defendants' negligence *per se* and the violations of the statutes and regulations described above, the Plaintiffs and Injured Parties suffered personal injuries and economic and non-economic damages, including pain and suffering.  Defendants acted maliciously and/or intentionally disregarded the Injured Parties' rights when violating the statutes and regulations described above, so as to warrant the imposition of punitive damages.

## FIFTH CAUSE OF ACTION

### BREACH OF IMPLIED WARRANTY

### (As to All Defendants)

211.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

212.    Defendants impliedly warranted to the Injured Parties and the Injured Parties' physicians and healthcare providers that the Drugs were of merchantable quality and fit for the particular purpose for which they were intended.

213.    Defendants, as the designers, manufacturers, testers, marketers and sellers of the Drugs, had reason to know the Injured Parties would use the Drugs for the particular purpose for which the Drugs were intended and were marketed and sold by Defendants; specifically, for the treatment of type 2 diabetes.

214.    Defendants, as the designers, manufacturers, testers, marketers and sellers of the Drugs, had reason to know the Injured Parties and the Injured Parties' physicians and healthcare providers were relying on the skill and judgment of the Defendants in using and prescribing the Drugs.

215.    The products were unsafe for their intended use, they were not of merchantable quality, and they were not fit for the particular purpose for which they were as warranted by Defendants, in that the Drugs would cause severe injury, including pancreatic cancer or death.  The Drugs were not accompanied by adequate warnings of their risks and dangers when they were distributed and sold.

216.    As a direct and proximate result of Defendants' breach of implied warranties, the

1 | Plaintiffs and Injured Parties suffered personal injuries and economic and non-economic damages,
2 | including pain and suffering.

3 |     217.    After the Plaintiffs and Injured Parties were made aware of or otherwise came to
4 | believe that the injuries discussed herein were a result of the Drugs, notice was duly given to
5 | Defendants of the breach of implied warranty.

6 | ## SIXTH CAUSE OF ACTION

7 | ## BREACH OF EXPRESS WARRANTY

8 | ### (As to All Defendants)

9 |     218.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth
10 | herein.

11 |     219.    Defendants' Drugs were expressly warranted to be safe for use by the Injured Parties,
12 | and other members of the general public.

13 |     220.    At the time the express warranties were made, Defendants had knowledge of the
14 | purpose for which the Drugs were to be used, and warranted the Drugs to be fit, safe, effective and
15 | proper for such use in all respects.  The Drugs were not accompanied by adequate warnings of their
16 | risks and dangers when they were distributed and sold.

17 |     221.    The Injured Parties and the Injured Parties' physicians reasonably relied upon the skill
18 | and judgment of Defendants, and upon their express warranties, in using the Drugs.  The warranties
19 | were untrue in that the Drugs were unsafe, and therefore unsuited for the purpose for which they were
20 | intended.

21 |     222.    As a direct and proximate result of Defendants' breach of express warranties, the
22 | Plaintiffs and Injured Parties suffered personal injuries and economic and non-economic damages,
23 | including pain and suffering.

24 |     223.    After the Plaintiffs and Injured Parties were made aware of or otherwise came to
25 | believe that the injuries discussed herein were a result of the Drugs, notice was duly given to
26 | Defendants of the breach of express warranty.

27 |

28 | / / /

397001

48

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

## SEVENTH CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION

#### (As to All Defendants)

224.   Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

225.   Defendants owed a duty to exercise reasonable care to ensure that they did not create unreasonable risks of personal injury to others in the communication of information concerning the Drugs.

226.   Defendants, through their sales representatives and other authorized agents, disseminated false information to physicians concerning the properties and effects of the Drugs, misrepresenting that the Drugs were safe and effective.

227.   The Defendants made the foregoing representations without any reasonable ground for believing them to be true.   These representations were made in publications and other written materials directed to physicians, consumers of the Drugs and the public, with the intention of inducing reliance on the prescription, purchase and use of the Drugs.

228.   The foregoing representations made by Defendants were false.   The Drugs were not safe and effective, but were hazardous to human health, and caused serious injuries including the injuries suffered by the Plaintiffs and Injured Parties herein.

229.   In reliance on the misrepresentations by Defendants, the Injured Parties were induced to use the Drugs.   If the Injured Parties had known the true facts, they would not have used the Drugs. The reliance of the Injured Parties on Defendants' misrepresentations was justified because the misrepresentations were made by individuals and entities that were in a position to know the true facts.

230.   As a direct and proximate result of Defendants' negligent dissemination of false information to physicians, the Plaintiffs and Injured Parties suffered personal injuries and economic and non-economic damages, including pain and suffering.

/ /

## SEVENTH CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

### (As to All Defendants)

224.   Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

225.   Defendants owed a duty to exercise reasonable care to ensure that they did not create unreasonable risks of personal injury to others in the communication of information concerning the Drugs.

226.   Defendants, through their sales representatives and other authorized agents, disseminated false information to physicians concerning the properties and effects of the Drugs, misrepresenting that the Drugs were safe and effective.

227.   The Defendants made the foregoing representations without any reasonable ground for believing them to be true.   These representations were made in publications and other written materials directed to physicians, consumers of the Drugs and the public, with the intention of inducing reliance on the prescription, purchase and use of the Drugs.

228.   The foregoing representations made by Defendants were false.   The Drugs were not safe and effective, but were hazardous to human health, and caused serious injuries including the injuries suffered by the Plaintiffs and Injured Parties herein.

229.   In reliance on the misrepresentations by Defendants, the Injured Parties were induced to use the Drugs.   If the Injured Parties had known the true facts, they would not have used the Drugs. The reliance of the Injured Parties on Defendants' misrepresentations was justified because the misrepresentations were made by individuals and entities that were in a position to know the true facts.

230.   As a direct and proximate result of Defendants' negligent dissemination of false information to physicians, the Plaintiffs and Injured Parties suffered personal injuries and economic and non-economic damages, including pain and suffering.

//

231.   Defendants acted maliciously and/or intentionally disregarded the Injured Parties' rights when negligently misrepresenting the Drugs as described above, so as to warrant the imposition of punitive damages.

## **EIGHTH CAUSE OF ACTION**

### **FRAUD BY CONCEALMENT**

### **(As to All Defendants)**

232.   Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

233.   Defendants had the duty and obligation to disclose to the Injured Parties and to the Injured Parties' physicians, the true facts concerning the Drugs, that is, that the Drugs were dangerous and defective, and likely to cause serious health consequences to users, including pancreatic cancer.

234.   Defendants concealed important facts from the Injured Parties and from the Injured Parties' physicians and healthcare providers which facts include, but are not limited to, the fact that Defendants:

a.   Failed to disclose any connection between the use of the Drugs and the development of pancreatic cancer;

b.   Did not inform prescribers and users of studies related to the use of the Drugs and the development of pancreatic cancer, and

c.   Concealed from prescribers and users that numerous adverse events have been reported linking the use of the Drugs to pancreatic cancer.

235.   Defendants made affirmative representations to the Injured Parties and the Injured Parties' prescribing physicians prior to the day the Drugs were first prescribed to the Injured Parties that the Drugs were safe as set forth above while concealing the material facts set forth herein.

236.   Defendants intentionally, willfully, and maliciously concealed or suppressed the facts set forth above from the Injured Parties' physicians, and therefore from the Injured Parties, with the intent to defraud as alleged herein.

237.   Neither the Injured Parties nor the Injured Parties' physicians or healthcare providers were aware of the concealed facts set forth herein.  Had they been aware of those facts, they would

not have prescribed the Drugs as part of the Injured Parties' treatment and the Injured Parties would not have been injured as a result.

238.   Had the Injured Parties been informed of the deaths and serious injury adverse reports associated with the Drugs' usage, the Injured Parties would have immediately discontinued the Drugs or never taken the Drugs in the first instance.

239.   As a direct and proximate result of the concealment or suppression of the facts set forth above, the Injured Parties and the Injured Parties' physicians and healthcare providers reasonably relied on Defendants' deception, and the Injured Parties were prescribed the Drugs and subsequently suffered personal injuries and economic and non-economic damages, including pain and suffering.  Defendants' concealment was a substantial factor in causing the injuries described herein.

240.   Defendants acted maliciously and/or intentionally disregarded the Injured Parties' rights when engaging in the foregoing fraudulent and deceitful conduct, so as to warrant the imposition of punitive damages

### NINTH CAUSE OF ACTION

### WRONGUL DEATH

### (Only Applicable if Injured Party is Deceased)

241.   Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

242.   Plaintiffs are the surviving spouse, child and/or parent, and representative of the estate of the Injured Parties, who used Defendants' Drugs and were injured and died as a result.  Said Injured Parties were prescribed, supplied with, and consumed the Drugs as designed, manufactured, tested, marketed and sold or otherwise placed in the stream of interstate commerce by Defendants.

243.   The injuries and damages of Plaintiffs and the Injured Parties were caused by the wrongful acts, omissions, and fraudulent misrepresentations of Defendants.

244.   As a result of the conduct of Defendants and the use of Defendants' Drugs, the Injured Parties suffered fatal injuries.

245.   As a result of the death of the Injured Parties, Plaintiffs were deprived of love, companionship, comfort, affection, society, solace and moral support of the Injured Parties.

246.    Plaintiffs are entitled to recover economic and non-economic damages against all Defendants for wrongful death directly, proximately and legally caused by the defects in Defendants' Drugs and the negligent conduct, acts, errors, omissions and intentional and negligent misrepresentations of Defendants.

## TENTH CAUSE OF ACTION

### LOSS OF CONSORTIUM

### (Only Applicable when Consortium Plaintiff Named)

247.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

248.    Plaintiffs were at all times relevant hereto the spouse, child, and/or parent of the Injured Parties.

249.    For the reasons set forth in this Complaint, Plaintiffs have been caused, presently and in the future, to suffer the loss of the Injured Parties' companionship and society, and accordingly, the Plaintiffs have been caused great mental anguish.

## ELEVENTH CAUSE OF ACTION

### SURVIVAL ACTION

### (Only Applicable if Injured Party is Deceased)

250.    Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

251.    As a direct and proximate result of the Defendants' conduct and their failure to comply with applicable standards, as outlined above, the Injured Parties suffered bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity of the enjoyment of life, expenses of hospitalization, medical and nursing care and treatment, and loss of earnings as well as loss of ability to earn money prior to the Injured Parties' death.

252.    The representative/administrator/successor-in-interest of the Injured Parties' estates bring this claim for damages on behalf of the Injured Parties' estates and the Injured Parties' beneficiaries.

397001

52

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

253.   The representative/administrator/successor-in-interest of the Injured Parties' estates further pleads all survival damages allowed by statute and law in the state or states in which the causes of action accrued.

## PUNITIVE DAMAGES ALLEGATIONS

### (Against All Defendants)

254.   Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

255.   The acts, conduct, and omissions of Defendants were willful and malicious and were done with a conscious disregard for the health, safety, and rights of the Injured Parties and other foreseeable users of the Drugs identified in this Complaint, and for the primary purpose of increasing Defendants' profits from the sale and distribution of the Drugs.  The outrageous and unconscionable conduct of Defendants, as set forth herein, warrants an award of exemplary and punitive damages against Defendants, and each of them, pursuant to Civil Code section 3294, in an amount appropriate to punish and make an example of each Defendant.

256.   Prior to the manufacturing, sale and distribution of the Drugs, Defendants knew the Drugs were in a defective condition as previously described herein and knew that those who were prescribed and the foreseeable users who took the Drugs would experience and did experience severe and permanent physical, mental, emotional and economic injuries.  Further, Defendants, through their officers, directors, managers and agents, had knowledge that the Drugs presented a substantial and unreasonable risk of harm to the public, including the Injured Parties, and as such, the purchasers and/or consumers of the Drugs were unreasonably subjected to risk of pancreatic cancer from the consumption of said drug.

257.   Despite such knowledge, Defendants, acting through their officers, directors and managing agents for the purpose of enhancing their profits, knowingly and deliberately failed to remedy the known defects of the Drugs and failed to warn any and all persons who prescribed, purchased or consumed Defendants' Drugs, including but not limited to any and all physicians and foreseeable users of the Drugs, of their defective nature and the extreme and dangerous risks associated with their foreseeable uses.  Defendants, as well as their individual agents, officers, and

1   directors, intentionally proceeded with the manufacturing, packaging, labeling, distribution,

2   marketing and sale of the Drugs knowing that foreseeable users would be exposed to serious potential

3   danger in order to advance Defendants' own pecuniary interest and monetary profits.  The conduct of

4   Defendants was despicable, and so contemptuous that it would be looked down upon and despised by

5   ordinary decent people.   Said conduct was carried on by Defendants with willful and conscious

6   disregard for the safety of the Injured Parties, entitling the Injured Parties to exemplary damages

7   under Civil Code section 3294.

8       **WHEREFORE**, Plaintiffs pray for judgment against Defendants, and each of them, as

9   follows:

10      a.   For all past and future general damages, according to proof;

11      b.   For all past and future medical, incidental and other expenses, according to proof;

12      c.   For all past and future loss of earnings and earning capacity, according to proof;

13      d.   For all future medical monitoring costs, according to proof;

14      e.   For all costs, attorneys' fees, expenses, and pre- and post-judgment interest as

15           authorized by law on the judgments entered on Plaintiffs' behalf;

16      f.   For all damages for loss of companionship and society, funeral expenses and burial

17           expenses, according to proof;

18      g.   For all wrongful death damages pursuant to Code of Civil Procedure sections 377.60,

19           *et seq.*, according to proof;

20      h.   For all survival action damages pursuant to Code of Civil Procedure sections 377.30,

21           *et seq.,* according to proof;

22      i.   For punitive and exemplary damages, according to proof; and

23      j.   For such other and further relief as the Court deems just and proper.

24

25  DATED: January 8, 2015                 **ENGSTROM, LIPSCOMB & LACK**

26                                         By: _Timothy M. Clark_

27                                         WALTER J. LACK, ESQ.
                                           BRIAN D. DEPEW, ESQ.
28                                         ELIZABETH L. CROOKE, ESQ.
                                           TIMOTHY M. CLARK, ESQ.

397001                        54
                **FOURTH AMENDED COMPLAINT FOR DAMAGES**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**JOHNSON BECKER, PLLC**
Michael K. Johnson, MN Bar No. 258696
Timothy J. Becker, MN Bar No. 256663
Kenneth W. Pearson, MN Bar No. 016088X
Peter C. Snowdon, MN Bar #389642
33 South 6th Street, Suite 4530
Minneapolis, MN 55402
Office: 612-436-1800
mjohnson@johnsonbecker.com
tbecker@johnsonbecker.com
kpearson@johnsonbecker.com
psnowdon@johnsonbecker.com

*Attorneys for Plaintiffs*

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

**DEMAND FOR JURY TRIALS**

Plaintiffs, CARLA MALLORY, individually, and as heir and successor in interest to STEPHEN MALLORY, Decedent; SCOTT INGRAHAM, individually, and as a child of STEPHEN MALLORY, Decedent; ROSARIO SALDANA, individually; SANDRA VARSI, individually, and as heir and successor in interest to INVANA VARSI, Decedent; MORDECHIA ZARGER, individually, and as heir and successor in interest to REBECCA ZARGER, Decedent, ILAN A. ZARGER, JOSEPH ZARGER, and WILLIAM ZARGER, individually, and as children of REBECCA ZARGER, Decedent; KAY BRUGGEMAN, individually, and as heir and successor in interest to HENRY BRUGGEMAN, Decedent; GEORGE VOLLMER, individually, and as heir and successor in interest to AUDREY VOLLMER, Decedent; MARY B. CLARK, individually, and as heir and successor in interest to EDWARD CLARK, SR., Decedent; MARY F. WILLIS, individually, and as heir and successor in interest to CLAUDE H. WILLIS, III, Decedent; MATTIE S. ALLEN, individually; TERRY BYRD AND RICKY BYRD, individually and jointly; VIVIAN MARIE SHAMBURGER MITCHELL, individually, and as heir and successor in interest to DOROTHY SHAMBURGER, Decedent; CAROL SHIMER, individually, and as heir and successor in interest to THOMAS SHIMER, III, Decedent, JOHN J. SHIMER and THOMAS E. SHIMER, IV, individually, and as children of THOMAS SHIMER, III, Decedent; SHELLEY BRIDGES, individually, and as heir and successor in interest to VIOLA CARSON, Decedent, JEREMY JOHNSON, individually, and as a child of VIOLA CARSON, Decedent; CAROLYN J. KENNEDY, individually, and as heir and successor in interest to BOBBY W. KENNEDY, Decedent, TAMMY CARR, GARY KENNEDY, and JIMMY PAUL KENNEDY, individually, and as children of BOBBY W. KENNEDY, Decedent; RUSSELL PICKERING AND CAROL PICKERING, individually and jointly; GONZALO RAMOS, JR., individually, and as heir and successor in interest to MARIA E. RAMOS, Decedent; IRENE CARSON AND LC. CARSON, individually and jointly; FRANCIS FRAILEY AND DORIS FRAILEY, individually and jointly; GILBERT E. JONES, JR., individually, and as heir and successor in interest to PATRICIA L. JONES, Decedent; TAMI BEERT ARNELL, individually, and as heir and successor in interest to CHRISTOPHER ARNELL, Decedent; NAGHMANA JANJUA, individually, and as heir and successor in interest to MOHAMMAD

**FOURTH AMENDED COMPLAINT FOR DAMAGES**

1  JANJUA, Decedent; ELLIOTT WAITES, JR., individually, and as heir and successor in interest to

2  JOSEPHINE ROBINSON, Decedent; LYNN MCCREA, individually, and as heir and successor in

3  interest to DAVID MCCREA, SR., Decedent; DAVID EDWARD MCCREA, JR. and TRAVIS

4  JAMES MCCREA, individually, and as children of DAVID MCCREA, SR., Decedent; FLORA

5  LLESHANAKU, individually, and as heir and successor in interest to ALPIN LLESHANAKU,

6  Decedent; ALMA COHEN, individually, and as child of ALPIN LLESHANAKU, Decedent;

7  WILLIAM BENTLEY, SR., individually, and as heir and successor in interest to ELMYRA

8  BENTLEY, Decedent; WILLIAM BENTLEY JR., individually, and as a child of ELMYRA

9  BENTLEY, Decedent; GERALDINE M. ROMANO, individually, and as heir and successor in

10  interest to JOHN A. ROMANO, Decedent; MELODY RYPSTRA, individually, and as a child of

11  JOHN A. ROMANO, Decedent; PATRICIA A. SHACKELFORD, individually, and as heir and

12  successor in interest and administrator of the estate of MELVIN L. SHACKELFORD, Decedent;

13  LAUREEN QUIRK AND TIMOTHY QUIRK, individually and jointly; JOANNE RIPA,

14  individually, and as heir and successor in interest to LOUIS N. RIPA, Decedent; TIMOTHY PRATT

15  AND JACKIE PRATT, individually and jointly; DANIEL HAMMOND AND SUSAN

16  HAMMOND, individually and jointly; (collectively "PLAINTIFFS"), hereby demand trials by jury.

17

18  DATED: January 8, 2015

ENGSTROM, LIPSCOMB & LACK

19  By: _Timothy M. Clark_

20       WALTER J. LACK, ESQ.
         BRIAN D. DEPEW, ESQ.
21       ELIZABETH L. CROOKE, ESQ.
         TIMOTHY M. CLARK, ESQ.
22

23  **JOHNSON BECKER, PLLC**
     Michael K. Johnson, MN Bar No. 258696
24   Timothy J. Becker, MN Bar No. 256663
     Kenneth W. Pearson, MN Bar No. 016088X
25   Peter C. Snowdon, MN Bar No. 389642
     33 South 6th Street, Suite 4530
26   Minneapolis, MN 55402
     Office: 612-436-1800
27

28   *Attorneys for Plaintiffs*

397001

57

**FOURTH AMENDED COMPLAINT FOR DAMAGES**