UNITED STATES JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

_____
                                            )
IN RE: INVOKANA (CANAGLIFLOZIN)             )    MDL No. 2750
PRODUCTS LIABILITY LITIGATION               )
_____ )

**DEFENDANTS BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., ELI LILLY AND COMPANY, AND LILLY USA, LLC'S OPPOSITION TO SCHROEDER PLAINTIFFS' SECOND MOTION FOR TRANSFER FOR CENTRALIZATION OF PRETRIAL PROCEEDINGS**

Pursuant to this Panel's October 12, 2016 Order [D.E. 31], Defendants Boehringer Ingelheim Pharmaceuticals, Inc. ("BIPI"), Eli Lilly and Company, and Lilly USA, LLC, (together "Lilly") (collectively, "Jardiance Defendants") hereby submit the following Opposition to the Schroeder Plaintiffs' Second Motion for Transfer of Actions for Centralization of Pretrial Proceedings [D.E. 30].  For the reasons shown below, Jardiance-related cases should not be included in an *Invokana* MDL, and a class-wide, multi-product MDL is not appropriate, especially at this juncture.

**INTRODUCTION**

The Schroeder Plaintiffs have failed to meet their burden of demonstrating that the handful of actions involving Jardiance, currently pending in the United States District Courts, are appropriate for transfer under 28 U.S.C. § 1407.  The Panel has made clear that MDL treatment is warranted only where there are requisite common questions of fact.  The Schroeder Plaintiffs make sweeping statements like "[t]his litigation involves *five* principal manufacturers and developers of Sodium Glucose Cotransporter 2 ('SGLT-2') inhibitors," Schroeder Pls.' Mem. of Law in Supp. of Second Mot. for Transfer [D.E. 30-1] (hereinafter "Schroeder Brief") at 1 (emphasis in original), and that there are "multiple cases pending within various federal courts" that will result in "leav[ing]" cases alleging "nearly identical injuries, resulting from nearly

identical drugs, with nearly identical mechanisms of action, to clog court dockets throughout the Country" if an Invokana-only MDL is formed, *id.* at 2.  The actual facts regarding Jardiance-related cases are very different.

Here, the Jardiance, Farxiga, and Invokana cases each involve different injuries, from different medicines, with different regulatory histories and available data concerning the adverse events of interest.  Moreover, the few Jardiance-related actions all lag the dozens of Invokana-related cases by at least eight months, leaving the cases in fundamentally different postures, making efficient coordination unlikely.  Further, issues of convenience to the parties are not in play here.  It is inconvenient to transfer Jardiance-related cases to a location where no Jardiance Plaintiff or Defendant resides and where no Jardiance case is pending.

There are neither enough cases nor any need to create a Jardiance MDL on its own, and Plaintiffs' unsupported assertions about the potential of future Jardiance actions are just the type of speculation the Panel has found unpersuasive.  As a consequence, the Schroeder Plaintiffs should not be permitted to bootstrap Jardiance cases onto a potential Invokana coordinated proceeding.  Allowing the Schroeder Plaintiffs to do so would have the opposite intended effect—it will create a holding place for Jardiance-related cases to sit, evading individual case scrutiny and clogging the federal courts.  Given the overlap of counsel, there are ample ways to utilize informal coordination between the Jardiance cases and an Invokana MDL, and the Panel has recognized that this type of coordination, as opposed to an MDL, is preferable in these instances.

The Schroeder Plaintiffs have not put forth any reason to override the Panel's usual reluctance "to centralize litigation against multiple, competing defendants which marketed, manufactured and sold [allegedly] similar products."  *In re Watson Fentanyl Patch Prods. Liab.*

*Litig.*, 883 F. Supp. 2d 1350, 1351 (J.P.M.L. 2012).  Indeed, the situation here parallels, and presents a stronger case for rejecting a class-wide MDL than those in *Watson Fentanyl Patch* and *In re Power Morcellator Prods. Liab. Litig.,* 140 F. Supp. 3d 1351, 1353 (J.P.M.L. 2015), where such a class-wide MDL similarly was denied.  For these reasons and the reason set forth below, the Schroeder Plaintiffs' motion seeking MDL treatment for Jardiance should be denied.

## BACKGROUND

### A. Factual and Procedural Background of Jardiance and Invokana Litigations.[1]

The U.S. Food and Drug Administration ("FDA") approved Jardiance (*empagliflozin*) as safe and effective for the treatment of type 2 diabetes on August 1, 2014, making Jardiance the third SGLT-2 inhibitor approved by the FDA following its approval of Invokana (*canagliflozin*) on March 29, 2013 and Farxiga (*dapagliflozin*) on January 8, 2014.

There are currently five total actions (*Darbro*, *Warren*, *Mitchell*, *MacMurray*, and *Watson*) pending in four different federal districts against the Jardiance Defendants.[2]  Four allege that the Plaintiffs developed diabetic ketoacidosis ("DKA") after taking Jardiance, and one (*Watson*), filed by the Schroeder Plaintiffs' counsel only last week, alleges that the Plaintiff developed acute kidney failure after first taking Invokana and, then, at a later point, Jardiance. *See Watson* Compl. [D.E. 3 in 16-cv-00186 (N.D. Tex.)] ¶ 35-36.  The Johnson Becker firm, counsel to the Schroeder Plaintiffs, is counsel in the *Mitchell* (W.D. Tenn.), *MacMurray* (S.D.

---

[1] The Jardiance Defendants do not agree with many of the assertions in the Schroeder Plaintiffs' papers, particularly those related to the purported merits of Plaintiffs' claims and allegations, all of which the Jardiance Defendants deny.  The Jardiance Defendants, however, limit their discussion of the background of these cases to matters pertinent to the Schroeder Plaintiffs' request for coordination of Jardiance-related cases with those involving Invokana and, potentially, Farxiga.

[2] *Darbro v. Boehringer Ingelheim Pharm., Inc.*, No 0:16-CV-00057 (E.D. Ky. May 13, 2016); *Warren v. Boehringer Ingelheim Pharm, Inc.* No. 1:16-cv-01326 (S.D. Ind. May 27, 2016); *Mitchell v. Eli Lilly & Co.*, No. 1:16-cv-02384 (W.D. Tenn. June 2, 2016); *MacMurray v. Janssen Pharm., Inc.*, No. 1:16-cv-02718 (S.D. Ind. Oct. 10, 2016); and *Watson v. Janssen Pharm., Inc.*, No. 1:16-cv-00186 (N.D. Tex. Oct. 18, 2016).

Ind.), and *Watson* (N.D. Tex.) cases, and Johnson Becker's co-counsel in *MacMurray* is also counsel in *Warren* (S.D. Ind.). There are no Jardiance cases pending in state courts anywhere in the country.

*MacMurray* and *Watson* allege dual use of Invokana and Jardiance.[3] Both dual-use cases were filed at the time the Schroeder Plaintiffs' counsel filed the instant motion for a class-wide MDL—the first was filed the day before their motion—and neither has been served. Both dual-use complaints are vague on details, but confirm Plaintiffs' acknowledgement of important differences in the regulatory histories and available scientific data between Jardiance and Invokana. For example, in *Watson*, the one case alleging dual use and acute kidney failure, the Plaintiff exclusively cites data concerning Invokana—not Jardiance—to support her claims. *See* Compl. ¶ 42 ("Invokana in particular, also dramatically increase the likelihood of a patient developing kidney failure"); *id.* ¶¶ 48, 51 (noting FDA communications concerning Invokana); *id.* ¶ 49 (citing Invokana-only data).[4] As the Schroeder Plaintiffs acknowledge, the medications have different regulatory histories and currently differ on certain aspects of their product labeling. *See* Schroeder Br. at 7 (referencing the FDA-required warnings in June 2016 "that Invokana and Farxiga can cause acute kidney injuries").

---

[3] By using the term "dual use," the Jardiance Defendants are not implying that the different SGLT-2 inhibitors involved were used concurrently by Plaintiffs. Contrary to the Schroeder Plaintiffs' assertion, the cases involving two SGLT-2 inhibitors are not "combination therapy" cases. Schroeder Br. at 2. Combination therapy refers to the practice of taking two different drugs at the same time. SGLT-2 inhibitors are only indicated for monotherapy or in combination with a non-SGLT-2 inhibitor. *See* Yehuda Handelsman, *Potential Place of SGLT2 Inhibitors in Treatment Paradigms for Type 2 Diabetes Mellitus*, 21 Endocrine Practice 1054, 1062-63 (2015). Indeed, Plaintiffs' Complaints allege no simultaneous use of Jardiance and Invokana. Thus any "intertwined" issues that this Panel has found with combination therapy claims do not apply here. *See* Schroeder Br. at 10.

[4] At one point, it appears that plaintiffs' counsel either tacitly concedes that the claims of kidney injury do not lie against BIPI and Lilly or simply may have forgotten that they sued any defendant but Janssen, as their Complaint is dominated by Invokana allegations. *Watson* Compl. ¶ 50 (stating "Defendant [*singular*] knew that the likelihood of renal adverse effects such as acute renal failure was nearly tripled in patients with near normal kidney function and more than doubled in patients with even moderately impaired kidney function," in a paragraph wedged among three others stating allegations referring only to Invokana).

The differences in the medications are perceived to be significant enough by the Plaintiffs' bar that several pending Invokana complaints, at least one of which is subject to transfer, and others in state courts, expressly allege that Jardiance is a safer alternative to Invokana and predicate claims on that theory.  *See, e.g.*, *Morey v. Janssen Pharm., Inc.*, No. 3:16-cv-06049 (D.N.J. Sept. 28, 2016), Compl. [D.E. 1] ¶ 60 ("Consumers, including Plaintiff, who have used INVOKANA for treatment of diabetes, have several alternative safer products available to treat the conditions, such as Metformin, Onglyza, Januvia and Jardiance."); *see also Fleming v. Janssen Pharm., Inc.*, No. L-2655-16 (N.J. Super. July 18, 2016) ¶ 58 (Ex. A) (same); *Williams v. Janssen Pharm., Inc.*, No. L-2656-16 (N.J. Super. July 18, 2016) ¶ 58 (Ex. B) (same).  As in *Power Morcellator*, this is a situation in which "the differences among each defendant's [drug] with respect to product design, development, testing, warnings, and marketing will predominate over the common issues."  140 F. Supp. 3d at 1353.  The three other Plaintiffs' consortiums that, to date, have moved for MDLs involving only Invokana underscore the differences between the drugs.

In the three served Jardiance cases, motions to dismiss are awaiting disposition or dispositive motion briefing is in process, and initial discovery and case management has been stayed in each case, pending resolution of the motions to dismiss.  The pleading deficiencies, which are the subject of these motions, are significant and could yield fewer claims, parties (as Lilly has sought dismissal of all claims based on its specific role), and/or pleadings that warrant a response.  In contrast to the five Jardiance cases, there are over 180 Invokana cases currently pending in state and federal courts.  Since the time Plaintiffs filed the first Invokana case in September 2015—eight months before the first Jardiance lawsuit—courts have ruled on dispositive motions and the parties have negotiated and filed discovery plans, protective orders,

and ESI protocols in a number of cases, and discovery also is underway. *See* Def. Janssen's Resp. in Opp. to Schroeder Pls.' Second Mot. [D.E. 45] (hereinafter "Janssen Second Resp.") at 6.

Consistent with the manner in which the *Watson* complaint noted above is pled, the principal injuries alleged in the Jardiance and Invokana litigations diverge. As the Seeger Weiss Plaintiffs describe, the Invokana Plaintiffs' claims focus on "a significant number of reports of severe kidney damage among users of Invokana," such that "patients taking Invokana are several times more likely to report severe kidney damage than those taking non-SGLT-2 diabetes drugs to treat diabetes." Mot. for Transfer and Coordination Under 28 U.S.C. § 1407 [D.E. 1-1] at 3; *see also* Janssen's Resp. to Mot. Transfer and Coordination And Consolidated Pretrial Proceedings [D.E. 32] (hereinafter "Janssen First Resp.") at. 2. The Seeger Weiss and other Plaintiffs also list Invokana cases involving other injuries, including heart attack, stroke and death, that are not among the injuries alleged in Jardiance cases. *E.g.*, *Humphries v. Janssen Pharm., Inc., et al.*, No. 16-cv-02278 (D.N.J. Apr. 22, 2016), Compl. [D.E. 1] ¶ 4, (stroke); *Jackson et al. v. Janssen Pharm., Inc., et al.*, No. 16-cv-00319 (M.D. La. May 10, 2016), Compl. [D.E. 1] (hereinafter "Jackson Complaint") ¶ 37 (diabetic ketoacidosis, heart problems, kidney damage, stroke, and eventual death); *Johnston v. Janssen Pharm., Inc., et al.*, No. 16-cv-05383 (D.N.J. Sept. 7, 2016), Compl. [D.E. 3] ¶ 28 (kidney failure, heart attack, and stroke); *Sarkisyan et al. v. Janssen Pharm., Inc., et al.*, No. 16-cv-05479 (D.N.J. Sept. 9, 2016), Compl. [D.E. 1] ¶ 5 (diabetic ketoacidosis, stroke, heart attack, and severe kidney damage). As stated, the Jardiance claims center on DKA allegations.

Moreover, while Plaintiffs conclusorily plead that the alleged risks outweigh the benefits for each medicine, *e.g.*, *Jackson* Compl. ¶ 152 ([H]arm caused by INVOKANA far outweighed

6

its alleged benefits . . . ."), *Watson* Compl. ¶ 52 ("INVOKANA and JARDIANCE's risks substantially outweigh their benefits"), the available data for each medicine is different. For example, there is evolving, published information on safety data for *empagliflozin*, the compound in Jardiance, that is not available yet for Invokana and Farxiga. In EMPA-REG OUTCOME, an *empagliflozin* randomized controlled cardiovascular outcome study required by the FDA, the results showed favorable cardiovascular and kidney profiles in a population of 7,020 patients. *See* Zinman B, Wanner C, Lachin JM, et al., *Empagliflozin, cardiovascular outcomes, and mortality in type 2 diabetes.,* N. Eng. J. Med. 373(22):2117 (2015) (Ex. C). The results of this study, published in September 2015 in the New England Journal of Medicine, report that the use of *empagliflozin* resulted in significantly lower risk, than placebo, of death from cardiovascular disease, death from any cause, and hospitalization for heart failure. *Id.* At this time, post-marketing clinical trials involving Invokana and Farxiga are ongoing.[5] Indeed, while the FDA has issued several drug safety communications regarding SGLT-2 inhibitors, only two of the five drug safety communications the FDA has directed at any one of these drugs relate to *all* SGLT-2 inhibitors. *See* FDA Safety Announcement regarding Ketoacidosis (May 15, 2015) (class-wide); FDA Safety Announcement regarding Ketoacidosis and Urinary Tract Infection (Dec. 4, 2015) (class-wide); *but see* FDA Safety Announcement regarding Bone Fracture (Sept. 10, 2015) (*canagliflozin* (Invokana, Invokamet)); FDA Safety Announcement

---

[5] Based on these results, on June 28, 2016, an FDA Advisory Committee voted 12 to 11 that there was "substantial evidence to establish that empagliflozin reduces cardiovascular death [in adults with type 2 diabetes and established cardiovascular disease]." Summary Minutes of the Endocrinology and Metabolic Drugs Advisory Committee Meeting, June 28, 2016, (available at
http://www.fda.gov/downloads/AdvisoryCommittees/CommitteesMeetingMaterials/Drugs/EndocrinologicandMetabolicDrugsAdvisoryCommittee/UCM518911.pdf ) (last accessed Oct. 24, 2016). Additionally, the FDA issued a bone fracture safety alert for *canagliflozin* (the compound in Invokana) on September 10, 2015, that did not include Jardiance or Farxiga. (available at
http://www.fda.gov/Safety/MedWatch/SafetyInformation/SafetyAlertsforHumanMedicalProducts/ucm461876.htm)
(last accessed Oct. 24, 2016).

regarding Amputation (May 18, 2016) (*canagliflozin* (Invokana, Invokamet)); FDA Safety Announcement regarding Acute Kidney Injury (June 14, 2016) (*canagliflozin* (Invokana, Invokamet) and *dapagliflozin* (Farxiga, Xigduo XR)).[6]

## ARGUMENT

### A. This Panel Disfavors Centralization of Multi-Manufacturer Actions.

As the Schroeder Plaintiffs recognize, "the Panel is '[h]esitant to centralize litigation against multiple, competing defendants which marketed, manufactured and sold similar products.'" Schroeder Br. at 8 (quoting *In re Yellow Brass Plumbing Component Prod. Liab. Litig.,* 844 F. Supp. 2d 1377, 1378 (J.P.M.L. 2012)); *accord* Janssen First Resp. at 5-6. There are at least five principal Defendants in these sixty-nine actions, all of whom would be required to provide separate discovery responses, documents and witnesses, and each of whom will have individualized defenses about development, testing, marketing, warnings, causation, notice, and other key issues involving their products and their particular role in their product's development and FDA approval. *See* Schroeder Br. 1 n.2 (listing manufacturers and developers). Such industry- or class-wide MDLs are not appropriate where, as here, "individual issues that result from the differences among each defendant's [product] with respect to product design, development, testing, warnings, and marketing will predominate over" factual issues regarding the individual plaintiffs "that are common to all defendants." *Power Morcellator*, 140 F. Supp. 3d at 1353-54; *see*, *e.g.*, *Watson Fentanyl Patch*, 833 F. Supp. 2d at 1351 (denying centralization in action concerning "alleged defects in the design, manufacture and marketing of the Watson fentanyl patch" where "[e]ach group of cases against each manufacturer will involve unique product—and defendant-specific issues (such as the different product designs, manufacturing

---

[6] All FDA Drug Safety Communications are available at http://www.fda.gov/Drugs/DrugSafety/ucm199082.htm (last accessed Oct. 22, 2016).

processes, regulatory histories, and company documents and witnesses) that will overwhelm the few common issues").

The Schroeder Plaintiffs make categorical claims that "common questions of fact exist with regard to all plaintiffs regardless of which drug was ingested." Schroeder Br. at 11. However, they fail to put forward any *facts* to support these assertions. Upon closer examination, even the Schroeder Plaintiffs' own brief highlights that this is a circumstance far more comparable to *Power Morcellator* and *Watson Fentanyl Patch*, in which centralization was denied, than it is to the cases on which Plaintiffs rely.[7]  For example, Plaintiffs rely on the FDA's June 14, 2016 Drug Safety Communication "warning that Invokana and Farxiga can cause acute kidney injury," and which references "101 confirmable cases with acute kidney injury and use of Invokana and Farxiga." Schroeder Br. at 7. This brings to the fore the FDA's different treatment of the medications at issue with respect to safety communications and mandatory product labeling changes, as well as the different principal theories of injury between Jardiance and Invokana cases. *See supra* at 4, 6-8. The same is true, as illustrated above, by the Johnson

---

[7] In *In re: Incretin Mimetics Prods. Liab. Litig.*, 968 F. Supp. 2d 1345 (J.P.M.L. 2013), all plaintiffs and all defendants supported centralization. *See id.* at 1347. Here, all Defendants oppose a class-wide MDL and only one of the four Plaintiffs' groups who filed a petition or response to the Seeger Plaintiffs' MDL petition are seeking class-wide centralization. Furthermore, plaintiffs in all the *Incretin* cases alleged that the medications all caused the same injury—pancreatic cancer. *Id.* at 1346-47 (finding the cases presented "highly similar allegations about . . . the propensity of those drugs to cause pancreatic cancer"). Here, however, as described, the Invokana Plaintiffs place greater emphasis on acute kidney injury, whereas until last week, Jardiance Plaintiffs alleged only DKA. In *In re: Incretin*, there was also a high number of dual-use cases. *Id.* at 1346. Similarly, Plaintiffs' reliance on *In re Androgel Prods. Liab. Litig.* 24 F. Supp. 3d 1378 (J.P.M.L. 2014) misses the mark. In that case, multiple defendants (albeit, not all) supported coordination, and the defendants acknowledged the likelihood of significant additional filings in part due to the frequency of the condition alleged (heart attacks). Given the rarity of the event at issue here, DKA, such a prediction is entirely speculative. Finally, there was also a much greater number of dual-use cases in both *Androgel* and *Incretin* than here. *See* Def. Merck's Resp. To Pls.' Mot. to Transfer [D.E. 27 in MDL-2452] at 7 (stating that 20 of 53 actions alleged more than one Incretin-based therapy); Resp. AbbVie, Abbott Lab., Eli Lilly, and Endo Pharm. to Pls' Mot. Transfer [D.E. 87 in MDL-2545] at 7 (stating 11 of 74 actions alleged use of more than one testosterone replacement therapy).

Becker firm's recent complaint in *Watson*, which is divided into allegations regarding Invokana and acute kidney injury and allegations regarding DKA that supposedly include Jardiance.[8]

Such differences will cause unnecessary complications in fact and expert discovery, expert and dispositive motions, as well as at trial if Jardiance is included in an MDL with Invokana (and Farxiga). Centralization of the five Jardiance cases is not warranted.

### B. The Number Of Jardiance Cases Is Small And May Well Remain Small.

As detailed, there are *five* cases involving Jardiance pending in federal district courts. Just two of them (*MacMurray* and *Watson*), filed by the Schroeder Plaintiffs' counsel the day before and a week after the motion at issue, respectively, also involve Invokana. This type of maneuvering has been disfavored by the Panel. *See generally In re CVS Caremark Corp. Wage & Hour Emp't Practices Litig.*, 684 F. Supp. 2d 1377, 1379 (J.P.M.L. 2010) ("[T]he Panel's primary purpose is not to divine the motives and strategies of the various litigants . . . . Nevertheless, where a Section 1407 motion appears intended to further the interests of particular counsel more than those of the statute, we would certainly find less favor with it."); *In re Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig.*, MDL No. 2004, ___ F. Supp. 3d ___, 2016 WL 4705827, at *1 (M.D. Ga. Sept. 7, 2016) (transferee court discussing "[s]ome [plaintiffs'] lawyers" interest in having cases "swept into the MDL where a global settlement will be reached"). After attempting to dodge the paucity of Jardiance cases,[9] the Schroeder

---

[8] The window for potential DKA-related claims may be significantly shorter for Jardiance than for Invokana due to Jardiance's later entry on to the market. Jardiance was approved on August 1, 2014, and the FDA communicated a health safety alert regarding DKA and SGLT-2 inhibitors on May 15, 2015, nine months later. A DKA warning was added to the label 16 months after Jardiance's approval, on December 4, 2015. *See* FDA Safety Announcement regarding Urinary Tract Infection (December 4, 2015) (class-wide). This relatively short time period between launch and label change is a further reason why the Schroeder Plaintiffs' assertion about the nature of future case filings is misplaced.

[9] The Jardiance Defendants understand that there is just one pending dual-use case involving both Farxiga and Invokana, and there are no cases involving both Farxiga and Jardiance. Thus, when the Schroeder Plaintiffs stress

Plaintiffs assert that because more Jardiance stand-alone and dual-use cases may be filed "in the future," Schroeder Br. at 12, a "*de facto* MDL" will occur absent centralization, compelling centralization of these cases now, *id.* at 3.

The Panel consistently has rejected bare assertions about potential future filings as a basis for centralization. *See*, *e.g.*, *In re Cal. Wine Inorganic Arsenic Levels Prods. Liab. Litig.*, 109 F. Supp. 3d 1362, 1363 (J.P.M.L. 2015) ("Where only a minimal number of actions are involved, the proponent of centralization bears a heavier burden to demonstrate that centralization is appropriate . . . . Although plaintiffs assert that the number of actions is likely to expand, the mere possibility of additional actions does not convince us that centralization is warranted."); *In re Qualitest Birth Control Prods. Liab. Litig.*, 38 F. Supp. 3d 1388, 1389 (J.P.M.L. 2014) ("As we have stated previously, 'we are disinclined to take into account the mere possibility of future filings in our centralization calculus.'"); *In re Intuitive Surgical, Inc., Da Vinci Robotic Surgical Sys. Prods. Liab. Litig.*, 883 F. Supp. 2d 1339, 1340 (J.P.M.L. 2012) ("While proponents maintain that this litigation may encompass 'hundreds' of cases or 'over a thousand' cases, we are presented with, at most, five actions."). The Panel should again reject the same type of bare assertions made here.

Indeed, the Schroeder Plaintiffs' arguments are more speculative here than in the usual case where such arguments are pressed. This is because Invokana Plaintiffs expressly have alleged that Jardiance is a safer alternative to Invokana and predicated design defect claims on that theory. *See*, *e.g.*, *Morey*, No. 3:16-cv-06049, [D.E. 1] ¶ 60 (*quoted supra* at 5). Facing a similar circumstance, in *Watson Fentanyl Patch*, this Panel noted that "[c]entralization of all actions against all manufacturers will add few efficiencies to the resolution of this litigation,

---

that there are "multiple cases pending within various federal courts . . . involve[ing] cases with combination therapy," Schroeder Br. at 2, there were only *two* such cases that were pending at the time of the motion. *Cf. id.* at 3.

especially given that [certain] defendants employ a . . . design . . . that plaintiffs contend is a safer alternative to the Watson reservoir design." 883 F. Supp. 2d at 1351.

### C. Centralization Neither Promotes Efficiency Nor Equally Conveniences The Witnesses Or Parties.

This Panel previously has explained that "centralization is not a cure-all for every group of complicated cases." *In re Uponor, Inc., F1960 Plumbing Fitting Products Liability Litig.*, 895 F. Supp. 2d 1346, 1348 (J.P.M.L. 2012). Centralization must "produce sufficient clarity or efficiency . . . to outweigh the added inconvenience, confusion and cost" associated with transferring disparate cases to one forum. *Id*. at 1349. Here, including Jardiance-related claims in an MDL would not do so. Efficiency—assessed from either the perspective of Jardiance Plaintiffs or the parties to the Invokana litigation—would suffer from including Jardiance cases in an Invokana-related or class-wide MDL.

*First*, the inclusion of the three Jardiance-only cases in an MDL focused almost entirely on Invokana will prolong the resolution of all actions. Given their sheer volume, Invokana cases surely will be the focus of MDL discovery, and it is inconceivable that dual-use cases will be selected as representative bellwether cases. That is, bellwethers are likely to be Invokana-only cases first and then Farxiga-only or Jardiance-only cases, before a dual-use case would be considered.[10] Thus, Jardiance cases, whether involving Jardiance alone or in combination with Invokana, will be forced to the back of the MDL queue, creating a parking lot for cases to sit and clog the court system.

This queuing issue is tangible, not merely theoretical, insofar as the Invokana cases are more advanced than the five Jardiance actions. The first Invokana case was filed eight months

---

[10] An Invokana case selected as a bellwether will not fairly represent a Jardiance case, given the differences between the products' labeling and regulatory history, as well as completed post-marketing clinical trial outcomes to date, discussed *supra* at 6-8.

12

before the first Jardiance lawsuit. Since then, the Invokana cases have had important rulings on motions to dismiss; have discovery plans, protective orders, and ESI protocols in place; and discovery is underway—and, indeed, have made substantial progress in the District of New Jersey, a proposed transferee court. *See* Janssen First Resp. at 3 n.5, 8-9; *see also* Janssen Second Resp. at 6. By contrast, in the three Jardiance-only cases in which the Jardiance Defendants were served, motions to dismiss are awaiting disposition or dispositive motion briefing is in process, and initial discovery and case management has been stayed in each case, pending resolution of the motions to dismiss. The fourth and fifth Jardiance cases have not been served. Thus, even setting aside the very large proportion of Invokana-only cases in any MDL, there would not be efficiencies created by coordination.[11]

By contrast, if the Jardiance cases remain in their respective transferor courts, they can move forward unencumbered by Invokana proceedings and issues. Additionally, through informal coordination, the *MacMurray* and *Watson* dual-use cases could benefit from headway already made in the Invokana-related proceedings and a potential Invokana MDL, while allowing the respective transferor courts to focus on the Jardiance claims. Such an approach also would allow the MDL transferee court to continue to focus on Invokana-related issues without concerning itself with getting up to speed on issues related to Jardiance, while preserving the experience that assigned transferor judges already have acquired about Jardiance cases.

*Second*, including Jardiance would unnecessarily frustrate MDL proceedings for the overwhelming majority of Invokana Plaintiffs and Janssen by injecting multiple new Defendants, proliferating the work necessarily involved when adding two global pharmaceutical companies

---

[11] No Jardiance case is pending in a proposed transferee district, and the Jardiance Defendants were not involved in the negotiation of Orders that are in place in the Invokana litigation. This is significant because the Jardiance Defendants have unique discovery concerns, including a difference in proportionality considerations, given that there are five Jardiance versus nearly 200 Invokana cases, and potential foreign data privacy and transfer implications for BIPI that were not negotiated or considered between the Invokana parties.

(four when including the Farxiga Defendants) and their counsel, and causing other procedural inefficiencies such as depositions, motions, and expert reports being noticed and/or filed across all MDL matters when, in fact, they may be relevant to only the Invokana arm of the proceedings. Such class-wide litigation stands to increase litigation expenses, create inefficiencies, and prolong the resolution of the cases in a manner that is unjustifiable given that the number of Invokana cases will dominate the proceedings.[12]

### D. The Jardiance Litigation Presents Alternative Ways of Promoting The Just and Efficient Management of Pre-Trial Proceedings Without Centralization.

For decades, this Panel has recognized that transfer is inappropriate where "alternatives to transfer" exist that can "minimize the potential for duplicative discovery and inconsistent pre-trial rulings" that might otherwise occur. *Cal. Wine*, 109 F. Supp. 3d at 1363; *accord In re Eli Lilly & Co. (Cephalexin Monogydrate) Patent Litig.*, 446 F. Supp. 242, 244 (J.P.M.L. 1978). Here, the circumstances show there are many alternatives to help efficiently handle the Jardiance litigation without including those cases in an *Invokana* MDL.

First, as noted above, the Schroeder Plaintiffs—the only parties who seek a class-wide MDL to date—are represented by the Johnson Becker firm. They include the Jardiance Plaintiffs in *MacMurray* (S.D. Ind.), a dual-use Plaintiff, and *Mitchell* (W.D. Tenn.). Johnson Becker also represents the dual-use *Watson* (N.D. Tex.) Plaintiff, and Johnson Becker's co-counsel in

---

[12] For example, at least four additional Defendants' counsel will need to review discovery responses and expert disclosures for each and every defendant (*e.g.* manufacturer, distributor, or otherwise) in order to distinguish their affirmations, defenses, and concessions. It also may be necessary for counsel to attend each and every other defendant's corporate and expert witness depositions in order to anticipate and defend against use of another party's testimony and/or evidence against the Jardiance Defendants. These tasks, which would not arise in the normal course of traditional litigation, will cause the Jardiance Defendants to incur significant litigation costs and expenses, despite the fact that only five cases to date would be included within the MDL proceedings. The parties will further be burdened by the need for extra protections, as they produce documents and provide testimony directly to their market competitors. While protective orders can address these issues in part, there is no question that having such provisions in the orders makes the conduct of litigation more difficult. Even with protective orders and parties acting in complete good faith, the proliferation of confidential documents makes it more likely there will be an unintended breach. Absent significant efficiencies created by coordination, there is little reason to put the Jardiance Defendants' confidential materials at risk.

*MacMurray* is counsel in a third Jardiance action (*Warren* (S.D. Ind.)).  Given that the same counsel represent 4/5 of the Jardiance Plaintiffs and that Johnson Becker also will represent certain Plaintiffs in any Invokana-related MDL, informal coordination is "practicable and preferable."  *In re Ocala Funding, LLC, Commercial Litig.*, 867 F. Supp. 2d 1332, 1332-33 (J.P.M.L. 2012) (declining to establish MDL where plaintiffs were "represented by common counsel"); *see*, *e.g.*, *Cal. Wine*, 109 F. Supp. 3d at 1363; *In re Dollar Tree Stores, Inc., FLSA & Wage & Hour Litig.*, 829 F. Supp. 2d 1376, 1377 (J.P.M.L. 2011) ("informal cooperation to avoid duplicative proceedings is appropriate where most plaintiffs share counsel").  Because the Jardiance Defendants each have the same lead counsel across five pending cases, such coordination is easier still.  *See In re Prospect Mortg., LLC, Fair Labor Standards Act (FLSA) & Wage & Hour Litig.*, 987 F. Supp. 2d 1383, 1384 (J.P.M.L. 2013) (declining to centralize proceedings where same defense counsel was involved in all 37 actions).[13]

Second, this presents a strong case for the use of informal coordination or separation of claims and remand given that the first-filed Invokana-Jardiance dual-use case is pending before Chief Judge Young of the Southern District of Indiana, an experienced MDL judge currently presiding over *In re Cook Medical, Inc., IVC Filters Mktg., Sales Practices and Prods. Liab. Litig.* (MDL 2570), who will understand how informal coordination with an *Invokana* MDL may be efficient and could set a road map for doing so.

Third, even if the Panel believes that Plaintiffs MacMurray and Watson's Invokana-related claims would benefit from something more than informal coordination with an *Invokana* MDL, this Panel has ample authority to include only the Invokana-side of their cases in the MDL.  *See* 28 U.S.C. § 1407(a) ("the panel may separate any claim . . . and remand any of such

---

[13] Additionally, the Jardiance Defendants are willing to informally coordinate with Janssen about Invokana-specific discovery that may be needed in *MacMurray* and *Watson*.

15

claims"). This Panel has drawn on this authority to simultaneously assign co-use cases to drug-specific MDLs. *See*, *e.g.*, *In re Vioxx Mktg., Sales Practices & Prods. Liab. Litig.*, 416 F. Supp. 2d 1354, 1355 (J.P.M.L. 2006). The Panel is equally equipped to send the Invokana-focused aspects of Ms. MacMurray and Ms. Watson's cases to the MDL while leaving the Jardiance-side of the cases in the transferor courts. *In re Celexa & Lexapro Prods. Liab. Litig.*, 416 F. Supp. 2d 1361, 1363 (J.P.M.L. 2006) (separating and remanding to transferor court claims "involving a prescription drug other than Celexa or Lexapro" because they "do not share sufficient questions of fact with claims against Forest regarding its drugs to warrant inclusion of the claims" in the MDL); *see also*, *e.g.*, *In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 812 F. Supp. 2d 1380, 1383–84 (J.P.M.L. 2011) (separating and remanding certain claims to transferor court).

Finally, the Panel can reassess its options if, as the Schroeder Plaintiffs speculate, more Jardiance cases are someday filed and might warrant an MDL or otherwise satisfy the requirements of Section 1407. *See*, *e.g.*, *In re Plavix Mktg., Sales Practices & Prods. Liab. Litig. (No. II)*, 923 F. Supp. 2d 1376, 1377-78 (J.P.M.L. 2013) ("we note that our denial of centralization in *Plavix I* did not foreclose Bristol-Myers and Sanofi from filing this second motion for centralization. That earlier denial also does not preclude us from reaching a different result here.").

## CONCLUSION

For the foregoing reasons, this Panel should deny the Schroeder Plaintiffs' Second Motion for Transfer of Actions for Centralization of Pretrial Proceedings.

Dated:  October 24, 2016

                Respectfully submitted,

                By: */s/ Heidi Levine*

                Heidi Levine
                hlevine@sidley.com
                Eamon P. Joyce
                ejoyce@sidley.com
                Lauren E. Treadaway
                SIDLEY AUSTIN LLP
                787 7th Avenue
                New York, NY 10019
                Telephone: (212) 839-5300
                Facsimile: (212) 839-5599

                *Attorneys for Defendant Boehringer Ingelheim Pharmaceuticals, Inc.*

                **AND**

                Barry H. Boise
                boiseb@pepperlaw.com
                Michael Edelman
                edelmanm@pepperlaw.com
                PEPPER HAMILTON LLP
                3000 Two Logan Square
                Eighteenth and Arch Streets
                Philadelphia, PA 19103-2799
                Telephone: (215) 981-4000
                Facsimile: (215) 981-4750

                *Attorneys for Defendants Eli Lilly and Company, and Lilly USA, LLC*