**BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | | |
|---|---|---|
| **IN RE: INVOKANA (CANAGLIFLOZIN) PRODUCTS LIABILITY LITIGATION** | ) | **MDL NO. 2750** |

**THE SCHROEDER PLAINTIFFS' CONSOLIDATED REPLY IN SUPPORT OF SECOND MOTION FOR TRANSFER OF ACTIONS FOR CENTRALIZATION OF PRETRIAL PROCEEDINGS**

On October 11, 2016, the *Schroeder* Plaintiffs[1] filed a Second Motion for Transfer of Action for Centralization Supporting in Part and Opposing in Part the *Benjamin* Plaintiffs' Petition. *See* Dkt. No. 30 (accepted by the Panel as a Response to the *Benjamin* Plaintiffs' Petition). The principal difference between the *Schroeder* and *Benjamin* petitions were in the scope of the proposed MDL. Specifically, *Schroeder* sought to centralize all SGLT-2 manufacturers in one setting, whereas *Benjamin* sought centralization of an Invokana-only MDL. *Schroeder's* rationale for this was two-fold: First, and most importantly, the entire class of SGLT-2 inhibitors were *all* subject to *identical* FDA alerts ultimately *requiring* each of them to amend their respective labels to reflect an increased risk of diabetic ketoacidosis ("DKA") and, for two of the three, acute kidney injury. Second, the *Schroeder* Plaintiffs noted that several "combination cases" were pending—including at least one case identified in the *Benjamin* petition. Based on this observation, it became clear that *if* the Panel centralized *any* action, it will effectively centralize *all* actions given all three Defendants will have cases pending in the proposed MDL.[2]

---

[1] Case Nos. MND 16-CV-3035, *Schroeder v. Janssen Pharmaceuticals, Inc.*; TXSD 2:16-cv-172, *Quintanilla v. Bristol-Myers Squibb Co., et al.*; TNWD 16-cv-2384, *Mitchell v. Eli Lilly and Co., et al.* UTD 16-cv-8838, *Davis v. Janssen Pharmaceuticals, Inc.*; and INSD, 16-cv-2718, *MacMurray v. Janssen Pharmaceuticals, Inc., et al.*

[2] Any notion that *either* Bristol-Myers or Boehringer will simply ignore their presence in a combined Invokana case—particularly where their product was the last product used, as it is in the *MacMurray* case—simply does not pass the snicker test.

And, Defendants recognize as much. Specifically, in an effort to evade litigating in the proposed "Invokana-Only" MDL, Defendant Boehringer Ingelheim ("Boehringer")—in response to the *MacMurray* case—urged the Panel to engage in claims splitting, suggesting that the Panel should sever the case sending the claim against itself to Indiana and the case against Janssen to the future Transferee court. *See* Dkt. No. 55 at 15. Even assuming the Panel had the authority to sever defendants from a filed complaint—which it does not—it is unquestionable that the very proposal Boehringer seeks is a form of prohibited claims splitting. *See e.g.*, *Kirtley v. Wadekar*, 2007 WL 1963018, at *4 (D.N.J. July 2, 2007) (New Jersey courts, under the 'entire controversy doctrine', must maintain all claims against all parties related to the same controversy or the claims are precluded) (citation omitted). In short, Boehringer's proposed solution is not an option the Panel can pursue.

Ultimately, each Defendant and two groups of Plaintiffs lawyers opposed the *Schroeder* Plaintiffs' request for centralization. Their arguments ultimately revolved around two themes: 1) the existence of multiple defendants will unnecessarily complicate the MDL; and 2) the *Schroeder* Plaintiffs are gaming the system in their efforts to seek multi-defendant centralization. In making these arguments, the opponents of multi-defendant centralization ignore *both* the Panel's clear guidance in multiple-manufacturer pharmaceutical cases *and* the reality of this litigation (i.e., that given the existence of combination cases, each Defendant *will* be involved in any MDL should the Panel agree centralization is appropriate). Faced with a virtually identical fact pattern—i.e., a case involving multiple manufacturers of the same pharmaceutical component—the Panel, over the defendants' objections, created a multi-manufacturer MDL stating:

> The warning labels of [the fluoroquinolones] were revised to contain virtually identical warnings with respect to [the risk of peripheral neuropathy]. Plaintiffs' actions followed the FDA announcement, relying on the same regulatory history and scientific background to support the allegations that fluoroquinolone

> antibiotics, *as a class*, are causally linked to the development of irreversible peripheral neuropathy. Thus, while we typically are hesitant to centralize litigation on an industry-wide basis, here all fluoroquinolone actions, *regardless of the manufacturer*, will share factual questions regarding general causation (in particular, the biological mechanism of the alleged injury), the background science, and common regulatory issues.

*In re: Fluoroquinolone* 122 F.Supp.3d at 1379 (noting "[o]ur decision here is in keeping with our past decisions in similar circumstances" and citing *In re: Androgel Prods. Liab. Litig.*, 24 F.Supp.3d 1378 (J.PM.L. 2014); *In re: Incretin Mimetics Prods. Liab. Litig.*, 968 F.Supp.2d 1345 (J.P.M.L. 2013) (emphasis supplied). The Court's rationale in those three cases is applicable here. *At a minimum, each* of the three Defendants share common questions of the biological mechanism related to the risk of DKA, *each* will share common facts of the general science related to SGLT-2 inhibitors and *each* was the subject of the FDA's alerts on May 15, 2015 and on December 4, 2015 requiring the manufacturers to *uniformly amend* their labels to reflect the increased risk of DKA. Nothing in Defendants' (or the opposing Plaintiffs') oppositions refutes this fundamental position.[3] In short, as in *In re: Fluoroquinolone*, *In re: AndroGel* and *In re: Incretin Mimetics*, the Panel ought to grant the *Schroeder* Plaintiffs' motion seeking to centralize a multi-manufacturer MDL.

---

[3] While no party refutes these similarities related to DKA injuries, Boehringer asserts the conclusory opinion that its drug is safer as it relates to acute kidney failure. *See* Dkt. No. 59 at 6-8. At the outset, time will tell whether that position is, in fact, correct. But, assuming it is, the assertion does nothing to undermine the fact the causation, scientific development and regulatory issues *are virtually identical* for the DKA claims against all three Defendants. Equally important, there are scores of MDLs involving multiple claimed injuries. *See e.g., In re: Am. Med. Sys., Inc., Pelvic Repair System Prods. Liab. Litig.*, 844 F.Supp.2d 1359, 1360 (J.P.M.L. 2012) (injuries resulting from sling and mesh implants); *In re: Zimmer Nexgen Knee Implant Prods. Liab. Litig.*, 802 F.Supp.2d 1374, 1376 (J.PM.L. 2011) (femoral component failure and recall of tibial component); and *In re: AndroGel*, 24 F.Supp.3d at 1379 (injuries included heart attack, stroke, deep vein thrombosis, and pulmonary embolism).

# ARGUMENT

## *A. A Multi-Manufacturer MDL Will Not Unnecessarily Complicate the SGLT-2 Litigation.*

### *1. The fact there are multiple Secondary Defendants and combination cases currently on file, supports a multi-manufacturer MDL.*

In a classic form over substance contention, several parties opposing multi-manufacturer centralization contend *Schroeder's* argument regarding "combination cases" is wrong because no plaintiff used the drug at the same time.[4] This argument demonstrates a clear lack of familiarity with the Panel's prior precedent. When the Panel talks about "combination cases" it means cases in which two or more defendants are named in a suit. *See In re: AndroGel*, 24 F.Supp.3d at 1379. This fundamental misunderstanding is on full display in the *Puente* Plaintiff's submission. Specifically, in commenting on the *In re: Incretin* decision, *Puente* contends the Panel "relied" on the "unique" fact that "several plaintiffs took more than one of the drugs at issue at the same time." *Puente Second Resp*., Dkt. No. 60 at 7. Of course, the Panel made no such finding, noting:

> Several plaintiffs took *more than one of the drugs at issue*, which suggests that discovery specific to the plaintiffs in those cases will involve many of the same or substantially similar documents and witnesses.

*In re: Incretin Mimetics*, 968 F.Supp.2d at 1346-47 (emphasis supplied). Nothing in *Incretins* suggested *simultaneous usage* as the factor the Panel considered to embrace centralization. Instead, the plaintiffs in the Incretin-mimetic MDL—like here—alleged use of more than one Incretin-mimetic.

With diabetic medication, doctors, by-and-large, do not prescribe two type 2 diabetes medications for simultaneous ("concurrent") usage. But one of the common treatment regimens is

---

[4] *See Second Response of Puente, et al.*, Dkt. No. 60 at 4-6; *see also Defendants Boehringer Ingelheim Pharmaceuticals, Inc., et al., Opposition*, Dkt. No. 59 at 4.

for the patient's doctor to switch between different type 2 diabetes medicines in order to determine which works best for a particular patient. In short, it will not be uncommon for plaintiffs in this litigation to switch between various SGLT-2 inhibitors. This exact fact patterns existed in *In re: AndroGel* where the Panel endorsed a multi-manufacturer MDL so as to avoid *de facto* centralization as defendants with smaller marker shares were named in future filings.

The same is true here. There is little doubt additional cases against the manufacturers of Farxiga and Jardiance will be filed or that they will be named in combination with Invokana lawsuits. At the outset, since the *Schroeder* Plaintiffs' original filing, additional cases against the secondary Defendants were filed *and* no less than five plaintiffs filed Interested Party Responses ("IPR") in support of multi-manufacturer centralization. These plaintiffs likely represent individuals who used Farxiga or Jardiance and recognize the efficiency of litigating the claims in one forum. Moreover, Farxiga's market share makes it highly unlikely there will not be more cases. In 2015 Farxiga sales were roughly $492 million.[5] Those sales continued to grow in 2016. Specifically, Farxiga posted sales of $165 million in just the first quarter of 2016,[6] and then significantly increased that number in the second quarter of 2016, hitting $211 million in sales in

---

[5] Renauer, Cory, *Who's Winning the Battle to Treat the Diabetic Masses?*, The Motley Fool, Mar. 10, 2016, available online at http://www.fool.com/investing/general/2016/03/10/whos-winning-the-battle-to-treat-the-diabetic-mass.aspx, last accessed on October 27, 2016.

[6] AstraZeneca Q1 2016 results, April 29, 2016, p. 7, available online at https://www.astrazeneca.com/content/dam/az/press-releases/2016/Q1_2016_results_press_release.pdf, last accessed on October 27, 2016.

Q2, a 65% year-over-year jump.[7] By comparison, Invokana's Q2 sales were $383 million.[8] Even if the Parties were to use the FDA actions on acute kidney failure and DKA as endpoints for claims in this litigation, Farxiga's market share and recent sales point to a significant number of additional claims.[9] Finally, the *Puente* Plaintiffs seek centralization of a host of claims beyond DKA and acute kidney failure.[10] Should the Panel craft the MDL to include these claims—in particular the heart attack claims—they will clearly apply to all Defendants given none of the manufacturers' labels identify an increased risk of heart attack leading to even additional cases.[11] In short, it is statistically unlikely—if not altogether impossible—that more Farxiga and Jardiance case will not be filed.

Further, Defendants will defend claims against them in whatever forum they are sued (or transferred to). As such, given there are cases—in the current Schedule of Actions—alleging injury due to ingesting Invokana and Farxiga or Jardiance, Counsel for the Farxiga and Jardiance Defendants will be litigating in the MDL (assuming the Panel agrees centralization is appropriate). This *is* the very *de facto* MDL the Panel expressed concern over when it chose to centralize the

---

[7] Zacks Equity Research, *AstraZeneca (AZN) Beats on Q2 Earnings, Keeps 2016 View*, Nasdaq.com, July 29, 2016, available online at http://www.nasdaq.com/article/astrazeneca-azn-beats-on-q2-earnings-keeps-2016-view-cm657244, last accessed on October 27, 2016.

[8] Campbell, Todd, *3 Important Takeaways From Johnson & Johnson's Second-Quarter Earnings*, The Motley Fool, July 24, 2016, available online at http://www.fool.com/investing/2016/07/24/3-important-takeaways-from-johnson-johnsons-second.aspx, last accessed on October 27, 2016.

[9] Roughly fifteen percent of the clients the undersigned represents took Farxiga or Jardiance.

[10] The irony of the *Puente* Plaintiffs' opposition to a multi-manufacturer MDL petition should not be lost on the Panel. On the one hand, *Puente* claims there are too few cases so as to justify centralization involving Farxiga and Jardiance cases. Yet, at the same time, proposes centralization of heart attack cases (two on file), amputation (zero on file) and bone fractures (zero on file).

[11] The *Schroeder* Plaintiffs take no position of whether the MDL should or should not include claims beyond DKA and acute kidney failure.

multi-manufacturer claims in *In re: AndroGel* and *In re: Incretins*. Ultimately, centralization allows the Parties to efficiently litigate all claims in one forum, as opposed to forums throughout the country. By contrast, were the Panel to decline to centralize claims involving Farxiga and Jardiance, plaintiffs like Patricia MacMurray will have to litigate scores of claims in individual Districts. Ultimately, the Panel's recent guidance confirms that in pharmaceutical litigation it is not altogether uncommon for the Panel to centralize multi-manufacturer MDLs, particularly where, as here, the cases involve similar molecular components, similar causation analysis, similar regulatory histories, and use by Plaintiffs of multiple therapies.

*2. Centralization of the "Secondary" SGLT-2 Inhibitors will promote judicial efficiency; the Opposing Parties' reliance on medical device litigation MDL case law is fundamentally misplaced.*

Next, the opponents of multi-manufacturer centralization point to the Panel's decision declining to centralize multi-manufacturer MDLs in two recent medical device cases. *See generally* Dkt. No. 60 at 2-3 (citing *In re: Watson Fentanyl Patch Prods. Liab. Litig.*, 883 F.Supp.2d 1350 (J.P.M.L. 2012) and *In re: Power Morcellator Prods. Liab. Litig.*, 140 F.Supp.3d 1351 (J.P.M.L. 2015)). At the outset, the Panel has, from time to time, centralized multi-manufacturer claims involving medical device cases. *See In re: Am. Med. Sys.*, 844 F.Supp.2d 1359 (J.P.M.L. 2012). But even if that were not the case, the analysis in medical device litigation is fundamentally different than that in pharmaceutical class-wide litigation. At the outset, the fundamental claim in a medical device case is that the design is defective. Typically—but not always—the plaintiff must prove a safer alternative design. For this reason, in *In re: Fentanyl Patch*, the Panel declined to centralize a class-wide MDL because the plaintiffs alleged that two of the defendant's products were a safer alternative design than Watson's fentanyl patch. Based, in part, on this concession—which the *Schroeder* Plaintiffs do not make—the Panel declined to

centralize a multi-manufacturer MDL. *See In re: Watson Fentanyl Patch*, 883 F.Supp.2d at 1351. Like *In re: Fentanyl Patch*, in *In re: Power Morcellator* the plaintiffs sought centralization of a multi-manufacturer MDL. The Panel declined noting,

> [w]e find that the individual issues that result from the differences among each defendant's power morcellator *with respect to product design*, development, testing, warnings, and marketing will predominate over the common issues.

*In re: Power Morcellator*, 140 F.Supp.3d at 1353 (emphasis supplied). In other words, the Panel declined to centralize the litigation given each manufacturer's design was different.

None of the concerns articulated in *In re: Fentanyl Patch* or *In re: Power Morcellator* exist here. At the outset, *the* primary claim in this litigation is that each Defendant failed to warn of the increased risk of DKA and that two Defendants failed to warn of the increased risk of acute kidney failure. These claims do not require proof of a safer alternative (as was required in *Fentanyl Patch*). Additionally, unlike in claims involving medical device litigation where the design (and hence the purported defect) differs from manufacturer to manufacturer, the mechanism of action for each SGLT-2 inhibitor in this case will be similar, if not altogether identical. Accordingly, the concern the Panel expressed in *Power Morcellator* related to different designs simply does not exist here. And, in fact, is was for this reason (i.e., that the molecular design of each SGLT-2 is nearly identical) that each Defendant *in this case* was subjected to an *identical* FDA Alert identifying concern over increased risk of DKA. From this perspective, the Panel's holding in *In re: Fluoroquinolone* is both far more compelling and on point:

> The warning labels of [the fluoroquinolones] were revised to contain virtually identical warnings with respect to [the risk of peripheral neuropathy]. . . . Thus, while we typically are hesitant to centralize litigation on an industry-wide basis, here all fluoroquinolone actions, *regardless of the manufacturer*, will share factual questions regarding general causation (in particular, the biological mechanism of the alleged injury), the background science, and common regulatory issues.

*In re: Fluoroquinolone,* 122 F.Supp.3d at 1379 (emphasis supplied). The same is true here. Each Defendant has a shared regulatory history *vis-à-vis* the FDA Alert, each involves similar, if not identical, biological mechanisms of injury, and each likely relied upon the same science to develop their respective SGLT-2 inhibitors. In the end, while the Panel is "reluctant" to centralize multi-manufacturer cases, that reluctance is often—if not always—abated in cases involving class wide pharmaceutical claims.[12] As such, the Panel should grant the *Schroeder* Plaintiff's motion seeking to centralize all SGLT-2 manufacturers in one setting.

**B. *It is Counsel's Obligation to Advocate for Their Clients' Best Interests; Nothing in the Request for a Multi-Manufacturer MDL Reflects an Effort to Game the System.***

*1. The MacMurray Case was not filed to game the system.*

Two Defendants and one Plaintiffs group (collectively the "Opposing Parties"), in response to the *Schroeder* Plaintiffs' multi-manufacturer petition, advance the unfortunate argument that the *Schroeder* Plaintiffs (in general) and their lawyers (in particular) are attempting the game the system by filing the combination case of *MacMurray v. Jansen et al.*, after the *Benjamin* Plaintiffs filed the original petition. *See* Dkt. Nos. 60 at 5-6; and 59 at 4.[13] In making this contention, *each*

---

[12] Finally, certain parties' reliance on *In re: Xarelto* as "proof" the Panel disfavors combined defendant MDLs involving the same class of drugs is wholly misplaced. The reason Xarelto and Pradaxa were not collectively centralized is: a) because no one ever asked; and b) the vast majority—if not all—of all Pradaxa cases were settled before the first Xarelto case was even filed. The same rational was true in the Cox II inhibiter litigation (i.e., no party moved for combined centralization—likely because the first Vioxx trial *ended* a month *before* the Panel ruled on the Bextra/Celebrex motion for centralization). In short, these litigates have exactly zero in common with this case.

[13] In fact, one goes so far as to coin the *Schroeder's* filing as a "turf war" between waring plaintiffs' factions. This type of flippant rhetoric is as misguided as it is wrong. The simple fact is the *Schroeder* Plaintiffs *always* intended to move for a multi-manufacturer MDL *and* were in the process of doing so when *Benjamin* filed the original petition. As noted above, no less than fifteen percent of the undersigned's clients took Farxiga or Jardiance. In fact, the *Schroeder* Plaintiffs assumed their position would find universal support amongst all Plaintiffs' counsel given

ignores that Johnson Becker, PLLC ("Firm") had filed two cases involving Jardiance or Farxiga *months* before the initial petition in this case. *See Quintanilla v. Bristol-Myers Squibb Co., et al.*, Case No. 2:16-cv-172 (TXSD), MDL 2750 Dkt. No. 30-16, filed May 23, 2016, and *Mitchell v. Eli Lilly and Company, et al.*, Case No. 16-cv-2384 (TNWD), MDL 2750 Dkt. No. 30-10. Further, *each ignored* the fact that the *original petition* included a combination therapy case. In short, there is nothing to suggest the facts in this case rise to the level of those in *In re: CVS Caremark*, 684 F.Supp.2d 1377 (J.P.M.L. 2010) as one Defendant suggests. Leaving aside *In re: CVS* involved *one firm's* effort to centralize a series of wage and hour cases against the backdrop of every other parties' independent oppositions, here *no less than six* plaintiffs filed Interested Party Responses supporting a multi-manufacturer MDL. In fact, the number of plaintiffs supporting a multi-manufacturer MDL is three times those who do not, and twice the number of oppositions by Defendants. If there is a conspiracy—as opposed to lawyers around the country who represent clients injured by Farxiga and/or Jardiance seeking to litigate in an efficient forum—it is indeed far and wide.

A lawyer is obligated to "zealously represent" her client in a way that progresses their client's best interest. Diligence, ABA MRPC Rule 1.3, Comment 1 (2014). This fundamental tenet of the rules *requires* counsel to make strategic decision in their client's best interest. That is precisely what the Firm did in this case, as does in each and every case it files. Specifically, nearly fifteen percent of the clients the Firm represents *are* persons who were injured while on Jardiance *or* Farxiga. Of those cases, no less than four are "combination" cases. Had the Firm intended to

---

*Benjamin's* and *Puente's* counsel supported multi-manufacturer MDLs in the past (most notably in *In re: AndroGel*).

"game the system" it would have, and could have, filed *each and every one of those cases* prior to filing its motion. It did not.

More important, the Firm is particularly disturbed by the personal nature of these oppositions. The vitriol of these attacks seems less founded on the law and more on prior grievance from prior litigations. They are particularly suspect given the fact no less than *five* plaintiffs filed Interested Party Responses endorsing the *Schroeder* Plaintiffs' multi-manufacturer approach. And, while the Firm is reluctant to comment upon these allegation, given several glaring errors, coupled with the personal nature of the attacks, it responds as follows: First, *two of the very defense lawyers* who now contend multi-manufacturer litigation is inappropriate *consented to it* in *In re: Incretin Mimetic*. Second, it is true that the Firm filed cases in both the *Incretin* MDL and California State Court JCCP. However, in response to these "sham" filings, neither Counsel for Farxiga (who represented Merck, Sharpe & Dohme in *In re: Incretins*), *nor* Counsel for Boehringer (who represented Novo Nordisk in *In re: Incretins*) *ever* filed a motion to sever, for change of venue or to dismiss the "sham" state court pleadings. That may be because both *endorsed* the state court JCCP. Finally, the suggestion the Firm chose a particular venue in the hopes of securing an underserved "global" resolution in *In re: Incretins* is as offensive as it is wrong. In the cited litigations (*see* Dkt. No. 47 at 9-10), the Firm conducted the *vast majority* of the depositions, wrote the *vast majority* of the briefs *and* was the primary counsel who appeared at oral argument in the *vast majority* of hearings. Plainly stated, there is nothing to suggest the Firm did anything other than what it was supposed to do here: zealously represent its clients.

A class-wide SGLT-2 inhibitor MDL is the most appropriate and most efficient way to move these cases towards their ultimate resolution. Given this view, the Firm was obligated to alert the Panel to the existence of other SGLT-2 cases, including cases alleging injury caused by

both Invokana and a second SGLT-2 inhibitor as well as cases with only one "secondary" defendant. The *MacMurray* case evidences this point. Specifically, Ms. MacMurray used *both* Invokana and Jardiance. As such, she squarely fell within the original *Benjamin* petition. However, her Invokana use occurred *before* her use of Jardiance. It is highly unlikely, if not altogether a certainty, that Janssen will claim it is either: a) not culpable for the harm; and/or b) that the use of Jardiance limits its exposure. *If* the Panel centralized an "Invokana only" MDL, *MacMurray* will not only face the conundrum noted above, *but worse*, will be forced to wait to litigate the claim against the Jardiance Defendant until completion of the Invokana MDL. Recognizing as much, Boehringer proposes the Panel *split MacMurray's* claim serving the two Defendants into separate cases, which at worse is a form of claims splitting, and at best creates an empty-chair defense.[14] *See* Dkt. No. 59 at 15-16. Boehringer's proposal is, in effect, a tacit concession that combination cases are most efficiently litigated in one forum.

2. *The Schroeder Plaintiffs presuppose that all Counsel make strategic decisions—in good faith—on behalf of their client's best interest.*

The core of Opposing Parties' allegation is that *MacMurray's* filing is somehow suspect because it was: 1) filed four months prior to the expiration of the limitations period; and 2) after the original petition seeking centralization. Leaving aside whether it is prudent or not to wait until the very last moment to file a timely Complaint (as is apparently *Puente's* Counsel's *modus operandi*), or that each and every case cited by Defendants involved purported manipulation by

---

[14] The *Puente Plaintiffs* make an even more bizarre contention regarding the timing of MacMurray's injury. Specifically, Puente argues—absent any expert report (let alone evidence)—that it could only be the drug that MacMurray was taking at the time of diagnosis that would have caused her DKA. *Puente Second Response*, Dkt. No. 60 at 5-6. *Puente's* counsel's clairvoyance notwithstanding, the far safer—and responsible—position at this point in the litigation is to name both Defendants so as not to create an "empty chair" defense (particularly where no discovery, no facts and no expert reports have been exchanged).

the *original movant* (as opposed to subsequent filers like *Schroeder* and the five individual Interested Party Responses that supports their motion), the simple fact is this: the Firm filed *MacMurray* so as to alert the Panel of the obvious problems associated with an Invokana-only MDL. Nothing in the original petition disclosed, let alone addressed, these potential problems including duplicative and delayed discovery. In short, the filing was made in good faith.

And, in fact, the *Schroeder* Plaintiffs presuppose that all counsel in this process acted ethically to vigorously prosecute their respective positions. This is true *even for Puente's* Counsel who—prior to the original petition—filed a case in the Eastern District of New York on May 13, 2016, on behalf of a Tennessee plaintiff alleging she was injured by Defendants with corporate ties to Japan, Pennsylvania, and New Jersey. *See* Dkt. No. 1-46 at 2-3. Setting aside *Puente's* Counsel's curious application of the jurisdiction and venue rules, we presuppose the decision to transfer the case to the District of New Jersey *after* the *Benjamin* Plaintiffs filed the Original Petition was also made in good faith, notwithstanding the fact the transfer occurred at the same time her Counsel was negotiating his appointment as "co-liaison counsel" in New Jersey.[15] The point is this: a party either advances a legitimate position or they don't. The suggestion the Firm merely filed *MacMurray* to gin-up a multi-manufacturer MDL is devoid of merit.

*Puente's* next attack—that the timing of its filing four months before the limitation period expires—is even more dubious. At the outset, MacMurray was under no obligation to postpone filing her case. The laws of the states of Utah and Indiana require products liability actions to be filed *within* two years. *See* Utah Code § 78B-6-706; Ind. Code § 34-20-3-1(b)(1). Whether

---

[15] *See* Dkt. No. 36, CMO #2, Invokana Plaintiffs v. Janssen Pharmaceuticals, Inc., et al., Case No. 3:16-cv-6046, Oct. 5, 2016, p. 2, Section III(1): ("The Court hereby appoints Michael London, Esq. … as interim co-liaison counsel.")

*Puente's* Counsel's practice to wait until the eve of the limitations period is wise is a discussion for a different day. What is clear is that his recommendation—to wait until the eve of a limitations period—apparently is unique and rejected by scores of prudent plaintiffs' counsel. Fully twelve (12) of the original thirty-six (36) plaintiffs (33%) listed on the Original Motion's Schedule of Actions filed in the District of New Jersey alleged they *began* usage of Invokana *in 2015*. Of these plaintiffs, nine (9) cases were filed in New Jersey only four days before the same attorneys filed the Original Motion to Transfer, including one plaintiff from Florida (4-year SOL) alleging Invokana usage in 2015, and another plaintiff from Missouri (5-year SOL) alleging Invokana usage in 2015.[16] Apparently, their Counsel ostensibly believed it was not prudent to wait until the eve of their statute's expiration date (sometime in 2017, 2019 and 2020) to file their claims opting instead to file the case after completing their good-faith investigation. In short, as with *MacMurray*, we presuppose the *timing* of these cases does not suggest an effort to gin-up a particular jurisdiction or theory—it simply suggests the cases were ready to go.

### ***C. The Northern District of Illinois is the Most Appropriate Venue to Resolve this Litigation.***

The Northern District of Illinois is the appropriate jurisdiction for three reasons: 1) it is the consensus jurisdiction amongst the majority of plaintiff and defense counsel; 2) it will lead to efficient and speedy resolution of this case; and 3) the proposed jurists are tenured highly skilled judges. Each will be assessed in turn.

---

[16] While two of the plaintiffs resided in one-year statute of limitations states (e.g., Kentucky), the majority did not. Additionally, the Original Movants' complaints do not list a date of injury, so the additional cases alleging ingestion into 2015 might also be nowhere near the running of a statute of limitations.

1. *If there is a "Consensus Jurisdiction" proposed for transfer and centralization, it is the Northern District of Illinois.*

Eleven law firms submitted memoranda on behalf of their clients suggesting venues for coordinated pretrial proceedings in this matter.[17] Eight of the submissions suggest the Northern District of Illinois.[18] Five of the submissions suggest the District of New Jersey.[19] Two submissions suggest the Southern District of Illinois.[20] The Northern District of Illinois has been suggested as an appropriate forum more times than the other jurisdictions combined.

Looking specifically at those parties responding to the *Schroeder* Plaintiffs' Motion, the numbers become more striking. Nine responses were filed to the *Schroeder* Plaintiffs' Motion, seven by plaintiffs' attorneys and two by Defendants (who suggest a jurisdiction). Of the responding plaintiffs, more than 70% (five out of the seven) favor centralization of a class-wide SGLT-2 MDL in the Northern District of Illinois. Further, each Defendant who suggested a jurisdiction supported the Northern District. Taking the *Schroeder* Plaintiffs into account, 75% of plaintiffs' counsel who responded to the question of class-wide versus Invokana-only support class-wide coordination in the Northern District of Illinois. Contrary to what the *Benjamin*

---

[17] Defendants Boehringer Ingelheim & Eli Lilly did not suggest any transferee court, as they oppose coordination of Jardiance actions. *See generally* Dkt. No. 59.

[18] *See Schroeder Pltfs. Memo*, Dkt. No. 30-1 at 13-17; *Janssen Resp*., Dkt. No. 32 at 11-12, and Dkt. No. 45 at 7; *AstraZeneca Resp*., Dkt. No. 47 at 13 (suggesting no centralization of Farxiga cases but suggesting the District of New Jersey or Northern District of Illinois should the panel decide class-wide coordination is appropriate); *Gray Resp*., Dkt No. 55 at 6-7; *Faedtke Pltfs. Resp*., Dkt No. 56-1 at 7-8; *Klein Resp*., Dkt. No. 66 at 1-2; *Carlson Pltfs. Resp*., Dkt. No. 78-1 at 8-9; and *Warner Resp*., Dkt. No. 81 at 6-8.

[19] *Benjamin Pltfs. Memo*, Dkt. No. 1-1 at 9-12; Dkt. No. 54 at 3; *Janssen Resp*., Dkt. No. 32 at 11-12; Dkt. No. 45 at 7; *Puente Pltfs. Memo*, Dkt. No. 33 at 10-16; *Dkt. No*. 60 at 13-14; *Allen Pltfs. Memo*, Dkt. No. 34 at 7-8; and *AstraZeneca Resp*., Dkt. No. 47 at 13.

[20] *Allen Pltfs. Memo*, Dkt. No. 34 at 4-7; and *Puente Pltfs. Memo*, Dkt. No. 33 at 10-16.

Plaintiffs and the *Puente* Plaintiffs state in their papers, the Northern District of Illinois has more support than any other district. As such, it is an appropriate Transferee Court. *See e.g.*, *In re Taxotere (Docetaxel) Products Liab. Litig.*, MDL 2740, 2016 WL 5845996, at *1 (J.P.M.L. Oct. 4, 2016) (centralizing cases in the Eastern District of Louisiana after several plaintiffs' counsel and defendant supported that transferee court in the first instance or secondarily).

*2. "Speed and Effective Resolution" is most quickly found in the Northern District of Illinois.*

Counsel for the *Puente* Plaintiffs provides case management statistics in support of the District of New Jersey. However, if it is speed and effective resolution that is sought, the Northern District of Illinois has better case resolution statistics than the District of New Jersey. Per the most recent judicial statistics from June 30, 2016, each Northern District of Illinois judge had approximately 615 civil filings for the 12-month period ending on June 30, 2016. Nonetheless, the average length of time from filing to disposition was an extremely efficient 7.3 months (0.7 months quicker than New Jersey), and 38.4 months to see a case through trial (9.4 months quicker than New Jersey). Given the demonstrably more efficient nature of the Northern District of Illinois, it would serve as a very appropriate transferee forum.

Further, the reality of this litigation is that no one jurisdiction is significantly further ahead or behind the other. To that end, preliminary non-controversial orders (like an Order for Protection and ESI Protocol) do not signify a litigation is advanced.[21] *See* Original Movants' Resp. to Second Motion to Transfer, Dkt. No. 54 at 2; *see also Puente Pltfs. Resp.*, Dkt. No. 60 at 9 and 13. To date,

---

[21] To augment this point, undersigned counsel notes that the first case pending in the Northern District of Illinois, *Davis v. Janssen Pharmaceuticals, Inc.*, Case No. 1:16-cv-8838, will have a protective order in place by November 10, 2016 and 26(a)(1) disclosures completed by November 14, 2016. Case No. 1:16-cv-8838, Dkt. No. 17 (Minute Order After October 24, 2016 Status Conference).

not one deposition, expert disclosure or substantive motion—i.e., the actual stuff of litigation—has occurred in New Jersey. As such, the feigned concern of setting back the process by "several months" seems a little hollow given *no substantive work* has occurred in New Jersey. Similarly, even if the Panel were to send the cases to New Jersey, that does not mean that the Parties will adopt in total the New Jersey preliminary procedural documents. As of October 28, 2016, notices of appearance were entered by eight plaintiffs' attorneys and four attorneys for Defendants who did not taken part in these negotiations[22] and, more importantly, the Associated Cases for this MDL lists 41 cases pending in 23 districts outside of the District of New Jersey who were not been represented in these negotiations. It is likely that new counsel will join the litigation—even if the Panel centralizes and sends the case to New Jersey. Those Counsel will invariably have a point of view on what should or should not be in these preliminary order (or alternatively, may conclude the preliminary orders are appropriate and endorse them). Yet, the Original Movants contend they are "nearly finished" negotiating several of the usual pieces of a pharmaceutical MDL. To put this in perspective, this means the New Jersey plaintiffs are advocating that nearly 150 of the approximately 200 plaintiffs on file to date, 75% of the claims on file, have no representation at the negotiation table, despite their cases being on file at the time of the Panel's transfer order. In other words, unless the New Jersey proponents are intimating that the future leadership structure is already in place, it seems unlikely that these preliminary reports will not be tweaked when the transferee court appoints a leadership structure.

*3. Judge St. Eve and Judge Feinerman are highly qualified capable jurists.*

Eight of the eleven submissions that suggest a venue for these cases advocate for the Northern District of Illinois in front of Judge St. Eve or Judge Feinerman. And for good reason.

[22] Dkt. Nos. 5, 6, 9, 15, 18, 39, 42, 50, 52, 65, 69, and 77.

Judge St. Eve is well known to the Panel with over fourteen years of experience as a Federal District Judge and having overseen MDL litigation. Her reputation of having an evenhanded approach to litigation and finding the appropriate means to move through a proceeding, coupled with her experience with managing the pretrial proceedings of other MDLs, underscores that she is a strong choice to oversee a complex MDL. The familiarity of the judges in the Northern District with complex MDLs—like the SGLT-2 cases—provides additional support for her ability to oversee this litigation. Ultimately, Judge St. Eve is an appropriate choice to oversee the SGLT-2 inhibitor consolidated proceedings.

Similarly, Judge Feinerman would be an appropriate judge to oversee the pretrial proceedings. After his career in private practice developing extensive experience in complex litigation, Judge Feinerman has developed a reputation for being evenhanded and moving through cases expediently. Judge Feinerman would also be an appropriate choice to oversee the SGLT-2 litigation.

## **CONCLUSION**

As discussed in the *Schroeder* Plaintiff's opening brief, an Invokana-only MDL will leave multiple cases alleging nearly identical injuries, resulting from nearly identical drugs, with nearly identical mechanisms of action, to clog court dockets, resulting in unnecessary expenses for all parties, and leading to conflicting rulings. Accordingly, for these reasons and those outlined in their opening brief, the *Schroeder* Plaintiffs respectfully request the Panel coordinate the SGLT-2 inhibitor cases on a class-wide basis, and transfer all actions on the original Schedule of Actions, all noticed Related Actions, and all subsequently filed tag-along cases to the Northern District of Illinois for pre-trial centralization before Judge Amy J. St. Eve, Judge Gary Feinerman, or the jurist the Panel determines is most capable to oversee the litigation in the Northern District. Additionally,

should the Panel conclude a multi-manufacturer MDL is appropriate that the Panel should caption the MDL as: *In re: SGLT-2 Inhibitor Products Liability Litigation.* Should the Panel approve an Invokana-only MDL, the Schroeder Plaintiffs request the Panel transfer all cases alleging injuries caused by Invokana for coordination before Judge St. Eve, Judge Feinerman, or an alternative jurist in the Northern District of Illinois.

Dated: October 31, 2016

Respectfully Submitted,

JOHNSON BECKER, PLLC

s/Timothy J. Becker________________
Timothy J. Becker (MN Bar No. 256663)
Rolf T. Fiebiger (MN Bar No. 391138)
444 Cedar Street, Suite 1800
St. Paul, MN 55101
(612) 436-1800/ (612) 436-1801 (fax)
tbecker@johnsonbecker.com
rfiebiger@johnsonbecker.com

Counsel for Schroeder Plaintiffs